# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF FLORIDA

**Case No. _____**

THE MAD ROOM LLC D/B/A BALL AND
CHAIN, ALTOS MEXICANO, LLC D/B/A
TAQUERIAS EL MEXICANO, LITTLE
HAVANA ARTS BUILDING, LLC, AND
LA GRAN FIESTA, LLC

     *Plaintiffs*,

v.

THE CITY OF MIAMI,

     *Defendant*.

_____/


**COMPLAINT**


Maria A. Fehretdinov
Jason S. Koslowe
Coral Del Mar Lopez
**STEARNS WEAVER MILLER WEISSLER
ALHADEFF & SITTERSON, P.A.**
Museum Tower, Suite 2200
150 West Flagler Street
Miami, Florida 33130

*Attorneys for Plaintiffs*

**TABLE OF CONTENTS**

INTRODUCTION ................................................................................................4

PARTIES ...........................................................................................................7

JURISDICTION, VENUE & APPLICABLE LAW ...........................................8

FACTUAL BACKGROUND...............................................................................8

    Calle Ocho ...................................................................................................8

    Ball & Chain ................................................................................................9

    Taquerias El Mexicano ...............................................................................10

    The City of Miami's Vendetta against Plaintiffs – An Official
    Municipal Policy and Custom.....................................................................12

    The City Constantly Harasses Ball & Chain and Ultimately Shuts
    Down the Business for Over a Year ...........................................................15

    How the City Succeeded In Shutting Down Ball & Chain Through
    The Suspension of Its CO and Revocation of Its CU ................................22

    The City Failed To Follow Any Applicable Statute, Regulation,
    Code Provision and/or Ordinance in Suspending the CO and
    Revoking the CU.........................................................................................25

    The City's Actions Regarding the CO and CU Also Violate
    Florida's Private Provider Statute..............................................................29

    While Plaintiffs Try To Work with the City to Re-Open Ball &
    Chain, the City Continues Violating Its Own Processes and Acts in
    Bad Faith.....................................................................................................30

    After Colluding to Shutting Down Ball & Chain, City Issues New
    Noise Ordinance Affecting Only Ball & Chain..........................................37

    Taquerias El Mexicano Is Also Damaged by the City's Constant
    Harassment and Unlawful Conduct ...........................................................39

    Despite Taquerias Having All Proper Liquor Licenses, the City
    Continuously Raids Taquerias and Unlawfully Shuts It Down ..................43

    Again Using its Unconstitutional Ordinance, the City Succeeds In
    Shutting Down Taquerias ...........................................................................48

New Miami Chief of Police Confirms the City's Policy Against
Plaintiffs...................................................................................................................52

Damages....................................................................................................................54

CAUSES OF ACTION .................................................................................................54

COUNT I
(Substantive Due Process – 42 U.S.C. § 1983)......................................................54

COUNT II
(Substantive Due Process, Florida Constitution).........................................................56

COUNT III
(Procedural Due Process – 42 U.S.C. § 1983)..........................................................57

COUNT IV
(Procedural Due Process, Facial, Quasi-Facial, As Applied
Challenges to Ordinance/Code – 42 U.S.C. § 1983) .................................................59

COUNT V
(Equal Protection, Class of One – 42 U.S.C. § 1983).................................................61

COUNT VI
(Unlawful Search & Seizure – 42 U.S.C. § 1983)......................................................62

COUNT VII
(Violation of City Charter).........................................................................................63

COUNT VIII
(Tortious Interference) ..............................................................................................64

DEMAND FOR JURY TRIAL ....................................................................................65

STEARNS WEAVER MILLER WEISSLER ALHADEFF & SITTERSON, P.A.

Plaintiffs Mad Room LLC ("Mad Room") d/b/a Ball and Chain ("Ball & Chain"), Altos Mexicano, LLC d/b/a Taquerias El Mexicano ("Taquerias"), Little Havana Arts Building, LLC, and La Gran Fiesta, LLC (collectively, "Plaintiffs"), by and through their undersigned attorneys, bring this complaint against Defendant The City of Miami ("City of Miami" or the "City"), and allege the following:

## INTRODUCTION

1.      The City of Miami developed and deployed a deliberate policy and plan of action—devised by a City Commissioner; reified by legislative acts of the City Commission; cultivated and planned by the City Attorney and its office; implemented by all of the City's major administrative departments, including Building, Planning, Zoning, Fire, Police, Code Enforcement, and others; and effectuated through dozens of the City's professional staff and employees—to destroy Plaintiffs' fundamental and constitutionally protected rights to their real property and in their businesses.

2.      Plaintiffs own property and operate legitimate and once-thriving businesses in the heart of Miami's Calle Ocho. The City of Miami, with malicious intent, for no legitimate reason and with no lawful purpose, instituted its policy and then corrupted every organ of its municipal government in a relentless effort against Plaintiffs designed to run them and their businesses out of town.

3.      The City's vendetta against Plaintiffs runs from top to bottom—its elected officials, lawyers, professional staff, and every single department within its administrative function. The City deliberately crafted a multi-pronged policy intended to unfold in stages and build relentlessly towards its eventual goal of destroying Plaintiffs' business and arrogating their property rights. To carry out its policy, the City weaponized the very tools of government designed to protect the

health and safety of its citizens—abusing its code and code enforcement to deprive Plaintiffs of their fundamental property and business rights.  To carry out its policy, the City in turn ignored and swept aside all procedural protections, even those required by both state statute and the City's own municipal laws. To carry out its policy, the City trapped Plaintiffs in a nightmare runaround, issuing and then pulling entitlements, demanding actions and then moving the goalposts—for no legitimate purpose and with no end in sight. To carry out its policy, the City enacted two unconstitutional ordinances exclusively targeting Plaintiffs. On the very same day one of these ordinances passed, the City ultimately succeeded in shutting down one of Plaintiffs' businesses. Later, the City raided, unlawfully seized, and shut down another of Plaintiffs' businesses, on pure pretext and with no reasonable or legitimate basis. All of this, in the City's unyielding march to oust Plaintiffs from their properties.

4.     This shameful conduct was recently corroborated by the Miami Police Chief's September 24, 2021 memorandum to the City's Manager and Mayor, wherein he details that City Commissioners  used "improper political influence" and "intimidation" in order "to influence the [Miami Police Department] ("MPD") and City Code Enforcement deployment decisions;" and "provided the MPD with a target list of establishments . . . causing the MPD to investigate business establishments based on nothing more than the whims of [these] Commissioners." His statements mirrored those from almost two years ago when the prior Miami Police Chief likewise cautioned the City Manager that "the City Attorney is requesting that Miami police personnel, and other departments, conduct new site inspections at the direction of a City Commissioner…aimed at one particular business owner…to intentionally cause harm to [that] business owner" and undertaking the "selective enforcement against the business owner's properties using city ordinances," which

he described as "an unsanctioned and unlawful exercise of powers" in contravention of "the code of ethics" and "our charter."

5.      This case is not "typical" Miami politics at play.  It concerns small-minded politicians and corrupt administrators destroying the rights and property of private citizens because they refuse to kowtow to the right person or pay the right ask.

6.      Property rights are fundamental to ordered liberty under the United States and Florida Constitutions. As the Supreme Court recently stated: "[T]he protection of property rights is necessary to preserve freedom and empowers persons to shape and to plan their own destiny in a world where governments are always eager to do so for them." *Cedar Point v. Hassid*, 141 S. Ct. 2063, 2071 (2021) (citations and quotations omitted).  There is no doubt: "[p]roperty must be secure, or liberty cannot exist." *Id.*  The prototype of these protections is to guard against arbitrary and capricious use of government power to take away rights solely predicated upon a vendetta. The City has turned the very idea of government on its head, abusing the very objectives of health, safety, and protection meant to protect its businesses and people, and taking advantage of that power for crass political gain.

7.      Therefore, Plaintiffs seek damages and equitable relief pursuant to 42 U.S.C. § 1983 and under the Federal and Florida Constitutions against the City of Miami for committing acts, under color of law, with the intent and for the purpose of depriving Plaintiffs of their fundamental rights, by: (1) violating Plaintiffs' substantive and procedural due process rights through the deprivation of Plaintiffs' property rights as secured by the Fourteenth Amendment to the United States Constitution and the Florida Constitution; (2) depriving Plaintiffs equal protection under the law by intentionally treating Plaintiffs differently from others similarly situated (and having no rational basis for the disparate treatment); (3) violating Plaintiffs' Fourth

STEARNS WEAVER MILLER WEISSLER ALHADEFF & SITTERSON, P.A.

Amendment rights by conducting warrantless searches of Plaintiffs' property, and searching Plaintiffs' establishment not in conformance with the purposes and procedures of any relevant statutory scheme; (4) violating the City Charter by not adhering to its own Code provisions, and (5) interfering with Plaintiffs' business relations in violation of Florida law.

## PARTIES

8.      Plaintiff Mad Room d/b/a Ball & Chain is a Florida limited liability company with its principal place of business in Miami, Florida.  Mad Room owns and operates Ball & Chain, a popular restaurant and bar located at 1513 SW 8th Street.  Through corporate entities, Ball & Chain is owned by Bill Fuller ("Fuller"), Ben Bush, and Zack Bush.

9.      Plaintiff Taquerias is a Florida limited liability company with its principal place of business in Miami, Florida.  Altos Mexicano, LLC owns and operates Taquerias, a prominent Mexican restaurant located at 521 SW 8th Street.  Through corporate entities, Taquerias is owned by Fuller, Ben Bush, and Zack Bush.

10.     Plaintiff Little Havana Arts Building, LLC is a Florida limited liability company with its principal place of business in Miami, Florida.  Little Havana Arts Building, LLC, is the owner of the building that Ball & Chain leases to conduct its operations.  Through corporate entities, Little Havana Arts Building, LLC is owned by Fuller.

11.     Plaintiff La Gran Fiesta, LLC is a Florida limited liability company with its principal place of business in Miami, Florida.  La Gran Fiesta, LLC is the owner of the building that Taquerias leases to conduct its operations.  Through corporate entities, La Gran Fiesta, LLC is owned by Fuller, Ben Bush, and Zack Bush.

12.     Defendant City of Miami is a municipality in Miami-Dade County, Florida, organized under the laws of the State of Florida, and is therefore, subject to this Court's jurisdiction.  The City is a local government entity subject to suit under 42 U.S.C. § 1983.

## JURISDICTION, VENUE & APPLICABLE LAW

13.     This Court has subject matter jurisdiction pursuant to 42 U.S.C. § 1983 and 28 U.S.C. § 1331.

14.     Venue lies in the Southern District of Florida because the cause of action accrued and the parties are located within this district.

15.     All conditions precedent to bringing this action have been performed or waived.

## FACTUAL BACKGROUND

### Calle Ocho

16.     Plaintiffs operate Ball & Chain and Taquerias in the heart of the Calle Ocho District of Little Havana.  Over the course of the last 7 years, Plaintiffs' owners, Fuller and the Bush brothers, worked hard to create a vibrant and diverse event space through their restaurants Ball & Chain and Taquerias.  Until their unlawful shutdown, Plaintiffs' businesses provided hundreds of jobs for local residents and produced hundreds of thousands of dollars in tax revenue for the City of Miami, Miami-Dade County and the State of Florida.

17.     Plaintiffs' business is dedicated to revitalizing the neighborhood of Little Havana, helping generate economic activity and new life into the area while at the same time preserving its historical significance and cultural identity.  Through these and many other projects in the area, Plaintiffs have sought to reestablish Little Havana as a healthy, dynamic neighborhood, showcasing new cultural life while celebrating its important place in Miami's history.

STEARNS WEAVER MILLER WEISSLER ALHADEFF & SITTERSON, P.A.

18.     Plaintiffs' efforts in the neighborhood have borne significant fruit—Little Havana offers visitors many new options of sights to see, places to seek entertainment and a vibrant arts scene to enjoy, much of which retains or reflects the cultural distinction, rich history and atmosphere that make Little Havana special.  Little Havana is now a major Miami destination for tourists and locals alike.  In 2017, the National Trust for Historic Preservation declared Little Havana a national treasure.

19.     Calle Ocho is a coherent and discrete district within the City of Miami. Plaintiffs' establishments are identical in all respects relevant here to the other restaurant and entertainment establishments in that geographic area.

## Ball & Chain

20.     Keeping with their efforts to continue curating and caretaking Calle Ocho, in 2014, Plaintiffs' owners Bill Fuller, and two of his childhood friends, Ben Bush and Zack Bush, reopened the famous Ball & Chain restaurant and bar.  With the vision of restoring the venue to its past glory days, Fuller and his partners, have made Ball & Chain once again a premier entertainment destination for people of all ages, races, and nationalities.

21.     From its opening in 2014 to January 2018, Ball & Chain served the community and operated without unnecessary interference from the City.

22.     Since January 2018, however, the City, under new control, has demonstrated it has a very different idea of what it wants to accomplish with the development of Little Havana, which does not include Plaintiffs' vision for Ball & Chain and Taquerias.  The City has a shockingly different set of rules and standards for Plaintiffs, which have not been applied to other businesses in Miami and in Little Havana, in particular.

23.     Indeed, the City's policy against Ball & Chain included issuing a myriad of meritless violations that were solely intended to harass the business, and no other business in Calle Ocho. Then, after Ball & Chain worked with one of the City's own private providers and the City to remedy the "issues" the City had identified, engaged in regular telephone calls and meetings with the City throughout the process, and was accordingly issued a new CO and CU proving full compliance with the City's demands, the City undertook an unprecedented audit of that provider and falsely accused them of submitting false information to the City, which the City used as a false pretense to shut down Ball & Chain without notice. Simultaneously, the City passed two unconstitutional ordinances targeting Ball & Chain to make it exceedingly difficult for the business to ever operate profitably again.

### Taquerias El Mexicano

24.     The original owners of Taquerias opened the restaurant in Calle Ocho in 1985. Their goal was to create a celebration of Mexico in the heart of Little Havana, a goal that Plaintiffs' owners Fuller and Bush have continued to this day upon taking over its ownership in 2017.  Their flagship location on Calle Ocho and 5th Avenue became the meeting place for locals, tourists, international personalities and dignitaries who were all looking for a true Mexican experience.

25.     For 36 years, Taquerias has operated without City interference – a true welcomed addition to the neighborhood.  Until recently, Taquerias was allowed to conduct its business largely unbothered, but that all changed upon the filing of a Related Case[1] against a key Commissioner for the Commissioner's retribution against Fuller for supporting his political opponents (among other things).  That case put the City officials' misconduct in plain view as of October 11, 2018.

---

[1] *Fuller et al. v. City of Miami et al.*, Case No.: 1:18-cv-24190, U.S. District Court, Southern District of Florida (hereinafter, the "Related Case").

STEARNS WEAVER MILLER WEISSLER ALHADEFF & SITTERSON, P.A.

In retaliation for the filing of the Related Case, the City honed in on Taquerias and began harassing it through constant inspections and "walk-throughs," that appeared as a drug bust to the larger public due to the sheer amount of officers attending each raid—usually including 10 or more officers wearing bulletproof vests and often fully armed.  These "inspections" have escalated in recent months to include multiple code enforcement raids, comprised of dozens of police officers, fire department officials, code enforcement officials and inspectors with the Division of Alcohol Beverages and Tobacco, Bureau of Law Enforcement ("ABT"), who operate under the guise of checking for alcohol licenses and permits that are easily accessible to the City through its own electronic system and do not require physical visits.  These raids are deliberately conducted on Friday and Saturday nights, with the sole purpose of causing substantial business disruption and monetary harm to Taquerias during peak business hours.

26.     Importantly, these incessant and damaging raids have not resulted in a single liquor license violation by Taquerias.  Indeed, ABT—the authority on the issue—confirmed, during an inspection in May 2021, that Taquerias fully complies with its use as a restaurant consistent with its alcohol license.  Unfortunately, ABT's confirmation that Taquerias complies with its validly issued liquor license has not stopped the City from further intimidating the owners, their employees, and above all, their patrons by conducting gestapo-style raids. Indeed, the City went so far as to shut down Taquerias and arrest Taquerias' General Manager in front of all of his employees in one such raid, only to have the State Attorneys' Office promptly dismiss the frivolous charges. Thus, the only possible reason for the City's continual "inspections" of Taquerias was to ensure a loss of business to run Plaintiffs out of town.

27.     As further explained below, once the liquor license issue was finally put to rest because Taquerias had at all times operated with the appropriate license, the City turned to its tried

STEARNS WEAVER MILLER WEISSLER ALHADEFF & SITTERSON, P.A.

and true "playbook" strategy to shut down Taquerias, through issuing violations for work performed many years ago without a permit and relying on a technicality about an outdoor staircase that the City staff had previously approved. Thus, both Ball & Chain and Taquerias were unjustifiably shut down by the City of Miami.

**The City of Miami's Vendetta against Plaintiffs – An Official
Municipal Policy and Custom**

28.     At the end of 2017, the City created a plan to target all properties owned by Plaintiffs' owner Fuller in District 3, including Ball & Chain and Taquerias. In essence, the City's plan to deprive Plaintiffs of their property and business rights consists of weaponizing code enforcement and all the various departments of the City to concoct a set of violations targeted at the Fuller-owned businesses that would eventually lead to a deprivation of property rights, while attempting to make it all look "legal" and "legitimate." The scheme has become the official policy of the City of Miami and is being effectuated as planned. This plan is not targeted at any other businesses in Calle Ocho, other than Plaintiffs.

29.     As evidenced below, Fuller's involvement with these businesses is the primary pretextual reason for the City's vendetta against Plaintiffs. Indeed, multiple current and former City employees have admitted that this plan was in place. The City officials involved include City commissioners, the City Manager, the City Attorney, the Deputy City Manager and Code Enforcement Director, countless inspectors, among others. The plan entailed having these City officials patrol down Calle Ocho specifically targeting Fuller's businesses.

30.     In a meeting with the City Attorney, City Commissioner Carollo brazenly confirmed that the plan was for the City to "take these guys' property" and "run [them] to the ground." The City Commissioner's plan was no secret, as he made it clear to all City staff from the moment he took office on December 2, 2017. The City Commissioner first used former City

-12-

Manager Emilio Gonzalez to effectuate the harassment against Plaintiffs, as evidenced below, which ramped up once the current City Manager Noriega took office, on February 24, 2020.  City Commissioner Carollo and the City Manager have been relentless in their pursuit against Plaintiffs, ultimately succeeding in shutting down Ball & Chain and Taquerias with their plan.

31.     Towards developing and implementing the City's policy, the City Attorney prepared and provided the former City Manager a list of only Fuller-owned properties (*i.e.,* including Plaintiffs) for Code Enforcement to investigate.  Upon the former City Manager warning the City Attorney that such actions would constitute "targeting," which Code Enforcement was not allowed to undertake, the City instead drafted a plan a week later adding two more establishments not owned by Fuller to the list. Notwithstanding the City's transparent attempt to cover up their true targets, the City proceeded to focus all of its enforcement efforts on Fuller's businesses.

32.     On information and belief, as part of the official policy, the City forbids employees from emailing each other or anyone externally about any of these issues related to Plaintiffs to not leave a trail.  Employees that do not follow the plan against Plaintiffs are penalized and terrorized, as the City has made clear that their jobs will be at stake.

33.     This web of City officials and employees are united against Plaintiffs.  City commissioners, who exercised informal control over Code Enforcement through the Planning and Zoning Department; the City Manager; the Police Chief; Code Enforcement Directors; the Fire Marshall; the head of the Building Department; and the City Attorney's office, through the help of attorneys working in that office, have and are engaged in this scheme of tortious conduct.  The City has enabled and contributed to this plan by providing all of its available resources to deprive Plaintiffs of their property rights.

STEARNS WEAVER MILLER WEISSLER ALHADEFF & SITTERSON, P.A.

34.     These top City officials permitted and condoned this policy and plan of unconstitutional violations against Plaintiffs.  They attended vexatious raids and "inspections" and have spoken in favor of the City's plans to deprive Plaintiffs of their property rights.  Moreover, these top officials have followed the plan and have carried out the unconstitutional conduct on behalf of the City.  That is, the City has deployed City employees, police officers, fire officials, building officials, code enforcement officers, the zoning department, and the City Attorney to carry out its unconstitutional plan.  Short of that, the City has done nothing to stop these employees, and, to the contrary, has supported their illicit conduct.

35.     In initial response to this conduct, on or about March 12, 2018, Fuller filed an Ethics Complaint against certain City officials with the Miami-Dade Commission on Ethics and Public Trust (the "Ethics Complaint").  The Ethics Complaint was based on all of the information included in the Related Case's Complaint, filed on October 11, 2018.  Unsurprisingly, after the Ethics Complaint was filed, City officials attempted to tamper with the witnesses in those proceedings to get them to perjure themselves and exempt these City officials from any unethical findings.  Some of those witnesses who were City employees and refused to lie on the accused City officials' behalf, were ultimately terminated.  The City's message to its employees was clear: either follow the plan against Plaintiffs, or suffer the consequences.  The Ethics Complaint did result in a short halt of the City's harassment to Plaintiffs' businesses for about five months.  Not even a noise complaint was filed during that time.  At which point Plaintiffs' owner requested permission to withdraw the Ethics Complaint in August 2018, in order to present a more robust showing of the actual harassment that had occurred through the Related Case in federal court.  The City took the withdrawal of the Ethics Complaint as a green light to resume and even ramp up their attacks on Plaintiffs, which became known amongst City officials as "Round 2" of the City's harassment

policy.  Immediately after the withdrawal of the Ethics Complaint, the City again pressed forward with its plan to destroy Plaintiffs' property rights and businesses.

**The City Constantly Harasses Ball & Chain and**
**Ultimately Shuts Down the Business for Over a Year**

36.     The City's vendetta has been on display through the City's effort to use its "task force" to ruin Plaintiffs' most profitable business in Little Havana: Ball & Chain.  At every step of the way, Plaintiffs bent over backwards to meet the City's demands and address any issues raised by the City, whether warranted or not.  Yet, the City has continued its relentless pursuit of manufacturing violations against Ball & Chain, ultimately resulting in the suspension of its Certificate of Occupancy ("CO") by the Building Official and the revocation of its Certificate of Use ("CU") by the Zoning Administrator.  Ironically, this suspension of the CO stems from the work performed by a reputable and highly recommended Private Provider arm of the City—Ortus Engineering, Inc. ("Ortus" or "Private Provider")—to correct the violations that had been issued by the City.

37.     Part of the City's plan to harass Plaintiffs and tortiously interfere with Plaintiffs' property rights consists of laying the pre-textual groundwork to shut the businesses down through constant notices and "violations."  The City was not acting pursuant to the City Code's legitimate purpose of maintaining the health and safety of its citizens—rather, it was all part of their scheme to run Plaintiffs out of town.  The volume of harassing activity was unique to Plaintiffs' properties and entirely outside of scope of the necessary actions to ensure compliance with the City Code and other regulations.  At all relevant times, no other business in Calle Ocho had been subjected to this kind of harassing activity.

38.     The City has taken the following unjustifiable actions, among others, against Ball & Chain:

STEARNS WEAVER MILLER WEISSLER ALHADEFF & SITTERSON, P.A.

a.     On February 18, 2018, City officials entered Ball & Chain's parking lot and began photographing parked cars. A City Commissioner then lowered his car window, flashed his City of Miami identification telling the valet attendant that he was performing an "official investigation" of the valet operation and lot and that he was doing so in his official capacity as a City of Miami Commissioner.  After one of Ball & Chain's employees showed him the parking lot and valet operation permits, City officials exited the lot.

b.     Eleven days later, on March 14, 2018, City officials arranged for a "park and walk" with numerous City employees, including a police officer, two Code Enforcement personnel, and other City officials, in direct violation of the City Charter.  Prior to the walk, City officials visited residents in a building located to the rear of Ball & Chain on 7th Street, close to 15th Avenue, and provided the residents with personal cell phone numbers, and prepped them to complain of loud music after 9:00 pm at Ball & Chain.  Prior to City officials' visits, there had been very few noise complaints about Ball & Chain but after the City officials had reached out to the neighbors, the complaints became an onslaught (orchestrated by the City officials).  To ensure that they could defend any false reports of noise violations, Ball & Chain owners then spent significant resources to implement high-tech noise cancellation equipment and a master switch to control the volume of the music automatically depending on the time of the night.  Staff could not bypass this master switch.  Additionally, Ball & Chain re-positioned stage speakers, eliminated use of musician monitors transitioning to in-ear monitors, and changed the times of live music performances to reduce any noise issues.  Even with these high-tech devices and preemptive measures ensuring that Ball & Chain would always comply with the allowed decibels under current regulations, the unwarranted noise citations continued.

c.     On July 6, 2018, Ball & Chain received a Fire Department Notice of Violation for not maintaining guest count clickers in the front, the interior occupancy being higher than the posted load, and a rear nonconforming exit.  All of these were simply excuses to give said violation.  Namely, there was no violation of occupancy as the establishment maintained clickers to control occupancy loads at all times; the northwest exist was conforming; and Ball & Chain had been instructed by the City to black out "exit" signs posted.

d.     On August 28, 2018, the City's fire inspector visited Ball & Chain, and confirmed that the only reason he was there was because the "chief sent him."  Finding no violations, he gave the premises an "all clear."

e.     On August 31, 2018, code enforcement inspectors again visited Ball & Chain without any basis to do so, finding no wrongdoing.

STEARNS WEAVER MILLER WEISSLER ALHADEFF & SITTERSON, P.A.

f.     On September 14, 2018, code enforcement inspectors again visited Ball & Chain to check valet permits, and again found no wrongdoing.

g.     On September 15, 2018, at approximately 12:30 am, three City of Miami Code Enforcement Officers and a police officer showed up at Ball & Chain to complain about alleged illegal parking on a lot owned by Plaintiffs that was adjacent to Ball & Chain, following an "anonymous" tip. The employees of Ball & Chain utilize the lot to park their cars while they are at work, which is zoned commercial and therefore may be used for public parking. Still, Code Enforcement officers issued Plaintiffs a citation for illegal parking and failure to have a valid CU, and without notice or an opportunity to be heard, forced 25 employees to stop working and immediately move their cars. When Plaintiffs investigated the incident, they found it was a City Commissioner who had texted the City Manager on September 15, 2018 stating "Mr. manager 1530 sw 7 street still parking illegally and music blaring in violation of city code." Ultimately, Code Enforcement admitted to Plaintiffs that the lot was properly zoned and could be used for parking, and that no other violations should have been issued.

h.     Later on, a public record request showed that Ball & Chain had apparently also received a noise citation the night of September 15, 2018. Plaintiffs challenged this citation as they had not received any noise violations that night and there were no decibel readings taken, in violation of Code Enforcement's official policy. Noise complaints (even bogus ones, as here) are extremely important, as the City claims it can force Ball & Chain to shut down permanently with just three such (false) complaints. And, as explained below, they give the City cover to pass ordinances—solely directed at Plaintiffs—directly tied to this noise issue.

i.     On September 27, 2018, multiple code enforcement inspectors and police officers surrounded Ball & Chain. They did not cite or inspect the inside of the area, and, again, found no violation.

j.     On October 2, 2018, a Ball & Chain manager noticed a City commissioner and a member of the Code Enforcement Board standing next to the parking lot in front of some residences discussing the fact that the residences were over 100 feet away from the music playing at the bar. Then the City officers began knocking on doors to ask the residents about the music, to see if they could find any to file a noise complaint against Ball & Chain. This notwithstanding, members of the Code Enforcement Board are prohibited from conducting personal investigations on matters that will be brought before the Board. Ball & Chain's manager followed up with the neighbors, who stated that they had no issues with the music coming from Ball & Chain and that most times they did not notice it.

-17-

k.      On October 17, 2018, code enforcement inspectors again issued another unwarranted noise violation to Ball & Chain.

l.      On October 18, 2018, a City Commissioner was spotted repeatedly circling Ball & Chain in city vehicle #214467.  When spotted by a staff member of Ball & Chain, the Commissioner quickly drove away.

m.      On November 16, 2018, a City Commissioner was again spotted loitering the Ball & Chain property, this time accompanied by police officers, and again found no wrongdoing.

n.      On February 20, 2019, the City sent the Department of Solid Waste officials to inspect on-site, finding no wrongdoing.

o.      After receiving a code violation for structural repairs, on March 26, 2019, Ball & Chain hired Ortus to assist with curing said violations and initiated a new permit application under BD19-005508-001 for remodeling/repairs with a very limited scope of work.

p.      On March 27, 2019, a City inspector issued Violation CE2019005418, citing Ball & Chain for failure to "pull/obtain building permit for the construction work performed (overhang attached to structure, floor windows, interior remodeling, stage/band shell)."  Plaintiffs were directed to prepare plans to address these issues by April 08, 2019.  Immediately, Plaintiffs, through Ortus, began diligently and tirelessly working with the City to develop and submit a plan to obtain an after-the-fact permit for the work.  Despite Plaintiffs' diligent efforts, the City intentionally delayed and did not issue the actual permit until March 11, 2020, *one year after* the building permit application was filed with the City of Miami.

q.      On September 12, 2019, a City Inspector again inspected Ball & Chain, yet again finding no violation.

r.      On October 15, 2019, Ball & Chain filed a warrant application for outdoor dining (the "Warrant"), specifically referencing alcohol use in its letter of intent, and thereafter, uploaded all required plans to the City.  Ball & Chain worked diligently at every step to provide the City with all required documentation to ensure alcohol use in the outdoor area.  Importantly, all of the documents and information provided to the City indicated that Ball & Chain sought permits for alcohol use and consumption.  The City never raised concerns about Ball & Chain's alcohol use request and moved forward with the Warrant application.  One year after the original filing of the Warrant application (*i.e.*, by October 19, 2020), the City was required to issue a Final Warrant Decision Letter.  The City provided Plaintiffs a draft of the Final Warrant Decision Letter for comments, which were addressed by Plaintiffs' counsel.  Thereafter, despite multiple requests by

Ball & Chain, the City never issued the Final Warrant Decision Letter, further pushing the timeline on the necessary approval. Instead, the City delayed an entire year after Ball & Chain filed its application to inform it for the first time that Ball & Chain would have to file a separate alcohol warrant application if it wanted its outdoor area to be approved for alcohol use and consumption—a process that would take, at least, another year to get approved. Thus, Ball & Chain requested that, at a minimum, the City issue its Final Warrant Decision Letter, so that Ball & Chain could open its outdoor space, and proposed to add a condition to the existing warrant that outdoor alcohol consumption could be approved by a separate warrant.[2] Yet, the City continued its harassment of Plaintiffs and insisted that the Outdoor Dining Warrant could not be approved separately from the Warrant for outdoor liquor consumption—despite that, the City's position was at odds with its own Code, Miami 21. After several months of the City's even further delay and abuse wherein the City insisted that the warrants needed to be linked, the City finally issued the outdoor dining Warrant in January 2021 and the alcohol warrant in April 2021. On information and belief, the same planning director overseeing Ball & Chain's Warrant application quit his position with the City because of the City's malfeasance with these issues.

s.    On January 7, 2020, police officers entered Ball & Chain looking for a "Cesar," and again finding no violation.

t.    On January 8, 2020, code enforcement conducted a health inspection at Ball & Chain, again finding no violation.

u.    On March 7, 2020, Fire Department officials visited Ball & Chain for a Fire Inspection onsite, finding "we're all good on all" matters.

v.    On March 20, 2020, Florida Governor De Santis banned restaurant dining due to the COVID-19 pandemic, forcing Ball & Chain to close its doors temporarily. On April 21, 2020, police officers visited Ball & Chain

---

[2] This pending separate warrant is normally used for other contingent approvals on warrants. Indeed, while the City refused to extend Ball & Chain's liquor license to its outdoor space via an administrative decision, it previously approved Ball & Chain's competitor and next-door neighbor Cubaocho's request to extend its alcohol warrant through the exact same minor modification process that Ball & Chain requested, but was unfairly denied by the City. Instead, Ball & Chain was required to go through a time-consuming and costly alcohol warrant process. The City forced Ball & Chain to jump through hoops to obtain a warrant not only to delay Ball & Chain's permits, but also because a separate warrant process would require that Ball & Chain meet more stringent requirements related to noise complaints, which (as noted *supra*) has been a key part of the City's plan to shut down Plaintiffs. All the while, Ball & Chain's competitors have been given concession after concession from the City.

STEARNS WEAVER MILLER WEISSLER ALHADEFF & SITTERSON, P.A.

through a "referral," alleging Ball & Chain was operating in violation of COVID restrictions, but failed, again, to find any violation.  Around May 16, 2020, again another police officer went to Ball & Chain to check the current CU, which was current with no issues.  Around May 27, 2020, Governor De Santis passed Executive Order 20-11 Section 3(b) allowing the opening of restaurants.  At 9 p.m. on May 26, 2020, the night before Ball & Chain was set to open pursuant to this Order—and after having spent over $30,000 in food products, labor costs, and safety precaution installations in preparation for the opening—the City Manager enacted Amendment No. 1 to Order 20-11, specifically excluding a "tavern" from being able to open, with the *sole purpose of singling out Ball & Chain*. Two weeks later, the day before an injunctive relief hearing on this issue was set to take place, the City adopted the County's Amended Emergency Order 23-20 and determined that certain alcohol establishments with 509 Licenses could open immediately.  Unsurprisingly, the City still found a way to keep Ball & Chain closed, erroneously determining that it did not possess a City Business Tax Receipt (BTR) for a "restaurant" or "food service establishment."  The City eventually admitted that a "tavern" like Ball & Chain does not need to have a BTR to operate in the City—it only requires a CU. Therefore, unlike its competitors, Ball & Chain was unlawfully prevented from reopening pursuant to Emergency Order 23-20.

w.      On September 11, 2020, the Building Official issued the CO to Ball & Chain in accordance with the approved plans prepared by Saladino Design Studios correcting all Code Violations issued through that date to Ball & Chain.

x.      On October 5, 2020, the City passed on first reading Ordinance No. 13936 sponsored by Commissioner Carollo to provide for the "inclusion of building code violations as a reason for revocation of certificates of use" (hereinafter the "CU Revocation Ordinance").

y.      Sometime between September 11, 2020 and October 5, 2020, the City initiated an *unprecedented* audit of its own private provider Ortus, which was completed on October 13, 2020.  Plaintiffs nor Ortus were provided any notice of the audit.

39.     Then, the City's ultimate plan to shut down Ball & Chain came to fruition:

a.      On October 22, 2020, the City adopted Ordinance No. 13936 "to provide for the inclusion of building code violations as a reason for revocation of certificates of use."

b.      Thereafter on October 22, 2020, unsurprisingly, the head of the Building Department, solely by way of certified letter, notified Plaintiffs that their CO was suspended as a result of the City's audit revealing that "the

Certificate of Occupancy was provided based on incomplete, misleading, and/or erroneous information as it relates to the requirements for fire safety and the American with Disabilities Act."

c.      The Zoning Administrator, also by way of certified mail, simultaneously notified Plaintiffs of the revocation of their Certificates of Use issued in 2010 and 2014, citing the suspension of the CO as the basis of the revocation of the CU.

d.      Also on October 22, 2020, the City passed on first reading Ordinance No. 13941 (hereinafter, the "Noise Ordinance") sponsored by Commissioner Carollo to "provide for the prohibition of outdoor music between the hours of 8:00 p.m. to 8:00 a.m. the following day in areas that share a property line with any property that has a residential use."

e.      Putting the final nail in the coffin, on November 19, 2020, the City adopted on second reading that Ordinance No. 13941 with several amendments prohibiting outdoor music between the hours of 10:00 p.m. to 8:00 a.m., and exempting *all* business in the City of Miami *except* Ball & Chain.

40.      Since the City unjustifiably shut down Ball & Chain, it has been working diligently to reopen the premises but the City continues to make unreasonable and new demands and requests preventing the business from opening.

41.      For all Code violations, the City must follow strict procedures, including that it allow the businesses 30 days to cure any alleged violations and to request a hearing before a special master. Then, only after a business has not cured the violation within the allotted time, can the City fine the business every day until the violation is cured. If not cured, the fines will turn into a lien, on which the City may then foreclose. The City can only foreclose on the lien through a specific judicial process ultimately allowing the City to sell the property. *See generally* City Code, §§ 2-814 *et al.*[3]

---

[3] As discussed *infra*, the City's code enforcement procedure is modeled after Fla. Stat. § 162.06. Title XI, Chapter 162 of the Florida Statutes, titled County or Municipal Code Enforcement, empowers municipalities to adopt alternate code enforcement procedures, but maintains the

42.     Despite all of these strict procedures and protections, the City bypassed all forms of due process and imposed a draconian measure to shut down Ball & Chain.  During the relevant timeframe, no other business in Calle Ocho has been shut down in this manner.

### How the City Succeeded In Shutting Down Ball & Chain
### Through The Suspension of Its CO and Revocation of Its CU

43.     The City implemented a specific, targeted plan that ultimately worked in shutting down Ball & Chain.

44.     As stated above, on March 27, 2019, Ball & Chain was cited for failing to "pull/obtain building permit for the construction work performed (overhang attached to structure, floor windows, interior remodeling, stage/band shell)."  Despite that Plaintiffs disagreed with the merits underlying the supposed violation, Plaintiffs nevertheless worked diligently with the City to develop and submit a plan to cure the "issues."  Ball & Chain's only goal was to work with the City to alleviate all of its concerns and keep Ball & Chain's doors open, so it filed for a new building permit on April 15, 2019.  Going the extra mile, on or about May 2019, Plaintiffs hired Ortus to assist in curing the four alleged issues regarding the construction work performed and assisting with the new permit process.[4]

45.     Under Florida's private provider statute, Section 553.791, companies like Ortus offer services to the public to "stand in" for the local building and code enforcement division.  In essence, a company like Ball & Chain pays Ortus to review plans and applications, and other documents, and certify that those documents comply with the applicable codes, rules, and

---

Florida Statutes are the baseline of the minimum procedures that must be followed for any code enforcement violations.

[4] This Complaint does not address Ortus' separate violation of its contract with Plaintiffs related to the work performed by the Private Provider.

STEARNS WEAVER MILLER WEISSLER ALHADEFF & SITTERSON, P.A.

regulations of the municipality.  Despite that the private provider charges the customer—here, Ball & Chain—a fee for providing these services, at all times the private provider is acting as an agent of and extension of the municipality in reviewing the documents for approval. Ortus then submits the documents and their approval directly to the City, which issues the appropriate permits, etc., based upon Ortus's—and only Ortus's—representations.

46.    Plaintiffs worked tirelessly with the City and Ortus for *almost a full year* to finalize a very specific scope of work included in the plans and the building permit, which the City eventually approved on March 11, 2020.

47.    Ball & Chain then hired licensed professionals to complete work in accordance with the approved building permit plans.  The work was conducted during the City's forced shut down. From around June 10, 2020 to August 28, 2020, Ortus, on behalf of Ball & Chain, filed all required affidavits (i.e. plumbing, electric, storm shutters) mandated by the City and Section 553.791.

48.    Plaintiffs employed counsel to work with the City to have an all department inspection of Ball & Chain, ensuring compliance with all applicable regulations.  The City was aware of the work being done and approved the completion of all the improvements completed. In fact, the City identified for Ball & Chain the improvements that needed to be completed to bring Ball & Chain into compliance with the City Building Code. *At no point* did the City object to the work that was done at the request of the City – after many meetings and pertinent analysis – in order to ensure compliance with the City and Florida Building Code.

49.    Based on these submissions and after a thorough walkthrough with the appropriate City departments, on or about September 11, 2020, the City's Building Department had no choice but to issue Ball & Chain its CO, as required under the law.

50.     Yet, upon learning that a CO had to be issued under the Code, the City had to find another way to try to shut Ball & Chain down.

51.     Thus, the City contrived an unprecedented "audit" of its Private Provider Ortus, pursuant to Florida Statutes § 553.791(18)—even though it had worked with Ortus for more than a year in the process and had reviewed its plans and issued the CO according to those plans. Indeed, the City's Unsafe Structures Department approved of all of the work *prior* to the City issuing Ball & Chain its new CO and CU. Under City Code, the only actions that the City could take in such audit was to confirm that the required affidavits by the Private Provider were filed and that inspections were completed.  Yet, despite this limited scope, the City illegally maneuvered a way to shut down Ball & Chain.

52.     There were *only two* Calle Ocho businesses of which the City chose to "audit": Ball & Chain and the Tower Hotel, both of which are owned by Fuller.  Indeed, in its five years of doing business with the City, even dealing with complex, high-rise properties, Ortus had never been audited.  It was only after Ortus began working on the Fuller-owned businesses did the City see the need to do so.

53.     On October 22, 2020, Ball & Chain received a letter from the City informing Ball & Chain that based on the City's "review of permitting by private providers," "[the City was] hereby suspending the Certificate of Occupancy No. BD19005508CO pursuant to Florida Building Code Section 111.4.[5]"  According to the City, the City's audit revealed, "**The Certificate of**

───────────────

[5] Section 111.4 under "Certificate of Occupancy" states: "A Certificate of Completion is proof that a structure or system is complete and for certain types of permits is released for use and may be connected to a utility system. This certificate does not grant authority to occupy a building, such as shell building, prior to the issuance of a Certificate of Occupancy."  It is wholly unclear which part of Section 111.4 allows the City to suspend its CO as stated in its letter.

-24-

Occupancy was based on *incomplete, misleading, and/or erroneous information* as it relates to the requirements for fire safety and the Americans with Disabilities Act ['ADA']." The suspension took place immediately and the City ordered Ball & Chain closed.

54.     Contemporaneously with the suspension of the CO, and as a result of the City's pre-textual audit of Ortus, the City informed Ball & Chain that its CUs "Nos. 2010-000808 and 1405-001154 [were being] revoked pursuant to Section 2-211(b) of the Code of the City of Miami" because "[t]he Building Certificate of Occupancy, issued on September 11, 2020, [had] been suspended resulting in the revocation" of the CU.  That is, because the City had suspended the CO, the City believed it could consequently revoke its CU.

55.     The City's unwarranted revocation of Ball & Chain's CU was the key to shutting down the business, as Ball & Chain could not operate without it.  The City implemented its malicious plan not only by manufacturing a baseless audit but also by taking the extreme measure of passing a law—Ordinance No. 13936, which was (not coincidentally) passed on the same day that the City revoked Ball & Chain's CO and CU—in order to purportedly justify its ability to strip Plaintiffs of both of its certificates without any warning or ability to remedy the ruthless measure.

### The City Failed To Follow Any Applicable Statute, Regulation, Code Provision and/or Ordinance in Suspending the CO and Revoking the CU

56.     In its October 22, 2020 letters, the City pretends as if its unprecedented audit of Ortus triggers the suspension of Ball & Chain's CO and revocation of the CU.  Yet, that is demonstrably false and nonsensical for at least three reasons.

57.     *First*, under the private provider statute, Florida Statutes Section 553.791, the City is only allowed to investigate whether Ortus acted according to its responsibilities pursuant to the

STEARNS WEAVER MILLER WEISSLER ALHADEFF & SITTERSON, P.A.

statute and the scope of work for which it was hired.[6]  Yet, Ortus was only tasked with reviewing

plans and applications related to the specific cited violations from March 27, 2019: for Ball &

Chain's failure to "pull/obtain building permit for the construction work performed (overhang

attached to structure, floor windows, interior remodeling, and stage/band shell)."  Ortus' work had

*absolutely nothing to do* with Ball & Chain's requirement for fire safety or the ADA.  This makes

sense, because fire safety is strictly under the purview of the City and its Fire Department and

cannot be delegated to a private provider.  Thus, the City could never have conducted an audit and

then suspend Plaintiffs' CO and revoked its CU for improper paperwork submitted by the private

provider, which had nothing to do with fire safety or ADA issues.  Moreover, the remedies under

the statute as set forth in Section 553.791(13) do not contemplate suspension of the issued CO.

The only remedies contemplated are: (i) a meeting by the parties to resolve the issues (which never

occurred in this matter); (ii) review by the Enforcement Agency Board of Appeal (which in this

matter as to the CO is the County Board of Rules and Appeals ("BORA"), explained further

below); (iii) a stop work order which is allowed only if a condition of the Building site constitutes

an immediate threat to the Public Safety and Welfare (and cannot possibly be the case here where

the City approved all building plans, participated in the final inspections and issued the CU and

CO based on the completion of the Improvements).Importantly, the private provider did not submit

any documents related to fire safety.

58.     Second, any issues related to a necessary Automatic Sprinkler System as part of the

Fire Provision of the Building Code, could not have emanated from the Ortus audit or scope of

---

[6] Section 553.791(1)(B) specifically states "Local Building Officials may not replicate the plan
review or inspections performed by the Private Provider."

work.  The question of whether "the Automatic Sprinkler System was necessary" was outside of the scope of the Ortus work and the plans submitted to the City and approved by the City on March 11, 2020.  Thus, the City could never have used the Ortus audit as a legitimate reason for suspending Plaintiffs' CO and revoking their CU.

59.     *Second*, if the City actually had a legitimate "fire safety" concern, it had two options—neither of which permitted it to strip Ball & Chain of its CO.  (1) Under Code Section 19-26, upon finding "evidence . . . establishing a violation" of the Fire Prevention Code, "the city's chief fire code enforcement official . . . may issue . . . a notice to correct the violation or a citation to cease the violation" with an opportunity to be heard and to cure said violation; or (2) Under Code Section 19-27, and only upon a finding of a "reasonable likelihood of imminent endangerment to life, health or property because of a threatened violation" of the Fire Prevention Code, can the "city's chief fire code enforcement official . . . [t]ake any action necessary to prevent such a violation."  The City cites "fire safety" concerns as the purported reason for its decision, but does not rely on either Section 19-26 nor 19-27.  Either way, the City has violated its own processes.  Under Section 19-26, the City failed to notice the violation and give Ball & Chain an opportunity to cure and be heard.  Under Section 19-27, the City failed to find *any* conditions at Ball & Chain causing "reasonable likelihood of imminent endangerment to life, health or property," nor could they, as there were no "fire safety" concerns at the establishment due to the fire sprinkler issue.  Without any of these explicit findings, the City could have never legally shut down the establishment indiscriminately.

60.     *Lastly*, the section cited by the Zoning Director as the reason for the City's decision to revoke Ball & Chain's CU – Section 2-211(b) of the City Code – provides that a zoning administrator "shall revoke a certificate of use" if a business commits any of a list of numbered

violations.[7] While the City does not specify, the City could only be relying on Section 2-211(b)(1) or 2-211(b)(7).  However, Ball & Chain is not the "applicant" under these sections subject to penalties – Ortus is.  Thus, Ball & Chain could not be penalized because it was Ortus, the City's own private provider (stepping in the shoes of the City), who submitted the application and the statements contained therein, not Ball & Chain.  In addition, even if Ortus' applications could have any bearing on this decision, the applications were only submitted in relation to Ball & Chain's CO – **not the CU**.  In fact, the CUs in this case, were issued in 2010 and 2014, prior to any involvement by Ortus.  Thus, Ortus' application could have in no way ever affected Ball & Chain's CU.  Lastly, there were no uncured violations at the time that the City revoked the CU pursuant to 2-211(b)(7). Simply put, there is no connection between the building permit and the applications for the CO and Ball & Chain's CU, or any inspections regarding fire safety done in relation to the CU.

---

[7] "b) **Revocation** of certificate of use. The zoning administrator **shall** revoke a certificate of use for any of, but not limited to, the following reasons:
  1) The applicant provided a material false statement in the application or in the supplemental or additional statements of fact or studies required by the city.
  2) There is a failure to comply with the terms or conditions of the certificate of use.
  3) There is a violation of the provisions of this division.
  4) The certificate of use holder subsequent to being issued a certificate of use, has been convicted of, or has pled guilty to, a violation of a law of Florida, or ordinance of Miami - Dade County or the city, which violation resulted from actions relating to the terms or conditions of the certificate of use.
  5) The certificate of use holder is engaging or has engaged in an activity from the proposed premises that is not in compliance with a zoning ordinance or other city ordinance.
  6) The business tax receipt ("BTR") for the certificate of use holder has been denied, suspended or revoked.
  7) There is a violation of Chapter 10 of the City Code, including but not limited to failure to obtain a forty ( 40) year certification."

City of Miami Code of Ordinances, Section 2-211, as amended by Ordinance 13936 (emphasis added).

61.     In conclusion, the above procedural deprivations and substantive falsehoods, further prove that the City's entire process was pre-textual, and part of the City's overarching plan to destroy the business and deprive Plaintiffs entirely of their property rights.  On top of the City having an unlawful goal—to shut Ball & Chain—they failed to follow their own processes in doing so.

### The City's Actions Regarding the CO and CU Also Violate
### Florida's Private Provider Statute

62.     Once the Private Provider submitted its Affidavit of Compliance/Completion, City Code prohibited the City from, months later, contesting the actions and approvals of the Private Provider, as it attempted to do by way of its suspension of the CO and revocation of the CU.

63.     By the time the City made its decision on October 22, 2020, the issued Building Permit was closed and Certificate of Completion for all work in accordance with the Permit had been provided by the Private Provider to the City. The City filed no objections to the work done within the strict time limits provided by Florida Statutes § 553.79 (12), which provides:

> [n]o more than 2 business days after receipt of a request for a certificate of occupancy or certificate of completion and the applicant's presentation of a certificate of compliance and approval of all other government approvals required by law, the local building official shall issue the certificate of occupancy or certificate of completion or provide a notice to the applicant identifying the specific deficiencies, as well as the specific code chapters and sections.  **If the local building official does not provide notice of the deficiencies within the prescribed 2-day period, the request for a certificate of occupancy or certificate of completion shall be deemed granted and the certificate of occupancy or certificate of completion shall be issued by the local building official on the next business day**.

(Emphasis added).

64.     Here, the City of Miami issued the CO on September 11, 2020. On October 22, 2020, *more than a month later*, and well-over the allowed 2-day period, the City suspended the CO predicated on "incomplete, misleading, and/or erroneous information as it relates to the

requirements for fire safety and the Americans with Disabilities Act," and thereafter revoked the CU.

65.     Thus, the City plainly failed to comply with the deadline set forth in the Statute.

## While Plaintiffs Try To Work with the City to Re-Open Ball & Chain, the City Continues Violating Its Own Processes and Acts in Bad Faith

66.     Upon receiving the City's October 22, 2020 letters, Ball & Chain submitted two appeals to the City of Miami Planning and Zoning Board ("PZAB Appeal") and to the Board of Rules and Appeals ("BORA Appeal"), on November 5 and November 18, 2020, respectively. These appeals set forth all of the reasons why the City's decision was erroneous and contrary to all applicable regulations and laws.

67.     The PZAB Appeal focused on the revocation of the CU, as that is under the purview of the Zoning Department.  The BORA Appeal focused on the CO, specifically, the building official's determination after the audit that the scope of work triggered a Level 3 review.

68.     The City responded to the appeals by raising new alleged issues and unfounded explanations to allegedly support its decision to suspend Ball & Chain's CO and revoke the CU.

69.     First, acting outside the City's permitted scope of the "audit" of Ortus, the City analyzed the Microfilm records and found that work done at Ball & Chain post-2008 had allegedly been done without a permit.  According to the City, the as-built[8] plan, prepared by the architect of record as part of the building permit submittal in 2019, should have contained improvements that

---

[8] "As-built" essentially means "this is exactly what was here" on the date of the Microfilm records. Of importance, Ball & Chain has for years been a thriving business under current and compliant CO/CU's for nightclub and restaurant use.  Ball & Chain in fact, obtained its 40/50 year recertification in 2016, without a single issue.  That is, the City had already recently reviewed the Microfilm records in 2016 and found the structure was safe and in compliance, reissuing the certification without a single violation and raising no issues about any post-2008 improvements.

-30-

were not found in the City's Microfilm records.  The City argued Ortus should have checked the Microfilm records to ensure that all improvements at the premises were permitted and approved by the City.  The approved permit for the work permitted pursuant to this notice on March 27, 2019, concerned four very narrow issues and limited scope of work.  In any event, if the City was right in its assessment of the Microfilm records, then it needed to have cited Ball & Chain for a different kind of violation with its own opportunity to cure and be heard, instead of shutting it down.

70.     Second, using the Microfilm records, the City determined that the work area had supposedly exceeded 50% of the building area under the work for alterations, triggering a Level 3 review, and requiring additional installation of an Automatic Sprinkler System per Code Section 804.2.  Importantly, Ortus confirmed that the improvements were subject to a Level 2 review standard and therefore, the improvements complied with all applicable requests of both the City Code and the Building Code. Level 3 is not applicable in this case because the work performed does not include 50% of the building area and otherwise does not meet the requirements of a Level 3 review under the Building Code.  The City allegedly calculated the work area at 60%, which is factually incorrect.  In order to trigger the Level III review, the City cites to a Class II Special Permit issued in 2008 that shows a proposed "Art Gallery/Studio and Bar Lounge."  The City utilized the as-built that was submitted with the Class II Special Permit (which only concerns applicable distance requirements and not construction work done or improvements) to calculate the work area to trigger a Level 3 review under the Florida Building Code.  The City now relied on a Level 3 review in order to require that Plaintiffs install an Automatic Sprinkler System that is not required under a Level 2 review.

71.     The Level 3 review decision came as a shock to Ball & Chain, as the City itself, repeatedly represented—until its delayed issuance of the CO objections (and had worked with all involved parties under that understanding)—that all improvements would be conducted according to a Level 2 review, which did *not* require enhanced fire safety measures like the Automatic Sprinkler System.  This heightened requirement was never brought up by the City during the scores of meetings and conversations it had with Ball & Chain and Ortus before approving the building permit, overseeing the construction, overseeing the application submitted by Ortus, multiple inspections since opening its doors by the Fire Department, including the approval by the Fire Department of the building permit, and ultimately approving the CO on September 11, 2022.

72.     While Plaintiffs waited for hearing dates on both appeals, they concurrently attempted to work with the City to fix any outstanding issues in an effort to expeditiously open their doors and mitigate their damages for the City's blatant misconduct.  Yet, it was clear that the City acted in bad faith and never had any intentions of working with Plaintiffs.  Plaintiffs' counsel met on multiple occasions with the City and the architect or record, and consistently challenged the City's incorrect determination that a Level 3 review had been triggered, but the City could never provide the requested information demonstrating that a Level 3 review was appropriate.  After much back and forth, Plaintiffs were forced to adhere to a Level 3 review and make the necessary changes to appease the City.

73.     On December 4, 2020, Plaintiffs' architect sent a letter to City, agreeing to submit a new set of plans for Ball & Chain that addressed the alleged deficiencies in the Ortus Audit.  Thereafter, based solely on the City's promises that if Ball & Chain submitted new drawings that addressed the comments raised in the Ortus Audit, the City would: (a) approve the revised plans on an expedited basis; (b) offer open assistance on inspections; and (c) upon issuance of a building

permit for the revised plans, issue a Temporary CO ("TCO"), and reinstate the CU to allow Ball & Chain to open with reasonable fire safety protocols – Plaintiffs agreed to defer both appeals.

74.     In addition, through the BORA Appeal, Ball & Chain would have only been able to obtain resolution on the limited issue of whether the scope of work triggered a Level 2 or Level 3 review, a matter that became moot once Ball & Chain unwillingly accepted to perform work pursuant to a Level 3 review solely for the sake of expediting matters. So even if Ball & Chain had succeeded with BORA, doing so would have not permitted it to reopen its doors, thus making a BORA hearing moot.

75.     Ball & Chain's only option was to work with the City and adhere to its every and ever changing demands. Yet, despite Ball & Chain's earnest efforts, the City acted in patent bad faith and continued to move the goal posts so as to continue to prevent Ball & Chain from opening its doors.

76.     Indeed, after working with the City for months, on January 27, 2021, the City Attorney's office emailed Plaintiffs' counsel, highlighting a few "issues" remaining with the "ongoing permitting process" at Ball & Chain.  Importantly, the City confirmed two key issues again: (1) Ball & Chain could have a "temporary" CU, while also using a fire watch for 1 or 2 weeks for the busy times, until the Automatic Sprinkler System was completely installed and approved; and (2) both the Zoning Department and Building Department were in agreement with this resolution.

77.     Thereafter, and in reliance on the City's promises, Ball & Chain obtained a second building permit on April 2, 2021, and awaited to receive its TCO (which would allow it to open) as the City had promised.  Yet, the City continued to play games and brought up new frivolous issues.

78.     While Plaintiffs had agreed to address the issues raised in the City's "audit" of Ortus in exchange for the City's promise to promptly consider their applications and issue a TCO (upon issuance of relevant County approvals), the City refused to honor its promises.

79.     On a call with the City on May 24, 2021, the City—for the first time—asked, as a condition for a temporary certificate, for a timeline of the relevant approvals and water main hook-up, and a timeline for building plan approvals.  Yet, the City nevertheless confirmed that it would issue a TCO upon such approvals.

80.     On June 10, 2021, Plaintiffs notified the City that their plans had been approved by the requisite authorities, provided a timeline for the balance of the building permits, and identified their track to tap into the water main by the end of July.  While the City first ignored Plaintiffs, it then, again, moved the goal posts—now conditioning the TCO on a tap-in and complete permit approval.

81.     Plaintiffs have cooperated extensively and complied in good faith with the understanding that the City's professional staff and counsel could be taken at their word. Yet, every time Plaintiffs complied with the City's requests, the City acted in manifest bad faith and changed the terms of their agreement. The City's new position—that Ball & Chain would get its TCO only after completed tap-in and completed approvals and post-approval inspection passage—was absurd and contrary to law. Plaintiffs would be due their permanent (not temporary) CO at that point. The purpose of a TCO—"temporary"—is to stand in place of and anticipating complete certification.

82.     Instead, the City raised a dozen new issues never raised before during the entire year the parties were discussing what was needed for Ball & Chain to reopen and, more importantly, had nothing to do with an imminent life/safety concern that would justify keeping the

business shut down. For instance, the City conditioned the issuance of a TCO on Ball & Chain (1) providing legal paperwork regarding an egress that the City had already been inspected and approved and which remained unchanged for several decades; and (2) certifying the fire rating of an outdoor stage with prior approval by the City multiple times before to the unlawful shutdown.

83.    To make matters worse, while Ball & Chain was shut down, the City continued harassing Ball & Chain with frivolous notices of violations.

84.    For example, on July 14, 2021, Code Enforcement posted yet another violation at an address also associated with Ball & Chain—an unlit letter in the businesses' sign.  City administration specifically sent the citation officer to harass Ball & Chain, and review its signs, but was not told to (so he did not) visit any other establishment in Calle Ocho.  This occurred even though there are at least 39 other signs on Calle Ocho that were missing one or more lights and do not illuminate properly.  Abiding by its plan to constantly move the goalposts, the City then maintained that Ball & Chain could not re-open until its sign violation was removed, only to then reverse course once the City realized that it had inadvertently issued the sign violation not to Ball & Chain's primary address. The City still threatens to use the sign violation to shut or keep shut Ball & Chain's operations.

85.    In a further effort to hinder Ball & Chain's reopening, the City Attorney unilaterally instructed the City Manager and all City staff to immediately stop communicating with Plaintiffs' owners and required that all communications take place strictly through counsel. She did so notwithstanding that bedrock federal and Florida law provides that Plaintiffs may communicate directly with the City and its officials, managers, and professional staff as part of their right to petition their government.

86.     The City Attorney also instructed Plaintiffs to "sue and have a Court decide," if they desired to exercise their First Amendment rights to communicate with City employees.

87.     Despite the City continually bringing up new "issues," Plaintiffs did everything the City asked, though not lawfully required, to get its business back open.

88.     Ultimately, more than a year later, Ball & Chain received a temporary TCO for only its interior premises.  Ball & Chain's counsel thereafter followed up on multiple occasions to have Zoning reinstate Ball & Chain's prior CU to allow it to open—rather than forcing it to apply for a new CU.  Yet, as part of the City's efforts to force Ball & Chain to be subjected to the new noise ordinance (detailed below, which exempts as "vested" businesses with an approval at the time of its passing), it refused and compelled Ball & Chain to apply for a new CU. To make matters worse, the City walked back its promise to allow Ball & Chain to reopen once it addressed all of the issues in the Ortus audit and has since found new "issues"—which it admits are not remotely related to any life or safety issues—to prevent Ball & Chain's reopening.

89.     All told, Plaintiffs and their design, construction, and legal professionals urgently, persistently, and desperately worked over the course of nearly a year, expending countless personnel-hours and hundreds of thousands of dollars, to attempt to reverse the City's unlawful suspicion of the CO, revocation of the CU, and closure of Ball & Chain. In the end, the City emailed Plaintiffs and instructed them to "sue" to protect their rights.

### After Colluding to Shutting Down Ball & Chain, City Issues New Noise Ordinance Affecting Only Ball & Chain

90.     The City's decision to strip Ball & Chain of its CO/CU was all a pretext to allow it to enact a new ordinance and amend another (both proposed by City Commissioner Carollo) that would be applied *exclusively* to Ball & Chain, and no other business in Calle Ocho, and would

STEARNS WEAVER MILLER WEISSLER ALHADEFF & SITTERSON, P.A.

give the City even more ways to continue keeping Ball & Chain's doors closed.  All part of the City's master plan.

91.     The same day it revoked the current CU and suspended the CO, on October 22, 2020, the City passed two ordinances directly targeted at closing down Ball & Chain and ensuring that its business would be severely curtailed if it ever reopened.

92.     First, the City introduced a proposal to the City Commission that banned all outdoor music from 10 p.m. to 8 a.m. at businesses neighboring any sort of residential property.  The proposal was then enacted by the City Commission as Ordinance 13941.  The Noise Ordinance is directly targeted at closing Ball & Chain's outdoor entertainment at night during its prime business hours.

93.     Importantly, those **businesses (including those in Calle Ocho) that had their CUs current at the time of the passing of the Noise Ordinance are grandfathered in and will not be affected by the Noise Ordinance**.  Thus, in order to directly affect Ball & Chain with the Noise Ordinance, the City had to revoke its CU before passing it. That is, the City unlawfully revoked the current CU and suspended the CO and then passed a new noise ordinance exempting every single similar business establishment in Little Havana/Calle Ocho (and the City of Miami), but Ball & Chain.  Ball & Chain remains the only business in the City of Miami affected by the Noise Ordinance, as other businesses from Wynwood and Coconut Grove were also exempted from the rule after multiple amendments.

94.     Second, on the same day, the City Commission enacted Ordinance 13936 (an amendment to Section 2-211 of the City Code), changing just one word in the City Code, but with great consequences.  Section 2-211, the CU Revocation Ordinance, governs the revocation of a CU for businesses and previously allowed the zoning director to decide whether to revoke a

certificate if a business commits one of a list of numbered violations. Yet, this amendment changed the wording of Section 2-211 from "may" to "**shall**," thereby taking away any discretion by the zoning director in making this decision.[9]

95.     As written, while Section 2-211(c) provides Ball & Chain with notice if the zoning administrator finds that Ball & Chain committed any of the violations giving rise to the automatic revocation, it only does so only **after** the CU is already revoked and the business is shut down, while the lengthy appeals process takes its course for years thereafter. This violates due process required by the U.S. and Florida Constitutions.

96.     Procedurally, the City also failed to follow its own processes in enacting both the Noise Ordinance and the CU Revocation Ordinance. For instance, the City did not allow Plaintiffs to present a video objecting to the two new ordinances and explaining how both ordinances would be used by the City to specifically attack Ball & Chain until after the vote had already occurred.

97.     Generally, the City also violated its own processes by failing to hear more than eight hours of recorded public comments (much of it from Ball & Chain supporters) objecting to the Noise Ordinance at the proposal hearing.

98.     The City argued that it failed to follow its own processes in listening to the comments (mostly submitted by Ball & Chain supporters) pursuant to an opinion by the Florida

---

[9] As discussed above, Section 2-211(b) now states: "Revocation of certificate of use. The zoning administrator **shall** revoke a certificate of use for any of, but not limited to," seven stated reasons. This is the same Section 2-211, which was improperly used by the zoning director, on **that same day** (October 22, 2020) as the only reason for the revocation of Ball & Chain's CU. Immediately after the passing of the CU Revocation Ordinance, the zoning director sent a letter to Plaintiffs explaining its CUs had been "revoked pursuant to Section 2-211(b) of the Code of the City of Miami." Prior to amendment the City could not have relied on Section 2-211 to revoke the CU in the manner in which they did.

Attorney General because all messages followed the same "script," but the Attorney General has denied ever giving an official legal opinion on the matter and has ignored all of Plaintiffs' request to produce an opinion of that nature.

99.     Substantively, and procedurally, the City's two ordinances affecting only Ball & Chain, and no other business in Calle Ocho, violate Plaintiffs' property and due process rights.

### Taquerias El Mexicano Is Also Damaged by the City's Constant Harassment and Unlawful Conduct

100.    While the City persecuted and ultimately shut down Ball & Chain, the City also harassed Plaintiffs' other main business in Calle Ocho: Taquerias El Mexicano.  The City's harassment of Taquerias specifically started after the filing of the Related Case, whereby the City began raiding the establishment on a daily or weekly basis to allegedly confirm whether Taquerias had the adequate liquor licenses.  After Taquerias repeatedly showed the City that it, at all times, operated with the appropriate license, the City then turned to repeatedly citing Taquerias for "violations" (for work previously approved by the City) and moving the goal post on improvements every time Taquerias fixed the most-recent violation.  The City ultimately succeeded in also shutting down Taquerias citing to the same unconstitutional ordinance, Section 2-211, to revoke Taquerias' CU based on a mere technicality regarding an outdoor staircase, which the City had previously approved and presents no imminent danger to the public.

101.    So far, the City has taken the following unjustifiable actions against Taquerias, among others:

      a.    On November 17, 2018, Code Enforcement entered Taquerias to check for "documentation."  Taquerias' staff had to ask them to leave, as they did not have a reason to be inside the store.

      b.    On December 16, 2018, the Fire Marshal and ABT entered Taquerias asking for a "sketch."  The requested information was provided and no violations were found.

STEARNS WEAVER MILLER WEISSLER ALHADEFF & SITTERSON. P.A.

c. On December 19, 2018, a Code Enforcement Inspector posted Violation CE2018025722 for Taquerias failing to have proper documentation indicating sales of food and alcoholic beverage, which could not be the case given the City had at that point already found Taquerias in complete and full compliance of its liquor license and food sales through the City's unprecedented audit.

d. On December 26, 2018, two other vexatious violations were posted at Taquerias, without any basis.

e. On January 24, 2019, the Fire Marshall conducted an inspection of the patio, finding no wrongdoing.

f. On January 25, 2019 at 8:30 a.m., just hours after, the Fire Marshall again visited Taquerias to "check the area." A Fire Department officer then posted an improper occupant load notice at Taquerias.

g. On February 6, 2019, Code Enforcement posted another violation at Taquerias for alleged: (1) failure to obtain a valid CU, (2) a tax receipt; (3) failure to obtain a warrant for a back patio; and (4) failure to obtain a BTR for a souvenir shop and CU for the upstairs lounge.

h. On February 14, 2019, the Fire Marshall again arrived at Taquerias to confirm compliance with occupancy levels, even though the restaurant was nowhere near the legal limit. Later on this same day, a City Inspector issued a violation from the Fire Department for failure to have a proper CU and other issues related to the occupant load. Fire Department officials thereafter continued harassing the Taquerias employees for the information, even after Taquerias already provided the requested information.

i. On March 10, 2019, the Fire Department again visited Taquerias, finding no wrongdoing. They came back on March 23, 2019, again finding no wrongdoing.

j. On March 25, 2019, the City then sent an ABT Inspector for "informational purposes." Inspector Lowry stated Taquerias had no license to sell alcohol, which was incorrect and once Taquerias confirmed as much, the Inspector retracted the statement.

k. On March 28, 2019, a City Inspector issued another violation at Taquerias, for alleged "work performed without a finalized permit and failure to provide the minimum off-street parking in SD2 zone."

l. On September 13, 2019, the Fire Department sent an inspector, along with a Code Enforcement inspector on an alleged noise complaint.

STEARNS WEAVER MILLER WEISSLER ALHADEFF & SITTERSON, P.A.

     m.     On November 8, 2019, Code Enforcement posted another baseless violation at Taquerias.

     n.     On January 13, 2020, Code Enforcement posted another baseless violation at Taquerias.

     o.     On March 7, 2020, Fire Marshalls visited Taquerias, finding no wrongdoing.

102.    Each and every single one of these violations has been cleared, but not easily. Each time the City cites Taquerias unjustifiably, or for the same reasons it has already cited Taquerias in the past, Plaintiffs' counsel has to expend considerable time and legal fees in discussing the new made-up "violations" with the City, to show Taquerias' compliance with all applicable rules and regulations, to then have the City agree with Plaintiffs' counsel and ultimately agree to delete the violation. This process often takes weeks if not months, disrupts business at Taquerias, and causes damages to Plaintiffs in legal fees and other resources. During the relevant time, no other business in Calle Ocho has been targeted for these alleged liquor law violations.

103.    The City has also failed to follow its own procedures for these violations, by only documenting them in the City's website as "noticed" but not providing Plaintiffs with an official notice of violation for some of them. Without such notice, Plaintiffs cannot be apprised of their due process rights as to each alleged violation. Moreover, the violations continue to cloud Plaintiffs' title when the investigations should be closed or voided altogether.

104.    As a glaring example of how the City's incompetence hurts Taquerias' business, on May 6-12, 2021, a production company wanted to hire Taquerias to be the site of a music video. Because of these unwarranted outstanding violations related to the BTR and CU, the City Attorneys' Office (in an unprecedented move) called the Event Director to have them refuse to issue a film permit to the production company, thereby causing Taquerias yet another lost business opportunity and thousands in lost profits. Importantly, the City has no legal basis to deny a film

STEARNS WEAVER MILLER WEISSLER ALHADEFF & SITTERSON, P.A.

permit due to outstanding violations, particularly given that Taquerias was already working with the City to correct them.  Of course, these unwarranted violations were subsequently voided.

105.    The City's vendetta against Taquerias has also become clear in relation to Taquerias' efforts to pursue an Outdoor Dining Warrant. Taquerias engaged counsel to obtain an Outdoor Dining Warrant pursuant to Article 6.3 of Miami 21 to allow Taquerias to operate as an Alcohol Service Establishment.  The outdoor dining is an extension of its Restaurant use subject to the 4COP SFS license.  Restaurant use is exempt from the distance requirements found in Section 4 of the City Code. Nonetheless, the City has placed a hold on the Outdoor Dining Warrant, claiming that it is reviewing the separation between Taquerias and an alleged "religious facility," despite that this has absolutely no bearing on the City's review of the Outdoor Dining Warrant. Accordingly, the City, placed a hold on the Outdoor Dining Warrant citing a certain "religious facility" allegedly within 300-feet at 476 SW 8th Street, called "Ministerio de Juan 3:16" ("Ministerio de Juan").

106.    However, Ministerio de Juan shares a wall with and is in the same building as local liquor store "El Gato Tuerto." The CU for Ministerio de Juan predates El Gato Tuerto's CU and permit to operate as a liquor store.  In other words, the City had no issue allowing a liquor store to operate next to Ministerio de Juan but refuses to process Taquerias' Outdoor Dining Warrant on the specious basis that it needs to review its "compliance with the 300' distance separation from a Religious Facility."

107.    Outrageously, but not surprisingly, the City Manager and City Commissioner Carollo were spotted on April 2, 2021 personally confirming the distance between Taquerias and Ministerio de Juan with a measuring tape, notwithstanding that there is no requirement for such distance separation, and that the City Manager is not tasked with conducing such measurements

(which are reserved for a professional surveyor).  When confronted by Plaintiffs' counsel about this bizarre conduct (which included the City Manager's decision to wear baseball cap to conceal his identity while measuring), the City Manager admitted to taking the measurements personally and to have supposedly "inconvenienced [City Commissioner Carollo] and asked him to indulge [him] since [they] were in the neighborhood."

**Despite Taquerias Having All Proper Liquor Licenses, the City**
**Continuously Raids Taquerias and Unlawfully Shuts It Down**

108.    As the latest glaring example of harassment and deprivation of property rights against Plaintiffs, Taquerias has now been raided on multiple dates, demanding that the restaurant provide documentation for a nightclub on the second floor ("Los Altos"), even though Los Altos is properly licensed and purely operating as part of the Taquerias' restaurant and was documented as such.

109.    On May 1, 2021, pursuant to a certain "Operation Dry Hour," the Police Department, Code Enforcement, ABT, and Building Inspectors entered Taquerias without a warrant and gave a written warning for a supposed liquor law violation.  When the Police Department and accompanying "task force" attempted to enter the building, Fuller reiterated that Code Enforcement was not allowed to enter the venue without a warrant.  The Police Department disregarded this request, instead stating: "that's not going to happen," and proceeded to let Code Enforcement and others in.

110.    This raid occurred just days after the City swore in its new Chief of Police, whose first and highest priority on the job was to conduct an unlawful stakeout at Taquerias, along with the City Manager and other City departments.  Pursuant to its "Operation Dry Hour," the Police Department is required to prepare an accurate police report. Post raid, Plaintiffs wrote to the Chief of Police alerting him that his police report did not match the ABT report, erroneously stating that

Los Altos was given a "written warning, liquor law violations" by ABT.  This was simply false.
ABT's report had correctly found no violations by Taquerias, yet still, the Chief of Police refused
to correct the falsified police records to comport with the ABT report, despite Plaintiffs' several
requests to do so.

111.    The police officers turned on all of the lights on the second floor, Los Altos, and
shut off the music, disrupting the night for all at the establishment.  Taquerias' staff continued
explaining the situation to the officers, and affirming that the CU posted by the downstairs entrance
covers the entire space, but the police officers ignored these explanations and instead threatened
to issue arrests.

112.    Plaintiffs' counsel quickly explained to the City that its threats were unwarranted.
Taquerias is a restaurant (including Los Altos), not a night club, and its CU provides for
"Restaurant" use, for which liquor may be sold as long as the ratio of food to liquor is 51% (food)
to 49% (liquor).  Whenever liquor is sold, its kitchen is open, in accordance with City of Miami
Code Section 4-2.  Taquerias (including Los Altos) has a 4COP SFS License that permits the sale
of alcohol at the premises, which includes both floors under license number BEV2300954.  The
fact that the license covers both floors can be easily verified by reviewing the sketch on file with
ABT.  This license is current and valid through March 31, 2022.  The CU for Los Altos is a
Restaurant Use. Pursuant to Chapter 4 of the City Code, the restaurant use must meet certain
requirements, as follows:

> Restaurant means a food service establishment that meets all of the following
> requirements: (1) Derives at least 51 percent of its gross food and beverage revenue
> from the sale of food and non-alcoholic beverages during the first 60-day operating
> period and each 12-month operating period thereafter; (2) Licensed by the state's
> division of hotels and restaurants; (3) Sells or offers for sale alcoholic beverages
> for consumption on the premises pursuant to a valid license issued by the state
> permitting such activity; (4) Equipped to seat at least 20 patrons at one time; and

(5) Does not sell alcoholic beverages after the hours of serving or consumption of food have elapsed.

*See* City Code Sec. 4-2.

113.    The plans reviewed for the CU at Taquerias included the entire premises consisting of both floors of the establishment.  Further, it does not distinguish between areas in the restaurant, per Chapter 4 of the City Code.

114.    This was also confirmed by the issued notice from ABT, which stated, "no violations observed" during the raid, citing as the reason for its determination that "Taqueria[s] has and continues to comply with all laws, rules, and regulations for the operation of a Restaurant with a 4COP liquor license."

115.    This kind of scrutiny as to a businesses' liquor license is unprecedented.  The City's Chief Financial Officer and Assistant City Manager conducted an audit of Taquerias' liquor license in 2018, after it was erroneously cited for violating 51% of its gross food sales.  The City's CFO and Assistant City Manager admitted this type of audit was the first of its kind ever conducted by the City, and confirmed that she could not find any records of a similar audit on any other business in Calle Ocho or the City of Miami.  After 4 months of an intensive audit, the City found Taquerias in complete and full compliance with its license and the City Code, and the case was closed with no action or recommendation.  Yet, another instance of the City targeting Plaintiffs' businesses unjustifiably.

116.    After the third raid at Taquerias, and since ATB found the business in compliance with its liquor license[10], the City instead cited the business for failure to display a BTR.  On May 6,

---

[10] The City's actions forced Taquerias to abandon its 4COP quota license in favor of a 4COP SFS license, which requires more stringent compliance with levels of square footage, seating, and

2021 at 10:50 p.m., Code Enforcement and the Police Department showed up to Taquerias again, alleging Taquerias did not have a valid BTR.  The general manager showed them the current receipt for the BTR, but the police officers and code inspectors remained at Taquerias for approximately 30 minutes.  Taquerias was only missing an official BTR permit because the City refused to mail it to Taquerias.  Plaintiffs were unable to get it in-person as the offices were closed due to the COVID-19 pandemic.

117.    Ultimately, the City acknowledged that the entire BTR issue was the City's fault.  However, the City still refused to remove the violation from its system and refused to send a print-only version of the BTR permit for Taquerias to display.  Taquerias was again cited for only displaying the receipt, even though this was clearly due to the City's own incompetence and malfeasance.  It took Plaintiffs' attorneys many hours with the City's and BTR's employees to release the BTR permit, which ultimately only happened the **day after** the court ruled against Commissioner Carollo's Motion to Dismiss in the Related Case.  This was not a coincidence.

118.    Nevertheless, the raids continued.  On June 19, 2021, at 1:00 a.m., the Police Department, Fire Department and Code Enforcement raided Taquerias without stating a reason for doing so.  Taquerias' general manager explained they could not come in without a warrant, or at least without providing a reason, per Florida Statute Section 933.29, but the City ignored him.  All three divisions paraded through Taquerias in an extremely disruptive fashion.  The officers ultimately left, finding no wrongdoing.

---

percentage of food sales.  Plaintiffs' decision to abandon its 4COP quota license was the result of the City's constant harassment and knowing that the City would not grant Taquerias the required "Exception" to allow Taquerias to achieve dual use as both a Restaurant and a Bar (while it pursues its Bar liquor license).  Thus, in an effort to appease the City, Taquerias abandoned a liquor license it was lawfully entitled to have.

STEARNS WEAVER MILLER WEISSLER ALHADEFF & SITTERSON, P.A.

119.   On Friday August 20, 2021, shortly before midnight, the Miami Police Department and Code Enforcement undertook an illegal warrantless search and (a) arrested the General Manager and (b) ordered all patrons to leave the premises, shutting down the restaurant for no legitimate reason.

120.   Their reasoning—that the upstairs area, Los Altos, was operating as a "nightclub"—is the same pretextual reason the City stated for all of the previous illegal raids.  As in the past, the Police Department failed to conduct any kind of inspection to properly determine whether it was operating as a nightclub, *i.e.*, that its primary use was not the sale of food.  Indeed, in order to do so, the City would have had to inspect the kitchen to ensure that it was open, and inspect Taqueria's liquor license—neither of which they did. Had they done so, the City would have confirmed, yet again, that Taquerias was operating legally and under its current BTR. Instead, the Police Department simply classified it as a "nightclub" because patrons were dancing and standing up—neither of which are relevant factors under the Code.

121.   As evidence of the City's vexatious and intimidation harassing tactics, City police issued an arrest affidavit and fingerprinted Taquerias' manager David Caplan was in front of his staff and customers.  Mr. Caplan tried to reason with the police and attempted to deliver the explanatory letter that Plaintiffs' counsel had prepared in anticipation of this very issue, given the countless times these unlawful raids have occurred. Yet, the Police Department refused to read the letter and proceeded with the arrest.  That the City engaged in malicious prosecution and unlawful harassment was further corroborated by the State Attorney's Office's decision to dismiss all charges against Mr. Caplan a month later—but only after Plaintiffs were forced to hire counsel for their employee to present a detailed request for dismissal outlining the unlawfulness of the City's actions.

STEARNS WEAVER MILLER WEISSLER ALHADEFF & SITTERSON, P.A.

122.     After the unlawful raid, Plaintiffs' counsel immediately emailed the City Attorney's office to request that the City take immediate action to correct their error and permit the business to reopen.

123.     After much petitioning, the City Attorney's office finally confirmed "there is no reason preventing [Taquerias' Los Altos] from opening and operating as a restaurant at this time." Yet, the City Attorney's office refused to explain why the City engaged in such brazenly unlawful conduct and then completely abandoned their prior position.

124.     The City Attorney's office has yet to confirm that the City will abide by its own laws and stop these unlawful and harassing warrantless searches, particularly on this patently frivolous basis given that Taquerias has repeatedly provided the City with proof of its proper BTR and liquor license.

**Again Using its Unconstitutional Ordinance, the City Succeeds In
Shutting Down Taquerias**

125.     Having failed in its efforts to permanently shut down Taquerias based on a liquor law issue, the City used the same strategy against Taquerias that it used to shut down Ball & Chain.

126.     On or about 2019, Taquerias was noticed for work without a permit.  Again, to avoid any hiccups, Taquerias immediately hired architects, obtained a building permit, and worked diligently to finalize a new building permit.  Yet, every time the City went to the premises to inspect the scope of work—and during each of Taquerias' weekly scheduled calls with the City, its discipline chiefs and inspectors, and its Building Directors—the City consistently found new supposed "issues" every time Taquerias finished addressing the prior one.   The City's acts were done maliciously and with ill intent, to continue expanding the scope of work and causing Taquerias' ownership to spend more than $100,000 at the City's behest and considerable amount of time, and frustration.

127.    In its final effort to shut down the business, on September 15, 2021 (the eve of Yom Kippur, the holiest Jewish Holiday, which Plaintiffs' principals and employees observe) three Building Department inspectors barged into Taquerias, unannounced, to conduct an inspection directed by "the City Administration" of a demolition permit that had been closed for four years. When the owners requested that the inspectors return later because they were observing the holiday, the City refused and said they did not have "an option to refuse entry to building inspectors" but could not cite any law or authority supporting its position.  Because the City failed to give any prior notice, Taquerias was not able to have its general contractor onsite to ensure compliance with inspection requirements.  The inspections and subsequent violation are all the more harassing given that Taquerias had been working with the City for the past year (including participating in weekly calls with the Building Department) to address any pending issues.  Yet, the City never once raised this "demolition permit" issue and, instead, showed up unannounced in a blatant attempt to disrupt the businesses' patrons and harass the owners.

128.    When confronted about this conduct, the City Attorneys' Office prohibited Taquerias' owners from exercising their constitutionally protected rights to speak directly with City staff and employees to remedy these issues and refused to respond to any of Taquerias' counsel half-dozen requests to speak.

129.    Six days later, on September 21, 2021, and without any prior notice, the City revoked Taquerias' CU pursuant to Sections 2-211(b) (5) and (7) of the Code, thereby shutting it down.  The City deployed the same unconstitutional ordinance to shut Taquerias as it had to shut Ball & Chain.

130.    The City's sole basis for shutting it down was that the outdoor, second staircase for the property was within 10 feet of the neighboring lot line, thereby allegedly violating Florida Building Code § 1027.5 "Location."

131.    However, the staircase at issue was part of a 2019 building permit (BD19-05503-001) on which Taquerias had been working with the City for years to ensure it met all applicable Codes, when the City abruptly shut down Taquerias.  Indeed, Taquerias spent the last two years and many tens of thousands of dollars making changes to the staircase at the behest of the City, including replacing the concrete landing at the bottom of the stairs and closing the risers.  During the entire period in which Taquerias was working with the City, the City never once raised the issue of the location of the stairs.  Moreover, at no point did the City ever mention that Taquerias could or would be shut down for this technical violation.

132.    Taquerias never received a Notice of Violation regarding its outside staircase. Instead, on July 21, 2021, *after* Taquerias had finished spending considerable time and money improving the stairs in accordance with the City's comments, a Building Department inspector noted in his comments to a field check that the staircase was less than 10 feet from the adjacent lot line.

133.    As a result, Taquerias immediately began working on bringing the staircase into compliance and hired a general contractor for the work.  Taquerias provided conceptual plans to the Chief of the Building Department who approved them, and prepared architectural and structural plans to conduct the necessary work.

134.    During these two months while Taquerias worked to demolish and move the staircase (the same staircase it had just finished repairing on account of the City's demands), the

City permitted Taquerias to remain open.  Indeed, there exists a secondary means of egress to address any imminent life or safety issues until the permanent solution was completed.

135.     In addition, since July 21, 2021, there were no any visits or inspections by the Fire Department or the Building Department related to the outside stairs.  At no moment did the Fire Department or the Building Department made any determination that the outside staircase presented an imminent danger to life and safety of the public. On the contrary, on February 16, 2021, the Fire Department conducted a final fire inspection (by Fire Inspector Daniel Caballero) finding Taquerias in full compliance on all fire issues, and raising no concerns about the outside staircase as an imminent danger to life or safety.  At no moment did the City require Taquerias to permit the outside stairs; in fact, Taquerias included the outside stairs in its "2nd Floor Legalization Plans" that the City approved and on which issued it permits.

136.     Taquerias' attorneys immediately contacted the City on September 22, 2021, challenging the revocation of the CU and the City's failure to provide Taquerias the requisite notice and opportunity to cure.  Taquerias' counsel explained in painstaking detail how the staircase issue poses no imminent risk to life or safety that would permit the closure of the business.  Yet, even after multiple requests, the City has failed to explain how the staircase, which provides a secondary form of egress and is nowhere close to an adjacent building, poses an imminent danger to life and property requiring the shutting down of a business per any City ordinance, rule, or code.  Nor could it, as one does not exist.

137.     In response to Taquerias' counsel's requests that the City explain why it was shut down, the City Attorney brazenly admitted the City's unlawful retaliation, stating "If your clients would have … treated City staff with respect, they would not be in the precarious situations they find themselves in today."

STEARNS WEAVER MILLER WEISSLER ALHADEFF & SITTERSON, P.A.

138.    At most, the City should have simply issued a code violation for which Taquerias would have been allowed notice and an opportunity to cure, rather than imposing the draconian measures it did.[11]

139.    During the relevant timeframe, no other business in Calle Ocho, other than Ball & Chain, has been shut down in this manner.

**New Miami Chief of Police Confirms
The City's Policy against Plaintiffs**

140.    On April 5, 2021, the City swore in a new Chief of Police because "there was a need to reform the MPD and to change the culture of the agency."  In his September 24, 2021 memorandum to the City Manager and the City of Miami Mayor, the new Chief details the conduct alleged against the City and its corrupt employees by Plaintiffs here.

141.    In particular, the Chief explains for months, three City Commissioners, including those who have personally targeted Plaintiffs, have "interfere[d] with the MPD's affairs including the IAD investigation, hamper[ed the Chief's] given mission to reform the MPD, and retaliate[d] for refusing to succumb to their collective efforts to influence the outcome of the ongoing IAD investigation and operations."  He goes on to explain that in his career of "over 35 years" he "has never personally experienced such interference in a confidential law enforcement investigation."

142.    The Chief further confirmed that Commissioner Carollo requested the Chief to "allow him to use the MPD as his personal enforcer against anyone he perceives as offensive," which included also influencing "City Code Enforcement deployment decisions."

---

[11] Section 162.06 of the Florida Statutes allows a "code inspector to initiate enforcement proceedings of the various codes" by first "notify[ing] the violator and give [ ] a reasonable time to correct the violation" within a specified time.  Fla. Stat. § 162.06(2).  "Should the violation continue beyond the time specified for correction, the code inspector shall notify an enforcement board and request a hearing."  *Id.*  Notice of the scheduled hearing must be provided.  *Id.*

143. He specified:

> In fact, Carollo and Diaz de la Portilla provided the MPD with a target list of establishments, which they claim are engaged in criminal activity and have pointed the finger at establishments in each other's districts, causing the MPD to investigate business establishments based on nothing more than the whims of Commissioners Carollo and Diaz de la Portilla.
>
> The MPD SIS/Vice Division has wasted untold hours investigating business establishments because of the improper political influence of, and intimidation by, these two commissioners. Unfortunately, Commissioner Reyes frequently joins Carollo and Diaz de la Portilla in their pattern of official misconduct.  After five months of observing these two commissioners, and the negative impact they are having on MPD and our business community, coupled with their unlawful obstruction of the IAD investigation involving Camacho, I feel compelled to memorialize and report their unlawful and retaliatory conduct.

144. These statements were no surprise as a former City of Miami Chief of Police made similar accusations in 2019 in an email to the then City Manager concerning the City Attorney's request  "that Miami police personnel, and other departments, conduct new site inspections at the direction of a city commissioner."  This request "was aimed at one particular business owner in the city" (i.e., Bill Fuller).  The email confirms the City Attorney created the list referenced at above, in which "the addresses forwarded in her email target[ed] the particular business owner [Bill Fuller] which gives the impression that the city is selectively targeting his businesses for new investigations."  The Chief described the City's acts as "an unsanctioned and unlawful exercise of powers beyond the limits of [the commissioner's] legislative power as a city commissioner to intentionally cause harm to a business owner" and a  "violation of the code ethics ordinance."

145. The Chief who wrote the 2019 email is no longer in power, and the current Chief's position is being threatened solely for opposing the unlawful conduct of the City, its commissioners, its attorneys and any other personnel implementing such illegal policies.  The message from the City is clear: either target Plaintiffs' business and fall in line, or risk retaliation.

**Damages**

146.    Plaintiffs have incurred millions in damages, including in excess of $27.91 million in lost profits (accruing more than $3.72M in damages monthly) and significant out of pocket expenditures, along with substantial lost time, stress and aggravation, on account of the City's malicious, vexatious and continuing harassing practices and policies.

**COUNT I**
**(SUBSTANTIVE DUE PROCESS – 42 U.S.C. § 1983)**

147.    Plaintiffs incorporate each of the above factual allegations as if fully restated here.

148.    The Fourteenth Amendment to the United States Constitution prohibits the City from "depriv[ing] any person of life, liberty, or property, without due process of law." The Fifth Amendment to the United States Constitution as applied by the Fourteenth Amendment to the United States Constitution prohibits the City from "depriv[ing a person] of life, liberty, or property, without due process of law."

149.    Plaintiffs have fundamental rights protected by the federal Constitution in their private property.

150.    Plaintiffs have fundamental rights protected by the federal Constitution to operate their lawful businesses and in their business reputations.

151.    The City developed and acted on an official policy to deprive Plaintiffs of their constitutionally protected property and business rights, as described herein.

152.    In addition and in the alternative, the City's pattern and practice of similar and interlocking malicious conduct to deprive, and resulting in depriving, Plaintiffs of their constitutionally protected property and business rights, described herein, constitutes a policy and custom of the City to do so.

STEARNS WEAVER MILLER WEISSLER ALHADEFF & SITTERSON, P.A.

153.    In addition and in the alternative, the City was deliberately indifferent to and therefore adopted the actions of its officials, agents and employees in depriving Plaintiffs of their constitutionally protected property and business rights, as described herein.

154.    There is a direct and causal link between the City's policies and customs against Plaintiffs and their constitutional rights being violated.  The plan against Plaintiffs is a persistent and widespread unconstitutional practice, and the City has full knowledge of such customs, having been approved and supported by the City and its resources. In addition and in the alternative, both through the City's unofficial custom and practice shown through repeated acts of the individual final policy makers for the City, and through a showing of the municipality's deliberate indifference to the constitutional rights of an individual, and the City's repeated failure to make any meaningful investigation into multiple complaints of constitutional violations by Plaintiffs and its counsel for years.

155.    The City's policy, pattern, and practice of depriving Plaintiffs of their constitutional rights was in part substantiated by and effectuated through legislative acts of the City, including the Ordinances stated *supra*.

156.    The City thereby deprived Plaintiffs of their constitutionally protected rights.

157.    The City deprived Plaintiffs of their constitutionally protected rights for no legitimate purpose, and for reasons that were and are pretextual and therefore arbitrary and capricious.

158.    Such deprivation was the result of an abuse of governmental power in excess of ordinary tortious conduct.

159.    The City acted herein under color of state law.

WHEREFORE, Plaintiffs demand judgment in their favor and against the City:

STEARNS WEAVER MILLER WEISSLER ALHADEFF & SITTERSON. P.A.

a.      awarding damages in an amount including but not limited to the actual damages, consequential damages, remunerative damages, lost profits, associated with the deprivation of Plaintiffs' constitutional rights, as well as all pre- and post-judgment interest;

b.      entering a preliminary and permanent injunction compelling the City to issue all entitlements to permit Plaintiffs to enjoy their constitutionally protected rights;

c.      entering a preliminary and permanent injunction preventing the City from taking any action including in its governmental capacity to prevent Plaintiffs from enjoying their constitutionally protected rights; and

d.      granting any other such relief as the Court deems just and proper.

## <u>COUNT II</u>
## (SUBSTANTIVE DUE PROCESS, FLORIDA CONSTITUTION)

160.    Plaintiffs incorporate each of the above factual allegations as if fully restated here.

161.    Section Nine of the Florida Constitution prohibits the City from "depriv[ing any person] of life, liberty or property without due process of law."

162.    Plaintiffs have fundamental rights protected by the Florida Constitution in their private property.

163.    Plaintiffs have fundamental rights protected by the Florida Constitution to operate their lawful businesses and in their business reputations.

164.    The City developed and acted on an official policy to deprive Plaintiffs of their constitutionally protected property and business rights, as described herein.

165.    In addition and in the alternative, the City's pattern and practice of similar and interlocking malicious conduct to deprive and resulting in depriving Plaintiffs of their constitutionally protected property and business rights, described herein, constitutes a policy and custom of the City to do so.

166.     In addition and in the alternative, the City was deliberately indifferent to and therefore adopted the actions of its officials, agents and employees in depriving Plaintiffs of their constitutionally protected property and business rights, as described herein.

167.     The City thereby deprived Plaintiffs of their constitutionally protected rights.

168.     The City deprived Plaintiffs of their constitutionally protected rights for an improper motive and by arbitrary and capricious means.

WHEREFORE, Plaintiffs demand judgment in their favor and against the City:

   a.     awarding damages in an amount including but not limited to the actual damages, consequential damages, remunerative damages, lost profits, associated with the deprivation of Plaintiffs' constitutional rights, as well as all pre- and post-judgment interest;

   b.     entering a preliminary and permanent injunction compelling the City to issue all entitlements to permit Plaintiffs to enjoy their constitutionally protected rights;

   c.     entering a preliminary and permanent injunction preventing the City from taking any action including in its governmental capacity to prevent Plaintiffs from enjoying their constitutionally protected rights; and

   d.     granting any other such relief as the Court deems just and proper.

## <u>COUNT III</u>
## (PROCEDURAL DUE PROCESS – 42 U.S.C. § 1983)

169.     Plaintiffs incorporate each of the above factual allegations as if fully restated here.

170.     The Fourteenth Amendment to the United States Constitution prohibits the City from "depriv[ing] any person of life, liberty, or property, without due process of law." The Fifth Amendment to the United States Constitution as applied by the Fourteenth Amendment to the United States Constitution prohibits the City from "depriv[ing a person] of life, liberty, or property, without due process of law."

STEARNS WEAVER MILLER WEISSLER ALHADEFF & SITTERSON, P.A.

171.    Plaintiffs have a liberty and property interest in their private property and business operations.

172.    As described herein, the City deprived Plaintiffs of their liberty and property interests, including by: suspending the CO, revoking the CU, closing Plaintiffs' business operations, forcing Plaintiffs to obtain a new "approval" which the City contends affects Plaintiffs' vesting of rights, and enacting Ordinance Nos. 13936 and 13941.

173.    As described herein, the City undertook those deprivations of those protected interests without affording Plaintiffs notice and an opportunity to be heard, both prior to and after the deprivations of those protected interests.

174.    The City did so by, among other things, failing to follow the procedures set forth in City Code § 2-814, et seq. to allow the businesses to cure any alleged violations and to request a hearing before a special master prior to stripping it of its entitlements, including its CU and CO.

175.    The City further did so by, among other things, failing to provide a constitutionally adequate process to remedy the deprivations, including because the BORA and PZAB appeals do not address the deprivations at stake here.

176.    The City thereby deprived Plaintiffs of their constitutionally protected rights.

177.    Such deprivation was the result of an abuse of governmental power in excess of ordinary tortious conduct.

178.    The City acted herein under color of state law.

WHEREFORE, Plaintiffs demand judgment in their favor and against the City:

> a.    awarding damages in an amount including but not limited to the actual damages, consequential damages, remunerative damages, lost profits, associated with the deprivation of Plaintiffs' constitutional rights, as well as all pre- and post-judgment interest;

STEARNS WEAVER MILLER WEISSLER ALHADEFF & SITTERSON, P.A.

b.      entering a preliminary and permanent injunction compelling the City to issue all entitlements to permit Plaintiffs to enjoy their constitutionally protected rights;

c.      entering a preliminary and permanent injunction preventing the City from taking any action including in its governmental capacity to prevent Plaintiffs from enjoying their constitutionally protected rights; and

d.      granting any other such relief as the Court deems just and proper.

## COUNT IV
## (PROCEDURAL DUE PROCESS, FACIAL, QUASI-FACIAL, AS APPLIED CHALLENGES TO ORDINANCE/CODE – 42 U.S.C. § 1983)

179.    Plaintiffs incorporate each of the above factual allegations as if fully restated here.

180.    The Fourteenth Amendment to the United States Constitution prohibits the City from "depriv[ing] any person of life, liberty, or property, without due process of law." The Fifth Amendment to the United States Constitution as applied by the Fourteenth Amendment to the United States Constitution prohibits the City from "depriv[ing a person] of life, liberty, or property, without due process of law."

181.    Plaintiffs have a liberty and property interest in their private property and business operations. Plaintiffs are entitled to notice and an opportunity to be heard, both prior to and after any deprivations of those protected interests.

182.    Ordinance 13936's alteration of Section 2-211 of the City Code from "may" to "shall," eliminating any discretion by the zoning director in revoking the CU for businesses based on the violations enumerated in the Code, which violations do not involve immediate life safety or like emergent conditions, facially and inherently, and as applied to Plaintiffs and to like circumstances, does not afford adequate notice and an opportunity to be heard prior to such revocation and deprivation.

183.    Section 2-211 as amended by Ordinance 13936 mandates ("shall") that the zoning administrator revoke *all* certificates of use for *any* reason—that is, it requires revocation of every certificate of use in issuance by the City, for no specified reason, without pre-deprivation notice or an opportunity to cure. That provision is therefore facially unconstitutional. Further, Section 2-211 as amended by Ordinance 13936 mandates ("shall") that the zoning administrator revoke *all* certificates of use for any circumstance within the ambit of the seven enumerated "reasons," which include innumerable circumstances not implicating emergent life-safety hazards, all without pre-deprivation notice or an opportunity to cure. That provision is therefore facially or quasi-facially unconstitutional. Finally, the City applied Section 2-211 as amended by Ordinance 13936 to mandatorily revoke Plaintiffs' certificates of use in circumstances that do not implicate emergent life-safety hazards, without pre-deprivation notice or an opportunity to cure. The provision is therefore unconstitutional as applied to Plaintiffs.

184.    Plaintiffs were injured and are likely in the future to be injured by the City's adoption and enforcement of the Ordinance, including in the revocation of their CU and closure of their businesses as described herein.

185.    The City acted herein under color of state law.

WHEREFORE, Plaintiffs demand judgment in their favor and against the City:

   a.    declaring unconstitutional Section 2-211 of the City Code as currently in force, as amended by Ordinance 13936;

   b.    invalidating and reverting any action or consequence harming Plaintiffs due to enactment and/or enforcement of Section 2-211 of the City Code as currently in force, as amended by Ordinance 13936;

   c.    issuing preliminary and permanent injunctive relief to that effect;

   d.    awarding damages in an amount including but not limited to the actual damages, consequential damages, remunerative damages, lost profits,

associated with the deprivation of Plaintiffs' constitutional rights, as well as all pre- and post-judgment interest; and

e.      granting any other such relief as the Court deems just and proper.

## COUNT V
## (EQUAL PROTECTION, CLASS OF ONE – 42 U.S.C. § 1983)

186.    Plaintiffs incorporate each of the above factual allegations as if fully restated here.

187.    The Fourteenth Amendment to the United States Constitution prohibits the City from "deny[ing] to any person within its jurisdiction the equal protection of the laws."

188.    Plaintiffs have constitutionally protected rights to equal protection of and under the laws.

189.    As described herein, the City intentionally treated Plaintiffs differently from others identically situated. Specifically, the City's regulatory conduct in respect of and treatment of Plaintiffs' property and businesses is different from, and intentionally discriminatory in comparison to, all other restaurant property and business owners and operators within the Calle Ocho area of the City of Miami, who are prima facie identical to Plaintiffs in all relevant respects.

190.    There is no rational basis for such difference in Plaintiffs' treatment by the City. All bases provided by the City for its different treatment of Plaintiffs' are pretextual and thus inherently arbitrary and capricious.

191.    In addition and in the alternative, as described herein, the City's animus against Plaintiffs is readily obvious in the City's regulatory conduct in respect of and treatment of Plaintiffs' property and businesses.

192.    The City acted herein under color of state law.

WHEREFORE, Plaintiffs demand judgment in their favor and against the City:

a.      awarding damages in an amount including but not limited to the actual damages, consequential damages, remunerative damages, lost profits,

STEARNS WEAVER MILLER WEISSLER ALHADEFF & SITTERSON, P.A.

associated with the violation of Plaintiffs' constitutional rights, as well as all pre- and post-judgment interest;

b.      entering a preliminary and permanent injunction compelling the City to issue all entitlements to permit Plaintiffs to enjoy their constitutionally protected rights;

c.      entering a preliminary and permanent injunction preventing the City from taking any action including in its governmental capacity to prevent Plaintiffs from enjoying their constitutionally protected rights;

d.      granting any other such relief as the Court deems just and proper.

<u>**COUNT VI**</u>
**(UNLAWFUL SEARCH & SEIZURE – 42 U.S.C. § 1983)**

193.    Plaintiffs incorporate each of the above factual allegations as if fully restated here.

194.    The Fourteenth Amendment to the United States Constitution prohibits the City from "depriv[ing] any person of life, liberty, or property, without due process of law." The Fourth Amendment to the United States Constitution as applied by the Fourteenth Amendment to the United States Constitution prohibits the City from "violat[ing]" Plaintiffs' "right . . . to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures," and prohibits the City from undertaking any search or seizure (a) without a warrant supported by probable cause and specifying the legitimate nature and purpose of the seizure, or (b) if conducting an administrative inspection of commercial premises subject of a statutory regulatory scheme, without a substantial interest in regulating the particular business, the inspection being necessary to further the regulatory scheme, and the statute's inspection program, in view of the certainty and regularity of its application, providing a constitutionally adequate substitute for a warrant.

195.    The City did not obtain a warrant for any search or seizure of Plaintiffs' properties described herein.

STEARNS WEAVER MILLER WEISSLER ALHADEFF & SITTERSON, P.A.

196.     As described herein, the City violated Plaintiffs' rights to be secure in their persons and property by trespassing on and/or searching Plaintiffs' establishment not in conformance with the purposes and procedures of the relevant statutory scheme.

197.     As described herein, the City's searches and seizures of Plaintiffs' establishments were unreasonable, pretextual, not designed to support and unnecessary for the furtherance of the relevant administrate scheme or purpose, and have been so random and unpredictable to eliminate reasonable procedures and expectations, thereby violating Plaintiffs' constitutionally protected rights to be secure in their persons and property.

198.     The City acted herein under color of state law.

WHEREFORE, Plaintiffs demand judgment in their favor and against the City:

  a.     awarding damages in an amount including but not limited to the actual damages, consequential damages, remunerative damages, lost profits, associated with the violation of Plaintiffs' constitutional rights, as well as all pre- and post-judgment interest;

  b.     entering a preliminary and permanent injunction enjoining the City from undertaking unreasonable searches and seizures of Plaintiffs' property and establishments;

  c.     entering a preliminary and permanent injunction requiring that the City obtain a warrant supported by probable cause, directed to particular property, and supporting the purpose of the statutory scheme, and otherwise requiring the City's compliance with the statutory scheme for inspection; and

  d.     granting any other such relief as the Court deems just and proper.

## <u>COUNT VII</u>
### (VIOLATION OF CITY CHARTER)

199.     Plaintiffs incorporate each of the above factual allegations as if fully restated here.

200.     The City is organized under, and governed and bound by, the City of Miami Charter ("Charter").

STEARNS WEAVER MILLER WEISSLER ALHADEFF & SITTERSON, P.A.

201.   The Charter's Bill of Rights, at Section 52(A)(1), Bill of Rights, at Section 52(A)(1), provides that the "City shall abide by all of [the Charter's] express provisions."

202.   The Charter, at Section 16(a), obligates the City, through its administrative branch headed by the city manager, to enforce all ordinances, including but not limited to the City of Miami Code of Ordinances ("Code").

203.   The City violated the Code by failing to adhere to City Code § 2-814, et seq. as more fully described herein.

204.   The Charter Bill of Rights, at Section 52(C), affords Plaintiffs standing to bring legal actions to enforce the Charter.

WHEREFORE, Plaintiffs demand judgment in their favor and against the City:

a.   awarding damages in an amount including but not limited to the actual damages, consequential damages, remunerative damages, lost profits, associated with the City's violations of the Charter, as well as all pre- and post-judgment interest;

b.   entering a preliminary and permanent injunction compelling the City to issue all entitlements to permit Plaintiffs as required by the Code and Charter;

c.   entering a preliminary and permanent injunction preventing the City from taking any action including in its governmental capacity adverse to Plaintiffs and violating the Code and Charter;

d.   granting any other such relief as the Court deems just and proper.

## COUNT VIII
## (TORTIOUS INTERFERENCE)

205.   Plaintiffs incorporate each of the above factual allegations as if fully restated here.

206.   Plaintiffs had and have a business relationship with the customers and patrons of Ball & Chain and Taquerias.

STEARNS WEAVER MILLER WEISSLER ALHADEFF & SITTERSON, P.A.

207.    The City knew or should have known about Plaintiffs' business relationship with the customers and patrons of Ball & Chain and Taquerias.

208.    The City intentionally and unjustifiably interfered with Plaintiffs' business relationship with the customers and patrons of Ball & Chain and Taquerias, as described herein, including but not limited to in limiting and shutting those businesses' operations.

209.    As a result of the City's intentional and unjustified interference with Plaintiffs' business relationship with the customers and patrons of Ball & Chain and Taquerias, Plaintiffs suffered damages, including but not limited to direct damages, consequential damages, lost profits, reputational damages, and loss of goodwill.

WHEREFORE, Plaintiffs demand judgment in their favor and against the City awarding damages in an amount in excess of $27.91 million, as well as all pre- and post-judgment interest, and any other relief as the Court deems just and proper.

## DEMAND FOR JURY TRIAL

210.    Plaintiffs demand a trial by jury on all claims so triable.

STEARNS WEAVER MILLER WEISSLER ALHADEFF & SITTERSON, P.A.

Dated: September 30, 2021                    Respectfully submitted,

                                             **STEARNS WEAVER MILLER WEISSLER**
                                             **ALHADEFF & SITTERSON, P.A.**
                                             Museum Tower, Suite 2200
                                             150 West Flagler Street
                                             Miami, Florida 33130
                                             Telephone: 305-789-3200

                                             By:  */s/  Maria A. Fehretdinov*
                                                  MARIA A. FEHRETDINOV
                                                  Florida Bar No. 52084
                                                  mfehretdinov@stearnsweaver.com
                                                  JASON S. KOSLOWE
                                                  Florida Bar No. 122758
                                                  jkoslowe@stearnsweaver.com
                                                  CORAL DEL MAR LOPEZ
                                                  Florida Bar No. 1022387
                                                  clopez@stearnsweaver.com