## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF FLORIDA
### Case No. 21-cv-23485-RKA

THE MAD ROOM LLC D/B/A BALL AND
CHAIN, ALTOS MEXICANO, LLC D/B/A
TAQUERIAS EL MEXICANO, LITTLE
HAVANA ARTS BUILDING, LLC, AND
LA GRAN FIESTA, LLC

      *Plaintiffs*,

v.

THE CITY OF MIAMI,

      *Defendant*.

_____/


## FIRST AMENDED COMPLAINT

Maria A. Fehretdinov
Jason S. Koslowe
Matthew C. Dates
Chelsea E. Koff
Coral Del Mar Lopez
Ryan T. Thornton
**STEARNS WEAVER MILLER WEISSLER
ALHADEFF & SITTERSON, P.A.**
Museum Tower, Suite 2200
150 West Flagler Street
Miami, Florida 33130

*Attorneys for Plaintiffs*

# TABLE OF CONTENTS

INTRODUCTION ............................................................................................................ 4

PARTIES ......................................................................................................................... 7

JURISDICTION, VENUE & APPLICABLE LAW .................................................... 8

BACKGROUND .............................................................................................................. 8

    Calle Ocho ................................................................................................................. 8

    Ball & Chain .............................................................................................................. 9

    Taquerias El Mexicano ............................................................................................. 10

    The City of Miami's Vendetta against Plaintiffs – An Official Municipal Policy
    and Custom ................................................................................................................ 12

    The City Constantly Harasses Ball & Chain and Ultimately Shuts Down the
    Business for Over a Year ........................................................................................... 26

    How the City Succeeded In Shutting Down Ball & Chain Through The
    Suspension of Its CO and Revocation of Its CU ...................................................... 33

    The City Failed To Follow Any Applicable Statute, Regulation, Code Provision
    and/or Ordinance in Suspending the CO and Revoking the CU ............................... 40

    The City's Actions Regarding the CO and CU Also Violate Florida's Private
    Provider Statute ........................................................................................................ 43

    While Plaintiffs Try To Work with the City to Re-Open Ball & Chain, the City
    Continues Violating Its Own Processes and Acts in Bad Faith ................................ 44

    After Colluding to Shut Down Ball & Chain, City Issues New Noise Ordinance
    Affecting Only Ball & Chain .................................................................................... 51

    Taquerias El Mexicano Is Also Damaged by the City's Constant Harassment and
    Unlawful Conduct .................................................................................................... 54

    Despite Taquerias & Ball & Chain Having All Proper Liquor Licenses, the City
    Continuously Raids Them and Unlawfully Shuts Taquerias Down .......................... 58

    Again Using its Unconstitutional Ordinance, the City Succeeds In Shutting Down
    Taquerias .................................................................................................................. 71

    New Miami Chief of Police Confirms The City's Policy against Plaintiffs .............. 76

The City Continues Unlawfully Harassing Plaintiffs After the Filing of This Lawsuit.................................................................................................................... 77

The City Continues Its Harassment By Keeping One of Ball & Chain's Largest Sources of Revenue, and Taquerias, Closed.................................................................. 80

Damages........................................................................................................................ 86

CAUSES OF ACTION ........................................................................................................ 86

COUNT I (SUBSTANTIVE DUE PROCESS – 42 U.S.C. § 1983) ............................... 86

COUNT II (SUBSTANTIVE DUE PROCESS, FLORIDA CONSTITUTION)............. 88

COUNT III (PROCEDURAL DUE PROCESS – 42 U.S.C. § 1983) ............................. 90

COUNT IV (PROCEDURAL DUE PROCESS, FACIAL, QUASI-FACIAL, AS APPLIED CHALLENGES TO ORDINANCE/CODE – 42 U.S.C. § 1983).................. 91

COUNT V (EQUAL PROTECTION, CLASS OF ONE – 42 U.S.C. § 1983) ............... 93

COUNT VI (UNLAWFUL SEARCH & SEIZURE – 42 U.S.C. § 1983) ...................... 94

COUNT VII (VIOLATION OF CITY CHARTER) ........................................................ 97

DEMAND FOR JURY TRIAL .......................................................................................... 102

STEARNS WEAVER MILLER WEISSLER ALHADEFF & SITTERSON, P.A.

Plaintiffs Mad Room LLC ("Mad Room") d/b/a Ball and Chain ("Ball & Chain"), Altos Mexicano, LLC d/b/a Taquerias El Mexicano ("Taquerias"), Little Havana Arts Building, LLC, and La Gran Fiesta, LLC (collectively, "Plaintiffs"), by and through their undersigned attorneys, bring this first amended complaint against Defendant The City of Miami ("City of Miami" or the "City"), and allege the following:

## INTRODUCTION

1.      The City of Miami developed and deployed a deliberate policy and plan of action—devised by a City Commissioner; reified by legislative acts of the City Commission; cultivated and planned by the City Attorney and its office; implemented by all of the City's major administrative departments, including Building, Planning, Zoning, Fire, Police, Code Enforcement, and others; and effectuated through dozens of the City's professional staff and employees—to destroy Plaintiffs' constitutionally protected rights to their real property and in their businesses.

2.      Plaintiffs own property and operate legitimate and once-thriving businesses in the heart of Miami's Calle Ocho. The City of Miami, with malicious intent, for no legitimate reason and with no lawful purpose, instituted its policy and then corrupted every organ of its municipal government in a relentless effort against Plaintiffs designed to run them and their businesses out of town.

3.      The City's vendetta against Plaintiffs runs from top to bottom—its elected officials, lawyers, professional staff, and every single department within its administrative function. The City deliberately crafted a multi-pronged policy intended to unfold in stages and build relentlessly towards its eventual goal of destroying Plaintiffs' business and arrogating their property rights. To carry out its policy, the City weaponized the very tools of government designed to protect the

health and safety of its citizens—abusing its code and code enforcement to deprive Plaintiffs of their property and business rights.  To carry out its policy, the City in turn ignored and swept aside all procedural protections, even those required by both state statute and the City's own municipal laws. To carry out its policy, the City trapped Plaintiffs in a nightmare runaround, issuing and then pulling entitlements, demanding actions and then moving the goalposts—for no legitimate purpose and with no end in sight. To carry out its policy, the City enacted unconstitutional ordinances and a commission resolution exclusively targeting Plaintiffs. On the very same day one of these ordinances passed, the City ultimately succeeded in shutting down one of Plaintiffs' businesses. Later, the City raided, unlawfully seized, and shut down another of Plaintiffs' businesses, on pure pretext and with no reasonable or legitimate basis. All of this, in the City's unyielding march to oust Plaintiffs from their properties.

4.      This shameful conduct was recently corroborated by the Miami Police Chief's September 24, 2021 memorandum to the City's Manager and Mayor, wherein he details that City Commissioners  used "improper political influence" and "intimidation" in order "to influence the [Miami Police Department] ("MPD") and City Code Enforcement deployment decisions;" and "provided the MPD with a target list of establishments . . . causing the MPD to investigate business establishments based on nothing more than the whims of [these] Commissioners." His statements mirrored those from almost two years ago when the prior Miami Police Chief likewise cautioned the City Manager that "the City Attorney is requesting that Miami police personnel, and other departments, conduct new site inspections at the direction of a City Commissioner…aimed at one particular business owner…to intentionally cause harm to [that] business owner" and undertaking the "selective enforcement against the business owner's properties using city ordinances," which

he described as "an unsanctioned and unlawful exercise of powers" in contravention of "the code of ethics" and "our charter."

5.      This case is not "typical" Miami politics at play.   It concerns small-minded politicians and corrupt administrators destroying the rights and property of private citizens because they refuse to kowtow to the right person or pay the right ask.

6.      Plaintiffs' property rights are protected under the United States and Florida Constitutions from the City's unconstitutional actions. As the Supreme Court recently stated: "[T]he protection of property rights is necessary to preserve freedom and empowers persons to shape and to plan their own destiny in a world where governments are always eager to do so for them." *Cedar Point v. Hassid*, 141 S. Ct. 2063, 2071 (2021) (citations and quotations omitted). There is no doubt: "[p]roperty must be secure, or liberty cannot exist." *Id.*  The prototype of these protections is to guard against arbitrary and capricious use of government power to take away rights solely predicated upon a vendetta.  The City has turned the very idea of government on its head, abusing the very objectives of health, safety, and protection meant to protect its businesses and people, and taking advantage of that power for crass political gain.

7.      Therefore, Plaintiffs seek damages and equitable relief pursuant to 42 U.S.C. § 1983 and under the Federal and Florida Constitutions against the City of Miami for committing acts, under color of law, with the intent and for the purpose of depriving Plaintiffs of their rights, by: (1) violating Plaintiffs' substantive and procedural due process rights through the deprivation of Plaintiffs' property rights as secured by the Fourteenth Amendment to the United States Constitution and the Florida Constitution; (2) depriving Plaintiffs of equal protection under the law by intentionally treating Plaintiffs differently from others similarly situated (and having no rational basis for the disparate treatment); (3) violating Plaintiffs' Fourth Amendment rights by

conducting warrantless searches of Plaintiffs' property, and searching Plaintiffs' establishment not in conformance with the purposes and procedures of any relevant statutory scheme; and (4) violating the City Charter.

## PARTIES

8.    Plaintiff Mad Room d/b/a Ball & Chain is a Florida limited liability company with its principal place of business in Miami, Florida.  Mad Room owns and operates Ball & Chain, a popular restaurant and bar located at 1513 SW 8th Street.  Through corporate entities, Ball & Chain is owned by Bill Fuller ("Fuller"), Ben Bush, and Zack Bush.

9.    Plaintiff Taquerias is a Florida limited liability company with its principal place of business in Miami, Florida.  Altos Mexicano, LLC owns and operates Taquerias, a prominent Mexican restaurant located at 521 SW 8th Street.  Through corporate entities, Taquerias is owned by Fuller, Ben Bush, and Zack Bush.

10.    Plaintiff Little Havana Arts Building, LLC is a Florida limited liability company with its principal place of business in Miami, Florida.  Little Havana Arts Building, LLC, is the owner of the building that Ball & Chain leases to conduct its operations.  Through corporate entities, Little Havana Arts Building, LLC is owned by Fuller.

11.    Plaintiff La Gran Fiesta, LLC is a Florida limited liability company with its principal place of business in Miami, Florida.  La Gran Fiesta, LLC is the owner of the building that Taquerias leases to conduct its operations.  Through corporate entities, La Gran Fiesta, LLC is owned by Fuller, Ben Bush, and Zack Bush.

12.    Defendant City of Miami is a municipality in Miami-Dade County, Florida, organized under the laws of the State of Florida, and is therefore, subject to this Court's jurisdiction.  The City is a local government entity subject to suit under 42 U.S.C. § 1983.

## JURISDICTION, VENUE & APPLICABLE LAW

13.    This Court has subject matter jurisdiction pursuant to 42 U.S.C. § 1983 and 28 U.S.C. §§ 1331, 1367.

14.    Venue lies in the Southern District of Florida because the cause of action accrued and the parties are located within this district.

15.    All conditions precedent to bringing this action have been performed or waived.

## BACKGROUND

### Calle Ocho

16.    Plaintiffs operate Ball & Chain and Taquerias in the heart of the Calle Ocho District of Little Havana.  Over the course of the last 7 years, Plaintiffs' owners, Fuller and the Bush brothers, worked hard to create a vibrant and diverse event space through their restaurants Ball & Chain and Taquerias.  Until their unlawful shutdown, Plaintiffs' businesses provided hundreds of jobs for local residents and produced hundreds of thousands of dollars in tax revenue for the City of Miami, Miami-Dade County and the State of Florida.

17.    Plaintiffs' businesses are dedicated to revitalizing the neighborhood of Little Havana, helping generate economic activity and new life into the area while at the same time preserving its historical significance and cultural identity.  Through these and many other projects in the area, Plaintiffs have sought to reestablish Little Havana as a healthy, dynamic neighborhood, showcasing new cultural life while celebrating its important place in Miami's history.

18.    Plaintiffs' efforts in the neighborhood have borne significant fruit—Little Havana offers visitors many new options of sights to see, places to seek entertainment and a vibrant arts scene to enjoy, much of which retains or reflects the cultural distinction, rich history and atmosphere that make Little Havana special.  Little Havana is now a major Miami destination for

STEARNS WEAVER MILLER WEISSLER ALHADEFF & SITTERSON, P.A.

tourists and locals alike.  In 2017, the National Trust for Historic Preservation declared Little Havana a national treasure.

19.      Calle Ocho is a coherent and discrete district within the City of Miami. Plaintiffs' establishments are identical in all respects relevant here to the other restaurant and entertainment establishments in that geographic area.

### Ball & Chain

20.      Keeping with their efforts to continue curating and caretaking Calle Ocho, in 2014, Plaintiffs' owners Bill Fuller, and two of his childhood friends, Ben Bush and Zack Bush, reopened the famous Ball & Chain restaurant and bar.  With the vision of restoring the venue to its past glory days, Fuller and his partners have made Ball & Chain once again a premier entertainment destination for people of all ages, races, and nationalities.

21.      From its opening in 2014 to January 2018, Ball & Chain served the community and operated without unnecessary interference from the City.

22.      Since January 2018, however, the City, under new control, has demonstrated it has a very different idea of what it wants to accomplish with the development of Little Havana, which does not include Plaintiffs' vision for Ball & Chain and Taquerias.  The City has a shockingly different set of rules and standards for Plaintiffs, which have not been applied to any of the other businesses in Miami and in Little Havana, in particular.

23.      Indeed, the City's policy against Ball & Chain included issuing a myriad of meritless violations that were solely intended to harass the business, and no other business in Calle Ocho. Then, after Ball & Chain worked with one of the City's own private providers and the City to remedy the "issues" the City had identified, engaged in regular telephone calls and meetings with the City throughout the process, and was accordingly issued a new CO and CU proving full

compliance with the City's demands, the City undertook an unprecedented audit of that provider and falsely accused them of submitting false information to the City, which the City used as a false pretense to shut down Ball & Chain without notice. Simultaneously, the City passed unconstitutional ordinances targeting Ball & Chain to make it exceedingly difficult for the business to ever operate profitably again should it be permitted to fully reopen. The City continues to harass Ball & Chain, by, among other things, moving the goalposts with eleventh hour requests and re-reviews by all department disciplines, to ensure that one of Ball & Chain's greatest sources of revenue, its patio, remains closed.

## Taquerias El Mexicano

24.     The original owners of Taquerias opened the restaurant in Calle Ocho in 1985. Their goal was to create a celebration of Mexico in the heart of Little Havana, a goal that Plaintiffs' owners Fuller and Bush have continued to this day upon taking over its ownership in 2017.  Their flagship location on Calle Ocho and 5th Avenue became the meeting place for locals, tourists, international personalities and dignitaries who were all looking for a true Mexican experience.

25.     For 36 years, Taquerias has operated without City interference – a true welcomed addition to the neighborhood.  Until recently, Taquerias was allowed to conduct its business largely unbothered, but that all changed upon Commissioner Carollo's election in late 2017, whereby it became subject to severe harassment that ramped up upon the filing of a Related Case[1] against this key Commissioner for the Commissioner's retribution against Fuller for supporting his political opponents (among other things).  That case put the City officials' misconduct in plain view as of October 11, 2018.  In retaliation for the filing of the Related Case, the City honed in on Taquerias

---

[1] *Fuller et al. v. City of Miami et al.*, Case No.: 1:18-cv-24190, U.S. District Court, Southern District of Florida (hereinafter, the "Related Case").

and began harassing it through constant inspections and "walk-throughs," that appeared as a drug bust to the larger public due to the sheer amount of officers attending each raid—usually including 10 or more officers wearing bulletproof vests and often fully armed.  These "inspections" have escalated in recent months to include multiple code enforcement raids, comprised of dozens of police officers, fire department officials, code enforcement officials and inspectors with the Division of Alcohol Beverages and Tobacco, Bureau of Law Enforcement ("ABT"), who operate under the guise of checking for alcohol licenses and permits that are easily accessible to the City through its own electronic system and do not require physical visits.  These raids are deliberately conducted on Friday and Saturday nights, with the sole purpose of causing substantial business disruption and monetary harm to Taquerias during peak business hours.

26.     Importantly, these incessant and damaging raids have not resulted in a single liquor license violation by Taquerias.  Indeed, ABT—the authority on the issue—confirmed, during an inspection in May 2021, that Taquerias fully complies with its use as a restaurant consistent with its alcohol license.  Unfortunately, ABT's confirmation that Taquerias complies with its validly issued liquor license has not stopped the City from further intimidating the owners, their employees, and above all, their patrons by conducting gestapo-style raids. Indeed, the City went so far as to shut down Taquerias and arrest Taquerias' General Manager in front of all of his employees in one such raid, only to have the State Attorney's Office promptly dismiss the frivolous charges. Thus, the only possible reason for the City's continual "inspections" of Taquerias was to ensure a loss of business and/or to ultimately run Plaintiffs out of town.

27.     As further explained below, once the liquor license issue was finally put to rest because Taquerias had at all times operated with the appropriate license, the City turned to its tried and true "playbook" strategy to shut down Taquerias, through issuing violations for work

-11-

performed many years ago without a permit and relying on a technicality about an outdoor staircase that the City staff had previously approved.  Thus, both Ball & Chain and Taquerias were unjustifiably shut down by the City of Miami.

### The City of Miami's Vendetta against Plaintiffs – An Official Municipal Policy and Custom

28.     The City created a plan to target all properties owned by Plaintiffs' owner Fuller in District 3, including Ball & Chain and Taquerias.  In essence, the City's plan to deprive Plaintiffs of their property and business rights consists of weaponizing code enforcement and all the various departments of the City to concoct a set of violations targeted at the Fuller-affiliated businesses that would eventually lead to a deprivation of property rights, while attempting to make it all look "legal" and "legitimate."  The scheme has become the official policy of the City of Miami and is being effectuated as planned.  This plan is not targeted at any other businesses in Calle Ocho or elsewhere in the City, other than Plaintiffs and their affiliates.

29.     As evidenced below, Fuller's involvement with these businesses is the primary pretextual reason for the City's vendetta against Plaintiffs.  Indeed, multiple current and former City employees have admitted that this plan was in place.  The City officials involved include City commissioners, the City Manager, the City Attorney, the Deputy City Manager, the Code Enforcement Director, the Zoning Director, the Building Director, the Building Official, the Assistant Fire Chief,  the Police Chief, and countless inspectors, among others, including from every discipline within the City.

30.     In a meeting with the City Attorney, City Commissioner Carollo brazenly confirmed that the plan was for the City to "take these guys' property" and "run [them] to the ground."  The City Commissioner's plan was no secret, as he made it clear to all City staff from the moment he took office on December 2, 2017.

31.     The City, through Commissioner Carollo and the City Attorney, originally planned to abuse eminent domain laws to strip Plaintiffs of their properties. However, in order to conceal their plan and policy, the City, through Commissioner Carollo and the City Attorney, devised the concept of initiating unfounded inspections of Plaintiffs' properties and businesses, manufacturing violations of City Code and other regulations, and using same to fine, harass, disrupt, and ultimately shut Plaintiff's businesses, thereby depriving Plaintiffs of their state-created use/occupancy/property rights.

32.     Commissioner Carollo instituted a "cloud of fear" among City staff to coerce them to submit to his demands that they take action against Plaintiffs' businesses or they would be demoted and/or terminated.

33.     For instance, Commissioner Carollo took part in the removal of Code Compliance Director Diez, a 14 year veteran for the City.  Commissioner Carollo directly threatened Director Diez's position by telling him that if he did not cite Plaintiffs' properties unlawfully he would be demoted. The Director was warned by the Assistant City Manager, among others, that Commissioner Carollo "want[s] your head" and "there will be consequences" by Commissioner Carollo if the Director did not falsely cite Plaintiffs' businesses with code violations that did not exist, in order to shut them down. When he refused to do so, Commissioner Carollo had Director Diez promptly terminated from his position and he was instructed, in an unprecedented move, never to speak with anyone in the Code Compliance Department again.

34.     When the new Code Compliance Director came on board, Director Valencia, Commissioner Carollo publically attacked her qualifications and the then-Manager's ability to put her in charge of the Department, when she was not able to find ways to cite Plaintiffs for violations that Commissioner Carollo deemed existed.

STEARNS WEAVER MILLER WEISSLER ALHADEFF & SITTERSON. P.A.

35.     Similarly, Commissioner Carollo directed the then-head of the Miami Parking Authority to harass Plaintiffs under the guise of "life safety" issues; and when he complied, Commissioner Carollo assisted in his promotion to City Manager, thereby permitting Commissioner Carollo even greater influence over the City department officials and employees, including their promotion and termination.

36.     The City officials who adhered to the plan to target Plaintiffs were promoted and rewarded for following orders, and those that resisted were harassed by Commissioner Carollo, demoted, terminated and/or forced to leave their position.

37.     The City's plan evolved over time and involved multiple and overlapping methods of implementation and chains of command. At times, Commissioner Carollo and his office made false "anonymous" complaints targeting Plaintiffs to avoid public scrutiny, despite that the City was aware that there was no valid basis for the complaints. Other times, directives and directions to staff came directly from Commissioner Carollo and his office. At times, features of the policy were directed by the City Attorney and her office to staff for implementation. At times, the City Manager—first City Manager Gonzalez and then current City Manager Noriega—enhanced and carried out the policy directly and then through the City's administrative hierarchy. At times, various other City final policy-makers, such as the Building Official or Zoning Administrator, honed and implemented the policy. Scores of City officials, employees and personnel in a dozen City departments, such as Building, Code Enforcement, Police, Zoning, Fire, Legal, and Finance, carried out the policy directives, through normal and atypical chains of command. Ultimately, the City has been relentless in their pursuit against Plaintiffs, ultimately succeeding in shutting down Ball & Chain and Taquerias with their plan.

38.     Towards developing and implementing the City's plan and policy, the City Attorney, the City Manager and his Deputy, and others—initially at the request and direction of Commissioner Carollo—prepared a list of Fuller-affiliated properties (*i.e.,* including Plaintiffs and Fuller's family members).  At first, this Fuller property list was created during a "walk-through" of Little Havana which Commissioner Carollo directed and participated in on a routine basis with each City official. The Fuller property list was then circulated to each City department, including Code Enforcement, Fire, Zoning, Building, among others, with the directive to investigate the Fuller properties for "potential" violations with the intended goal of closing the businesses; *not* to allow compliance, as is the goal for other businesses.

39.     Multiple iterations of this Fuller property list were created and disseminated as part of the City's plan and policy. In response to one Fuller property list, the former City Manager warned the City Attorney that such actions would constitute "targeting" or selective enforcement which Code Enforcement was not allowed to undertake. In response, the City, primarily by initiative and coordination of Commissioner Carollo and the City Attorney, added more establishments not owned by Fuller to the list—intended for the sole purpose, and which City staff understood, as window dressing to obscure or conceal the City's exclusive and baseless targeting of Fuller/Plaintiff-affiliated businesses/properties. Notwithstanding the City's transparent attempt to cover up their true targets, the City proceeded to focus all of its enforcement efforts on Fuller-affiliated businesses and mainly Plaintiffs.

40.     All relevant City policymakers, including *inter alia* the City Manager, Building Official, and Zoning Administrator, affirmed that the City devised and deployed the property list to target Fuller/Plaintiff affiliates properties, and, that the City had no independent reason to do so other than for political vendetta.

-15-
STEARNS WEAVER MILLER WEISSLER ALHADEFF & SITTERSON, P.A.

41.     On information and belief, as part of the official policy, the City forbids employees from emailing each other or anyone externally about any of these issues related to Plaintiffs to not leave a trail.  Employees that do not follow the plan against Plaintiffs are penalized and terrorized, as the City has made clear that their jobs will be at stake.

42.     This web of City officials and employees are united against Plaintiffs.   City commissioners, who exercise informal control over Code Enforcement through the Planning and Zoning Department; the City Manager; the Police Chief; Code Enforcement Directors; the Fire Marshall; the head of the Building Department; and the City Attorney's office, through the help of attorneys working in that office, have and are engaged in this scheme of tortious conduct.  The City has enabled and contributed to this plan by providing all of its available resources to deprive Plaintiffs of their property rights.

43.     These top City officials permitted and condoned this policy and plan of unconstitutional violations against Plaintiffs.  They attended vexatious raids and "inspections" and have spoken in favor of the City's plans to deprive Plaintiffs of their property rights.  Moreover, these top officials have followed the plan and have carried out the unconstitutional conduct on behalf of the City.  That is, the City has deployed City employees, police officers, fire officials, building officials, code enforcement officers, the zoning department, and the City Attorney to carry out its unconstitutional plan.  Short of that, the City has done nothing to stop these employees, and, to the contrary, has supported their illicit conduct.

44.     In initial response to this conduct, on or about March 12, 2018, Fuller filed an Ethics Complaint against certain City officials with the Miami-Dade Commission on Ethics and Public Trust (the "Ethics Complaint").  The Ethics Complaint was based on all of the information included in the Related Case's Complaint, filed on October 11, 2018.  Unsurprisingly, after the Ethics

STEARNS WEAVER MILLER WEISSLER ALHADEFF & SITTERSON, P.A.

Complaint was filed, City officials attempted to tamper with the witnesses in those proceedings to get them to perjure themselves and exempt these City officials from any unethical findings.  Some of those witnesses who were City employees and refused to lie on the accused City officials' behalf, were ultimately terminated.  The City's message to its employees was clear: either follow the plan against Plaintiffs, or suffer the consequences.  Ultimately, Plaintiffs' owner requested permission to withdraw the Ethics Complaint in August 2018, in order to present a more robust showing of the actual harassment that had occurred through the Related Case in federal court.  The City took the withdrawal of the Ethics Complaint as a green light to resume and even ramp up their attacks on Plaintiffs, which became known amongst City officials as "Round 2" of the City's harassment policy.  Immediately after the withdrawal of the Ethics Complaint, the City again pressed forward with its plan to destroy Plaintiffs' property rights and businesses.

45.     The City dramatically ramped up its targeting policy immediately after the filing of the Related Case, in the fall of 2018. Within weeks, City officials and staff in various departments, such as Zoning, Building, Code Enforcement, and Legal, coordinated to activate the list of Plaintiff-affiliate properties for targeted zoning, planning, and code enforcement action. Those departments and employees conducted targeted reviews, inspections, investigations, and raids of only the Plaintiff-affiliated properties and establishments, and no other properties or establishments in the City, in an attempt to identify or manufacture violations and thereby impair or shut the businesses. Internal directives were given, across the spectrum of the City's administrative functions, to collect information and conduct inspections of Plaintiffs' business, including without limitation, the certificate of use, BTR, building permit plans, fire safety plans, parking requirements, code compliance, and any related violations, citations and tickets. Myriad City departments carried out

those directives in early 2019, reviewing, inspecting, investigating, and reporting internally as to the various aspects of Plaintiffs' businesses.

46.     City officials and personnel admit that the only reason for the City to target Plaintiffs' properties and establishments was because of their related ownership; that that reason was pretextual and arbitrary, related only to political vendetta and animus; and that there was no independent rational basis (such as cause to believe that the businesses had any violations at all, or violations in excess of or different than other like properties and establishments) for the City to target these properties and establishments.

47.     In February 2019, the City Commission by formal legislative act renewed, expanded, and codified the City's policy and plan to target Plaintiffs and Fuller/Plaintiff-affiliated properties and businesses and eventually shutdown Ball & Chain and Taquerias.

48.     At the City's February 14, 2019 public Commission meeting, Commissioner Carollo made a presentation to introduce a measure for vote, ostensibly regarding alleged violations related to life safety issues at Taquerias. This, despite that throughout 2018 and early 2019 Taquerias was repeatedly investigated by the City and no life-safety violations were found, and, with respect to minor Code or zoning infractions, either no violations were found or any violations were already remedied. The City Commission discussed the measure over the course of two and half hours, without providing Plaintiffs any notice that the Commission would be defaming and conducting a sham "trial" of their businesses and owners at the hearing.

49.     Through that discussion, the Commission articulated the true purpose of the measure: to target properties, establishments, and businesses owned or affiliated with Fuller, including the Plaintiff businesses; to place violations on those properties, establishments, and businesses; and to thereby shutdown those business operations.

-18-

50.     Commissioners Hardemon and Reyes suggested that the Commission resolve to apply its Code to repeat violators of life-safety issues Citywide. Members of the City administration, including the Fire Chief, explained however that the City did not need a Commission resolution or formal policy to apply the City's Code or other regulations to any business within the City. This was including and especially as related to business closures for alleged emergent life-safety issues. But by contrast, the City could not leverage alleged life safety concerns into inspecting businesses for non-life-safety issues.

51.     Commissioner Carollo explained the intent behind the proposed measure was not merely to apply the City's Code and regulations, in continuation of already existing policy, or by mere application of existing Code or regulation, but was indeed to create a new policy to target specific businesses—those affiliated with Fuller—and not other businesses or other City residents, and not for only life-safety issues.

52.     In connection with this discussion, the Commission was not sitting in any executive function capacity. The discussion confirmed that the goal of the proposed policy was not to bring allegedly violating properties or businesses into compliance with the relevant Code and regulations, but rather, was to stop operations at and shutdown Plaintiffs and other Fuller-affiliated businesses.

53.     Commissioner Russell disagreed with using the Commission to create policy to attack individual businesses; Commissioner Russell ultimately voted against the measure. Multiple members of the City's administration, including the then-Chief of Police, then-City Manager and then-Deputy City Manager, confirmed that the measure would cause the City to target only Fuller-owned/affiliated properties.

54.     With a majority vote, the City Commission passed Resolution No. R-19-0072 at the February 14, 2019 meeting:

> A RESOLUTION OF THE MIAMI CITY COMMISSION DIRECTING THE CITY ATTORNEY TO RESEARCH PROPERTIES DESCRIBED AT THE FEBRUARY 14, 2019 CITY COMMISSION MEETING DURING DISCUSSION ITEM "D3.1 – CODE ENFORCEMENT" REGARDING VIOLATIONS RELATED TO NO CERTIFICATE OF USE, CERTIFICATE OF USE OBTAINED UNDER FALSE PRETENSES, AND/OR PROPERTIES WITH VIOLATIONS THAT POSE LIFE-SAFETY ISSUES, AND INITIATE INJUNCTIVE PROCEEDINGS AGAINST SAID PROPERTIES UNTIL THE PROPERTIES ARE BROUGHT INTO COMPLIANCE.

55.     On February 20, 2019, the City Attorney directly contacted via email every department in the City providing interpretation, guidance and a directive in "carrying out" the City Commission's February 14, 2019 Resolution. In this email, the City Attorney directed the City employees, "all departments" and "all disciplines," to conduct "new site inspections and review of all city records for comparisons to existing site improvements/site uses/violations vs. the existing city records, permits, CUs, Cos, BTRs, warrants, waivers, occupancies, etc. [the City] has on file for the sites, by all the city disciplines/departments" for a specific list of only 10 properties identified by the City Attorney in that email. Less than an hour later, the City Attorney sent another email adding Ball & Chain to the list of properties to be levied with various violations and citations, bringing the target list total to 11.

56.     This list of properties created by the City Attorney was nothing more than a distillation of the previously-created target list of Fuller-affiliated properties, including the 3 non-Fuller-affiliated properties—*i.e.*, window dressing—previously assembled by the City. The City's goal was again reaffirmed to be the shutdown of the Plaintiffs (and Fuller-affiliated) businesses and properties on that list.

57.     Of the 11 properties on the list, 8 are Fuller-affiliated properties, including Ball & Chain and Taquerias, and the remaining 3 properties were added in a thinly-veiled attempt to avoid the appearance of targeting. Indeed, one of the 3 non-Fuller-affiliated properties was a made-up address that does not exist in City records. For these 3 non-Fuller-affiliated properties, the City simply did a cursory, superficial investigation into their parking lots, and they were not subject to any of the balance of the City's targeting policies described herein that were effectuated against Plaintiffs and the other Fuller-affiliated properties on the City Attorney's February 20, 2019 list. *See* Comparators at Addendum A.

58.     The City, including through its Deputy and Assistant City Manager, has repeatedly asserted that the City Attorney's February 20 emails were a strict restatement with appropriate interpretation of, and not an expansion, extension, or deviation from, the policy and directives provided by, in, and through the Commission's Resolution. This includes the "all department / all discipline" directive, and the specific 11-property target list of mainly Plaintiff/Fuller-affiliated properties for investigation, citation, violation, and closure.  Should this not be true, the City Attorney and Commissioner Carollo violated the City Charter by issuing directives directly to City employees without the consent of the City Manager.

59.     In response to the City Attorney's February 20 emails, multiple individuals within the City's administrative leadership, including the then-City Manager, then Deputy City Manager and then Chief-of-Police expressed concerns, including as to the improper targeting of the Plaintiffs, and the City Attorney's actions of directing City employees in violation of the City Charter. At the time, the City Manager led a meeting of the City's top administration to discuss those concerns about targeting and illegality, ultimately resolving that City staff were required to carry out City policy, notwithstanding their concerns. The City Manager, recognizing the

seriousness of the City's improper policy targeting Plaintiffs, referred these issues to the State Attorney's Office.

60.     City staff nevertheless began implementing the Resolution's policy directive immediately. In direct response to the Resolution and the City Attorney's February 20 emails, every City department, including Building, Zoning, Planning, Fire, Police, and Code Enforcement, renewed their conduct, re-investigated the Plaintiff properties, undertook actions proactively to issue and manufacture violations regardless of the basis and with the stated intent of eventually shutting-down Plaintiffs' businesses.

61.     Various City policymakers attempted to squelch whistleblowers within the City staff distressed by the City's unlawful and on-going conduct. In one glaring example, the City Attorney engaged in witness tampering by contacting the City Manager in an attempt to prevent him from testifying truthfully in the Related Case—going so far as informing him that Commissioner Carollo had "turned white" when he discovered that the City Manager intended to speak the truth about the City's political vendetta and unfounded targeting, and instructing him to "pasar la mano"—*i.e.,* to smooth things over with Commissioner Carollo or turn a blind eye to the City's misconduct.  In another instance, the City Attorney again pressed the City Manager to hasten closure—not merely passive investigation, and regardless of whether there was any cause—of Plaintiffs' businesses, instructing him to "throw a bone" to Commissioner Carollo and carry through with the City's policy to get the Commissioner "off his back."

62.     The City's investigations and violations continued, as detailed herein, until the eventual shut-down of each of Ball & Chain and Taquerias. Ball & Chain was shut down in October 2020 for obtaining its CO under "false pretenses" under the guise of a one-of-a-kind audit of its private provider Ortus; Taquerias was eventually shut down the following year in September

2021 under a claim by Zoning of a "life safety issue" in connection with the location of an outdoor staircase which had been in place during every inspection, including Fire's inspection on February 14, 2019, after which it confirmed there were no life safety issues or concerns. Both of these excuses are outlined in the February Commission Resolution.

63.     The February 14, 2019 Commission Resolution, standing alone and also as restated and interpreted by the City Attorney, constituted a legislative act setting a formal policy of the City to target Plaintiffs to the exclusion of any other business and any other resident in the City, based on pretextual and arbitrary reasons and without any basis in promoting any legitimate government purpose, which resulted in the unconstitutional deprivation of Plaintiffs' protected state-created property and entitlement rights.

64.     The Resolution did not only reify the City's custom or formal/informal policy of targeting Plaintiffs and Fuller-affiliated businesses. The Resolution established same as the formal and official City policy, to be implemented through formal chains of command, throughout the City. The Resolution set or formalized the policy of targeting—to focus already limited City resources and attention to a specific set of businesses, because of their common ownership/affiliation, and regardless of cause or evidence of any past violation or issue, to the exclusion of and differently than all other properties and businesses, rather than the City's prior policies of applying its Code and other regulations equally Citywide.

65.     The Resolution altered the City's policy, still in place for all other properties, establishments, and businesses in the City, of "reactive" Code enforcement (whereby the City responds to alleged Code violations or other infractions to determine non/compliance) to "proactive" Code enforcement (whereby the City actively sought out and manufactured violations)—but only for the Fuller/Plaintiff-affiliated properties, establishments, and businesses.

66.     The Resolution altered the City's policy, still in place for all other properties, establishments, and businesses in the City, of Code compliance (whereby the City attempts to identify issues and help property owners and business achieve Code compliance) to punishment and other punitive action (whereby the City actively sought to harass, disrupt, and fine the businesses)—but only for the Plaintiff-affiliated properties, establishments, and businesses.

67.     The Resolution suspended normal City policies for Code violations and other infractions, which involve notices of violation, procedures for resolution of violations, and appeals to determine unsafe conditions requiring injunctive action such as closure and/or suspension or revocation of use/occupancy entitlements—but only for the Plaintiff-affiliated properties, establishments, and businesses.

68.     The Resolution further emplaced a policy specifically of closure—to seek not only to disrupt but to close the Plaintiff-affiliated businesses, both temporarily and eventually permanently.

69.     The City's policy emplaced by and through the Resolution was done for only pretextual and arbitrary reasons. The policy's core features—to target a specific set of businesses because of common ownership/affiliation; to proactively locate and manufacture violations; and to shut the businesses—were emplaced only because of unsupported political animus directed at perceived enemies of a City Commissioner, and for no other reason.

70.     Further, the City's policy emplaced by and through the Resolution bears no rational relationship to any legitimate City interest. The City had no, and never acquired any, cause or evidence to believe that Plaintiffs or Plaintiff-affiliated businesses were susceptible to Code or regulatory violations, uniquely or differently from any other similar set of properties or businesses within the City, that could justify the policy to target them to the exclusion of others. Various heads

of relevant City departments have confirmed same. The City had no, and never acquired any, reason to suspend normal-course reactive Code enforcement and by contrast to proactively search for, and manufacture entirely false, violations at only Plaintiffs or Plaintiff-affiliated businesses— and such policies bear no relationship to potentially legitimate City interests, such as Code compliance. Various heads of relevant City departments have confirmed same. The City had no, and never acquired any, reason to suspend its normal-course policies of violation notices, resolution, and appeals, and replace same with a closure policy, for only Plaintiffs or Plaintiff-affiliated businesses—and such policies bear no relationship to potentially legitimate City interests, such as life safety concerns or Code compliance. Various heads of relevant City departments have confirmed same. Indeed, City management and staff confirmed—even before the City reified and adopted the policy through the Resolution—and have now reaffirmed that the City's closures of (rather than normal course compliance and other measures to remedy alleged violations, had any existed, with respect to) Plaintiffs' businesses had no beneficial impact on any legitimate City interest, such as Code compliance and the emergent protection of life and property.

71.    Even further, there was never any rational basis to target, affirmatively reinvestigate, manufacture violations, suspend normal compliance procedures for, and force closure of, these Plaintiffs and these  Plaintiffs' properties and businesses, because, in addition to all other facts alleged herein, the City, as described above and herein, had already subjected these Plaintiffs and their businesses to undue, unique, and specialized scrutiny, and determined that there were no issues and there was no cause to suspect that these Plaintiffs were specially susceptible to Code and other regulatory violations.

## The City Constantly Harasses Ball & Chain and
## Ultimately Shuts Down the Business for Over a Year

72.     The City's vendetta has been on display through the City's effort to use its "task force" to ruin Plaintiffs' most profitable business in Little Havana: Ball & Chain.  At every step of the way, Plaintiffs bent over backwards to meet the City's demands and address any issues raised by the City, whether warranted or not.  Yet, the City has continued its relentless pursuit of manufacturing violations against Ball & Chain, ultimately resulting in the suspension of its Certificate of Occupancy ("CO") by the Building Official and the revocation of its Certificate of Use ("CU") by the Zoning Administrator.  Ironically, this suspension of the CO stems from the work performed by a reputable and highly recommended Private Provider arm of the City—Ortus Engineering, Inc. ("Ortus" or "Private Provider")—to correct the violations that had been issued by the City.

73.     The City's top building official attested that Ball & Chain is the only business in the history of the City of Miami for which the City has suspended a CO—*for any reason*—notwithstanding that there exist other businesses identical to Ball & Chain in all relevant respects. *See* Comparators at Addendum B.

74.     Part of the City's plan to harass Plaintiffs and deprive Plaintiffs of their property rights consists of laying the pre-textual groundwork to shut the businesses down through constant notices and "violations."  The City was not acting pursuant to the City Code's legitimate purpose of maintaining the health and safety of its citizens; rather, it was all part of their scheme to run Plaintiffs out of town.  The volume and intensity of harassing activity was unique to Plaintiffs' properties and entirely outside of the scope of the necessary actions to ensure compliance with the City Code and other regulations.  At all relevant times, no other business in Calle Ocho had been subjected to this kind of harassing activity. In Addenda B & C are all businesses in the City of

Miami (including Calle Ocho) and specifically those in the same business as Plaintiffs with the same certificates of use and liquor licenses. Of those businesses who are all similarly situated as Ball & Chain and Taquerias, the City has testified that none have been subject to the same amount or level of inspections, raids or scrutiny as Ball & Chain or Taquerias.

75.     The City has taken the following unjustifiable actions, among others, against Ball & Chain[2]:

a.      On February 18, 2018, City officials entered Ball & Chain's parking lot and began photographing parked cars. A City Commissioner then lowered his car window, flashed his City of Miami identification telling the valet attendant that he was performing an "official investigation" of the valet operation and lot and that he was doing so in his official capacity as a City of Miami Commissioner.  After one of Ball & Chain's employees showed him the parking lot and valet operation permits, City officials exited the lot.

b.      Eleven days later, on March 14, 2018, City officials arranged for a "park and walk" with numerous City employees, including a police officer, two Code Enforcement personnel, and other City officials, in direct violation of the City Charter.  Prior to the walk, City officials visited residents in a building located to the rear of Ball & Chain on 7th Street, close to 15th Avenue, and provided the residents with personal cell phone numbers, and prepped them to complain of loud music after 9:00 pm at Ball & Chain. Prior to City officials' visits, there had been very few noise complaints about Ball & Chain but after the City officials had reached out to the neighbors, the complaints became an onslaught (orchestrated by the City officials).  To ensure that they could defend any false reports of noise violations, Ball & Chain owners then spent significant resources to implement high-tech noise cancellation equipment and a master switch to control the volume of the music automatically depending on the time of the night.  Staff could not bypass this master switch.  Additionally, Ball & Chain re-positioned stage speakers, eliminated use of musician monitors transitioning to in-ear monitors, and changed the times of live music performances to reduce any noise issues.  Even with these high-tech devices and preemptive measures ensuring that Ball & Chain would always

---

[2] The City continues to implement its plan and policy against Plaintiffs, and, accordingly, Plaintiffs reserve their right to amend their complaint and/or present the continued and unrelenting harassment by the City against Plaintiffs to the jury, including the City's actions that took place after the filing of Plaintiffs' complaint.

STEARNS WEAVER MILLER WEISSLER ALHADEFF & SITTERSON, P.A.

comply with the allowed decibels under current regulations, the unwarranted noise citations continued.

c.  On July 6, 2018, Ball & Chain received a Fire Department Notice of Violation for not maintaining guest count clickers in the front, the interior occupancy being higher than the posted load, and a rear nonconforming exit.  All of these were simply excuses to give said violation.  Namely, there was no violation of occupancy as the establishment maintained clickers to control occupancy loads at all times; the northwest exist was conforming; and Ball & Chain had been instructed by the City to black out "exit" signs posted.

d.  On August 28, 2018, the City's fire inspector visited Ball & Chain, and confirmed that the only reason he was there was because the "chief sent him."  Finding no violations, he gave the premises an "all clear."

e.  On August 31, 2018, code enforcement inspectors again visited Ball & Chain without any basis to do so, finding no wrongdoing.

f.  On September 14, 2018, code enforcement inspectors again visited Ball & Chain to check valet permits, and again found no wrongdoing.

g.  On September 15, 2018, at approximately 12:30 am, three City of Miami Code Enforcement Officers and a police officer showed up at Ball & Chain to complain about alleged illegal parking on a lot owned by Plaintiffs that was adjacent to Ball & Chain, following an "anonymous" tip. The employees of Ball & Chain utilize the lot to park their cars while they are at work, which is zoned commercial and therefore may be used for public parking.  Still, Code Enforcement officers issued Plaintiffs a citation for illegal parking and failure to have a valid CU, and without notice or an opportunity to be heard, forced 25 employees to stop working and immediately move their cars.  When Plaintiffs investigated the incident, they found it was a City Commissioner who had texted the City Manager on September 15, 2018 stating "Mr. manager 1530 sw 7 street still parking illegally and music blaring in violation of city code."  Ultimately, Code Enforcement admitted to Plaintiffs that the lot was properly zoned and could be used for parking, and that no other violations should have been issued.

h.  Later on, a public record request showed that Ball & Chain had apparently also received a noise citation the night of September 15, 2018.  Plaintiffs challenged this citation as they had not received any noise violations that night and there were no decibel readings taken, in violation of Code Enforcement's official policy.  Noise complaints (even bogus ones, as here) are extremely important, as the City claims it can force Ball & Chain to shut down permanently with just three such (false) complaints.  And, as

explained below, they give the City cover to pass ordinances—solely directed at Plaintiffs—directly tied to this noise issue.

i.      On September 27, 2018, multiple code enforcement inspectors and police officers surrounded Ball & Chain.  They did not cite or inspect the inside of the area, and, again, found no violation.

j.      On October 2, 2018, a Ball & Chain manager noticed a City commissioner and a member of the Code Enforcement Board standing next to the parking lot in front of some residences discussing the fact that the residences were over 100 feet away from the music playing at the bar.  Then the City officers began knocking on doors to ask the residents about the music, to see if they could find any to file a noise complaint against Ball & Chain.  This notwithstanding, members of the Code Enforcement Board are prohibited from conducting personal investigations on matters that will be brought before the Board.  Ball & Chain's manager followed up with the neighbors, who stated that they had no issues with the music coming from Ball & Chain and that most times they did not notice it.

k.      On October 17, 2018, code enforcement inspectors again issued another unwarranted noise violation to Ball & Chain.

l.      On October 18, 2018, a City Commissioner was spotted repeatedly circling Ball & Chain in city vehicle #214467.  When spotted by a staff member of Ball & Chain, the Commissioner quickly drove away.

m.      On November 16, 2018, a City Commissioner was again spotted loitering the Ball & Chain property, this time accompanied by police officers, and again found no wrongdoing.

n.      On February 20, 2019, the City sent the Department of Solid Waste officials to inspect on-site, finding no wrongdoing.

o.      After receiving a code violation for structural repairs, on March 26, 2019, Ball & Chain hired Ortus to assist with curing said violations and initiated a new permit application under BD19-005508-001 for remodeling/repairs with a very limited scope of work.

p.      On March 27, 2019, a City inspector issued Violation CE2019005418, citing Ball & Chain for failure to "pull/obtain building permit for the construction work performed (overhang attached to structure, floor windows, interior remodeling, stage/band shell)."  Plaintiffs were directed to prepare plans to address these issues by April 08, 2019.  Immediately, Plaintiffs, through Ortus, began diligently and tirelessly working with the City to develop and submit a plan to obtain an after-the-fact permit for the work.  Despite Plaintiffs' diligent efforts, the City intentionally delayed

and did not issue the actual permit until March 11, 2020, *one year after* the building permit application was filed with the City of Miami.

q.    On September 12, 2019, a City Inspector again inspected Ball & Chain, yet again finding no violation.

r.    On October 15, 2019, Ball & Chain filed a warrant application for outdoor dining (the "Warrant"), specifically referencing alcohol use in its letter of intent, and thereafter, uploaded all required plans to the City.  Ball & Chain worked diligently at every step to provide the City with all required documentation to ensure alcohol use in the outdoor area.  Importantly, all of the documents and information provided to the City indicated that Ball & Chain sought permits for alcohol use and consumption.  The City never raised concerns about Ball & Chain's alcohol use request and moved forward with the Warrant application.  One year after the original filing of the Warrant application (*i.e.*, by October 19, 2020), the City was required to issue a Final Warrant Decision Letter.  The City provided Plaintiffs a draft of the Final Warrant Decision Letter for comments, which were addressed by Plaintiffs' counsel.  Thereafter, despite multiple requests by Ball & Chain, the City never issued the Final Warrant Decision Letter, further pushing the timeline on the necessary approval.  Instead, the City delayed an entire year after Ball & Chain filed its application to inform it for the first time that  Ball & Chain would have to file a separate alcohol warrant application if it wanted its outdoor area to be approved for alcohol use and consumption—a process that would take, at least, another year to get approved.  Thus, Ball & Chain requested that, at a minimum, the City issue its Final Warrant Decision Letter, so that Ball & Chain could open its outdoor space, and proposed to add a condition to the existing warrant that outdoor alcohol consumption could be approved by a separate warrant.[3]

---

[3] This pending separate warrant is normally used for other contingent approvals on warrants. Indeed, while the City refused to extend Ball & Chain's liquor license to its outdoor space via an administrative decision, it previously approved Ball & Chain's competitor and next-door neighbor Cubaocho's request to extend its alcohol warrant through the exact same minor modification process that Ball & Chain requested, but was unfairly denied by the City.  Instead, Ball & Chain was required to go through a time-consuming and costly alcohol warrant process.  The City forced Ball & Chain to jump through hoops to obtain a warrant not only to delay Ball & Chain's permits, but also because a separate warrant process would require that Ball & Chain meet more stringent requirements related to noise complaints, which (as noted *supra*) has been a key part of the City's plan to shut down Plaintiffs.  All the while, Ball & Chain's competitors have been given concession after concession from the City.  Cubaocho is located at 1465 SW 8 St; is engaged in the same business use as Ball & Chain; also has a 4COP license like Ball & Chain's (though it looks to be inactive, which raises the question as to how the City is allowing CubaOcho to continue serving alcohol); has the same alcohol warrant as Ball & Chain; and also has an outdoor patio serving food

Yet, the City continued its harassment of Plaintiffs and insisted that the Outdoor Dining Warrant could not be approved separately from the Warrant for outdoor liquor consumption—despite that, the City's position was at odds with its own Code, Miami 21.  After several months of the City's even further delay and abuse wherein the City insisted that the warrants needed to be linked, the City finally issued the outdoor dining Warrant in January 2021 and the alcohol warrant in April 2021. On information and belief, the same planning director overseeing Ball & Chain's Warrant application quit his position with the City because of the City's malfeasance with these issues.

s.      On January 7, 2020, police officers entered Ball & Chain looking for a "Cesar," and again finding no violation.

t.      On January 8, 2020, code enforcement conducted a health inspection at Ball & Chain, again finding no violation.

u.      On March 7, 2020, Fire Department officials visited Ball & Chain for a Fire Inspection onsite, finding "we're all good on all" matters.

v.      On March 20, 2020, Florida Governor De Santis banned restaurant dining due to the COVID-19 pandemic, forcing Ball & Chain to close its doors temporarily.   On April 21, 2020, police officers visited Ball & Chain through a "referral," alleging Ball & Chain was operating in violation of COVID restrictions, but failed, again, to find any violation.   Around May 16, 2020, again another police officer went to Ball & Chain to check the current CU, which was current with no issues.  Around May 27, 2020, Governor De Santis passed Executive Order 20-11 Section 3(b) allowing the opening of restaurants.  At 9 p.m. on May 26, 2020, the night before Ball & Chain was set to open pursuant to this Order—and after having spent over $30,000 in food products, labor costs, and safety precaution installations in preparation for the opening—the City Manager enacted Amendment No. 1 to Order 20-11, specifically excluding a "tavern" from being able to open, with the *sole purpose of singling out Ball & Chain*. Two weeks later, the day before an injunctive relief hearing on this issue was set to take place, the City adopted the County's Amended Emergency Order 23-20 and determined that certain alcohol establishments with 509 Licenses could open immediately.  Unsurprisingly, the City still found a way to keep Ball & Chain closed, erroneously determining that it did not possess a City Business Tax Receipt (BTR) for a "restaurant" or "food service establishment."  The City eventually admitted that a "tavern" like Ball & Chain does not need to have a BTR to operate in the City—it only

---

and alcohol.  Cubaocho is thus identical to Ball & Chain in all respects relevant to compliance with the service of alcoholic beverages yet was treated differently.

-31-

requires a CU. Therefore, unlike its competitors, Ball & Chain was unlawfully prevented from reopening pursuant to Emergency Order 23-20.

w.   On September 11, 2020, the Building Official issued the CO to Ball & Chain in accordance with the approved plans prepared by Saladino Design Studios correcting all Code Violations issued through that date to Ball & Chain.

x.   On October 5, 2020, the City passed on first reading Ordinance No. 13936 sponsored by Commissioner Carollo to provide for the "inclusion of building code violations as a reason for revocation of certificates of use" (hereinafter the "CU Revocation Ordinance").

y.   Sometime between September 11, 2020 and October 5, 2020, the City initiated an *unprecedented* audit of its own private provider Ortus, which was completed on October 13, 2020.  Neither Plaintiffs nor Ortus were provided any notice of the audit.

76.   Then, the City's ultimate plan to shut down Ball & Chain, and establish the basis to later shut down Taquerias, came to fruition:

a.   On October 22, 2020, the City adopted Ordinance No. 13936 "to provide for the inclusion of building code violations as a reason for revocation of certificates of use."

b.   Also on October 22, 2020, unsurprisingly, the head of the Building Department, solely by way of certified letter, notified Ball & Chain that its CO was suspended as a result of the City's audit of the Private Provider which the City claims revealed that "the Certificate of Occupancy was provided based on incomplete, misleading, and/or erroneous information as it relates to the requirements for fire safety and the American with Disabilities Act."

c.   The Zoning Administrator, also solely by way of certified mail, simultaneously notified Ball & Chain of the revocation of its Certificates of Use issued in 2010 and 2014, citing the suspension of the CO as the basis of the revocation of the CU.

d.   Also on October 22, 2020, the City passed on first reading Ordinance No. 13941 (hereinafter, the "Noise Ordinance") sponsored by Commissioner Carollo to "provide for the prohibition of outdoor music between the hours of 8:00 p.m. to 8:00 a.m. the following day in areas that share a property line with any property that has a residential use."

e.   Putting the final nail in the coffin, on November 19, 2020, the City adopted on second reading that Ordinance No. 13941 with several amendments

prohibiting outdoor music between the hours of 10:00 p.m. to 8:00 a.m., and exempting *all* business in the City of Miami *except* Ball & Chain.

77.    Since the City unjustifiably shut down Ball & Chain, it has been working diligently to reopen the premises but the City continues to make unreasonable and new demands and requests preventing the business from opening.

78.    For all Code violations, the City must follow strict procedures, including that it allow the businesses 30 days to cure any alleged violations and to request a hearing before a special master.  Then, only after a business has not cured the violation within the allotted time, can the City fine the business every day until the violation is cured.  If not cured, the fines will turn into a lien, on which the City may then foreclose.  The City can only foreclose on the lien through a specific judicial process ultimately allowing the City to sell the property.  *See generally* City Code, §§ 2-814 *et al.*[4]

79.    Despite all of these strict procedures and protections, the City bypassed all forms of due process and imposed a draconian measure to shut down Ball & Chain.  During the relevant timeframe, no other business in Calle Ocho has been shut down in this manner.

**How the City Succeeded In Shutting Down Ball & Chain
Through The Suspension of Its CO and Revocation of Its CU**

80.    The City implemented a specific, targeted plan that ultimately worked in shutting down Ball & Chain.

---

[4] As discussed *infra*, the City's code enforcement procedure is modeled after Fla. Stat. § 162.06.  Title XI, Chapter 162 of the Florida Statutes, titled County or Municipal Code Enforcement, empowers municipalities to adopt alternate code enforcement procedures, but maintains the Florida Statutes are the baseline of the minimum procedures that must be followed for any code enforcement violations.

STEARNS WEAVER MILLER WEISSLER ALHADEFF & SITTERSON, P.A.

81.     As stated above, on March 27, 2019, Ball & Chain was cited for failing to "pull/obtain building permit for the construction work performed (overhang attached to structure, floor windows, interior remodeling, stage/band shell)."  Despite that Plaintiffs disagreed with the merits underlying the supposed violation, Plaintiffs nevertheless worked diligently with the City to develop and submit a plan to cure the "issues."  Ball & Chain's only goal was to work with the City to alleviate all of its concerns and keep Ball & Chain's doors open, so it filed for a new building permit on April 15, 2019.  Going the extra mile, on or about May 2019, Plaintiffs hired Ortus to assist in curing the four alleged issues regarding the construction work performed and assisting with the new permit process.[5]

82.     Under Florida's private provider statute, Section 553.791, companies like Ortus offer services to the public to "stand in" for the local building and code enforcement division.  In essence, a company like Ball & Chain pays Ortus to review plans and applications, and other documents, and certify that those documents comply with the applicable codes, rules, and regulations of the municipality.  Despite that the private provider charges the customer—here, Ball & Chain—a fee for providing these services, at all times the private provider is acting as an agent of and extension of the municipality in reviewing the documents for approval. Ortus then submits the documents and their approval directly to the City, which issues the appropriate permits, etc., based upon Ortus'—and only Ortus'—representations.

83.     Plaintiffs worked tirelessly with the City and Ortus for *almost a full year* to finalize a very specific scope of work included in the plans and the building permit, which the City eventually approved on March 11, 2020.

---

[5] This Complaint does not address Ortus' separate violation of its contract with Plaintiffs related to the work performed by the Private Provider.

84.     Ball & Chain then hired licensed professionals to complete work in accordance with the approved building permit plans.  The work was conducted during the City's forced shut down. From around June 10, 2020 to August 28, 2020, Ortus, on behalf of Ball & Chain, filed all required affidavits (i.e. plumbing, electric, storm shutters) mandated by the City and Section 553.791.

85.     Plaintiffs employed counsel to work with the City to have an all department inspection of Ball & Chain, ensuring compliance with all applicable regulations.  The City was aware of the work being done and approved the completion of all the improvements completed. In fact, the City identified for Ball & Chain the improvements that needed to be completed to bring Ball & Chain into compliance with the City Building Code. *At no point* did the City object to the work that was done at the request of the City – after many meetings and pertinent analysis – in order to ensure compliance with the City and Florida Building Code.

86.     Based on these submissions and after a thorough walkthrough with the appropriate City departments, on or about September 11, 2020, the City's Building Department had no choice but to issue Ball & Chain its CO, as required under the law.

87.     Yet, upon learning that a CO had to be issued under the Code, the City had to find another way to try to shut Ball & Chain down.

88.     Thus, the City contrived an unprecedented "audit" of its Private Provider Ortus, pursuant to Florida Statutes § 553.791(18)—even though it had worked with Ortus for more than a year in the process and had reviewed its plans and issued the CO according to those plans. Indeed, the City's Unsafe Structures Department approved of all of the work *prior* to the City issuing Ball & Chain its new CO and CU. Under City Code, the only actions that the City could take in such audit was to confirm that the required affidavits by the Private Provider were filed and

that inspections were completed.  Yet, despite this limited scope, the City illegally maneuvered a way to shut down Ball & Chain.

89.     During the relevant period, by the City's approximation, there were between 15 and 20 private providers operating within the City of Miami. Of those, Ortus is one of the most prominent by volume of projects, having reviewed more than 316 projects in the City in the past five years.  The other top private providers in the City during the relevant period are: MDCI, Universal/Pacifica, ARC, NV5 and NTCI. Every private provider operating within the City must, and did, complete a set of intake application documents and registration. Every private provider operating within the City is thus identically confirmed by the City to have all relevant qualifications, licensure, insurance, and otherwise be able to operate within the City.  The City's Quality Control Manager is responsible for conducting private provider audits in the City. The City has never audited any of the top private providers in the City aside from Ortus, and even then, it was solely in connection with the Ball & Chain audit and not in connection with Ortus' work for the City or any other project.

90.     Of *all* of the private providers in the City during the relevant period, the Quality Control Manager has never audited any, except for the audit of Ortus in connection with the Ball & Chain audit. Of the hundreds of projects for which Ortus was the private provider, the City has never audited any other project except for the Ball & Chain audit. For all other private providers in the City, the City initiated an audit only after first having had cause—*i.e.,* notice to suspect a substantial problem with the private provider's work—identified by the City during routine plan review; by contrast, the City audited Ortus/Ball & Chain with no cause whatsoever. *See* Comparators at Composite Addendum D (containing the City's Interrogatory Response Ex. G on

all Ortus projects in the City of Miami and a subset of the same identifying specifically the restaurants/bars that Ortus serviced).

91.     There were *only two* businesses which the City chose to "audit" a private provider's work and submission to the City:  Ball & Chain and the Tower Hotel, both of which are ultimately owned by Fuller—and notwithstanding that the City had already approved and issued Ball & Chain's certificate of occupancy approximately one month prior.  Indeed, as the City concedes, in its five years of doing business with the City, even dealing with complex, high-rise properties, Ortus had never been audited.  It was only after Ortus began working on the Fuller-owned businesses, and after pressure from Commissioner Carollo, that the City saw the need to do so. Even then, the City did not audit Ortus, as the statute provides, it audited only Ortus' work in connection with Fuller-affiliated businesses, in violation of the private provider statute.

92.     On October 22, 2020, Ball & Chain received a letter from the City informing Ball & Chain that based on the City's "review of permitting by private providers," "[the City was] hereby suspending the Certificate of Occupancy No. BD19005508CO pursuant to Florida Building Code Section 111.4."  This provision of the Code states, in relevant part, that a "building official is authorized to, in writing, suspend [] a certificate of occupancy [] issued under the provisions of this code whenever the certificate is issued in error or on the basis of incorrect information supplied, or where it is determined that the building or structure or portion thereof is in violation of any ordinance or regulation or any of the provisions of this code."

93.     According to the City, the City's audit revealed, "The Certificate of Occupancy was based on *incomplete, misleading, and/or erroneous information* as it relates to the requirements for fire safety and the Americans with Disabilities Act ['ADA']."  The suspension took place immediately and the City ordered Ball & Chain closed.

94.     Contemporaneously with the suspension of the CO, and as a result of the City's pre-textual audit of Ortus, the City informed Ball & Chain that its CUs "Nos. 2010-000808 and 1405-001154 [were being] revoked pursuant to Section 2-211(b) of the Code of the City of Miami" because "[t]he Building Certificate of Occupancy, issued on September 11, 2020, [had] been suspended resulting in the revocation" of the CU.

95.     The Zoning Administrator who revoked Ball & Chain's CU testified that the only CU he had ever revoked was Ball & Chain's and that no imminent life safety issue existed at the time justifying the revocation. Rather, he testified, the only reason he revoked the CU is because he was informed by the Building Department that the CO was being suspended, and, a business cannot have a CU if it does not have a CO. That Zoning Administrator further testified this was the first and only time he was ever informed by Building, or any other department at the City, that a CO was being suspended and the first and only time he ever revoked a CU. *See* comparators at Addenda B & G.

96.     The City's unwarranted revocation of Ball & Chain's CU was the key to shutting down the business, as Ball & Chain could not operate without it.  The City implemented its malicious plan not only by manufacturing a baseless audit but also by taking the extreme measure of passing a law—Ordinance No. 13936, which was (not coincidentally) passed on the same day that the City suspended Ball & Chain's CO and revoked its CU—in order to purportedly justify its ability to strip Plaintiffs of both of its certificates without any warning or ability to remedy the ruthless measure.

97.     Following the same logic employed by the Zoning Administrator and building personnel, on or about February 16, 2022, Plaintiffs' counsel emailed the City informing it of three businesses in Little Havana – one block away from Ball & Chain and on the same Calle Ocho as

Taquerias—that had their CUs revoked on December 20, 2021 for "life safety issues," *i.e.*, unsafe structures under 2-211(b)(7). But, they continue to operate in violation of the law and without action by the City to shut them down, despite the City having knowledge of them, doing so:

      a.    <u>Sabor Borinqueno</u>, 1644 SW 8 Street—restaurant cited for life/safety issues, including electrical work without a permit;

      b.    <u>Oriental Chinese Restaurant D/B/A Sala'o Cuban Restaurant</u>, 1642 SW 8 Street—restaurant cited and adjudicated for electrical work without a permit and also had life safety concerns. Instead of closing the business down, Sala'o was given 90 days to comply after the Board found them guilty; and

      c.    <u>Latin Art Core, Inc.</u>, 1646/1648 SW 8 Street—cited for life/safety issues, including electrical work without a permit.

In other words, Plaintiffs' counsel gave the City the same information given to the Zoning Administrator that "required" him to revoke Ball & Chain's CU and ensure they shut down the business.

98.    Specifically, Plaintiffs' counsel wrote to the City:

By way of this email, I am requesting that your office enforce the revocations of the CUs and provide my office with confirmation that the businesses have been ordered to close while they correct the outstanding code violations, or until the Planning, Zoning & Appeals Board hears their appeal, which appeal was deferred this evening.

As you know, the patio for Ball and Chain and Taqueria el Mexicano remain closed as the result of a revoked CU. We demand that the City either immediately shut down businesses without valid CUs, or permit the Ball & Chain patio and Taqueria el Mexicano to open while they close out their issued permits.

It is only fair that the rules are applied equally to all businesses within the City of Miami.

99.    The City Attorney's office responded:

If there is a complaint for operating without a certificate of use, Code Compliance can cite accordingly and then bring the matter before the Code Board pursuant to the City Code.

STEARNS WEAVER MILLER WEISSLER ALHADEFF & SITTERSON, P.A.

The City has further attested that any electrical work done without a permit is an imminent "life safety issue." Yet, these 3 businesses, two of whom are restaurants like Ball & Chain, and all of which are on the same street, remain open without a CU, and Ball & Chain remains closed by the City under the exact same circumstances.

### The City Failed To Follow Any Applicable Statute, Regulation, Code Provision and/or Ordinance in Suspending the CO and Revoking the CU

100.    In its October 22, 2020 letters, the City pretends as if its unprecedented audit of Ortus triggers the suspension of Ball & Chain's CO and revocation of the CU.  Yet, that is demonstrably false and nonsensical for at least three reasons.

101.    *First*, under the private provider statute, Florida Statutes Section 553.791, the City is only allowed to investigate whether Ortus acted according to its responsibilities pursuant to the statute and the scope of work for which it was hired.[6]  Yet, Ortus was only tasked with reviewing plans and applications related to the specific cited violations from March 27, 2019: for Ball & Chain's failure to "pull/obtain building permit for the construction work performed (overhang attached to structure, floor windows, interior remodeling, and stage/band shell)."  Ortus' work had *absolutely nothing to do* with Ball & Chain's requirement for fire safety or the ADA.  This makes sense, because fire safety is strictly under the purview of the City and its Fire Department and cannot be delegated to a private provider.  Thus, the City could never have conducted an audit and then suspend Plaintiffs' CO and revoked its CU for improper paperwork submitted by the private provider, which had nothing to do with fire safety or ADA issues.  Moreover, the remedies under the statute as set forth in Section 553.791(13) do not contemplate suspension of the issued CO.

---

[6] Section 553.791(1)(B) specifically states "Local Building Officials may not replicate the plan review or inspections performed by the Private Provider."

The only remedies contemplated are: (i) a meeting by the parties to resolve the issues (which never occurred in this matter); (ii) review by the Enforcement Agency Board of Appeal (which in this matter as to the CO is the County Board of Rules and Appeals ("BORA"), explained further below); (iii) a stop work order which is allowed only if a condition of the Building site constitutes an immediate threat to the Public Safety and Welfare (and cannot possibly be the case here where the City approved all building plans, participated in the final inspections and issued the CU and CO based on the completion of the Improvements). Importantly, the private provider did not submit any documents related to fire safety.

102.    Also, any issues related to a necessary Automatic Sprinkler System as part of the Fire Provision of the Building Code, could not have emanated from the Ortus audit or scope of work.  The question of whether "the Automatic Sprinkler System was necessary" was outside of the scope of the Ortus work and the plans submitted to the City and approved by the City on March 11, 2020.  Thus, the City could never have used the Ortus audit as a legitimate reason for suspending Plaintiffs' CO and revoking their CU.

103.    *Second*, if the City actually had a legitimate "fire safety" concern, it had two options—neither of which permitted it to strip Ball & Chain of its CO.  (1) Under Code Section 19-26, upon finding "evidence . . . establishing a violation" of the Fire Prevention Code, "the city's chief fire code enforcement official . . . may issue . . . a notice to correct the violation or a citation to cease the violation" with an opportunity to be heard and to cure said violation; or (2) Under Code Section 19-27, and only upon a finding of a "reasonable likelihood of imminent endangerment to life, health or property because of a threatened violation" of the Fire Prevention Code, can the "city's chief fire code enforcement official . . . [t]ake any action necessary to prevent such a violation."  The City cites "fire safety" concerns as the purported reason for its decision,

but does not rely on either Section 19-26 nor 19-27.  Either way, the City has violated its own processes.  Under Section 19-26, the City failed to notice the violation and give Ball & Chain an opportunity to cure and be heard.  Under Section 19-27, the City failed to find *any* conditions at Ball & Chain causing "reasonable likelihood of imminent endangerment to life, health or property," nor could they, as there were no "fire safety" concerns at the establishment due to the fire sprinkler issue.  Without any of these explicit findings, the City could have never legally shut down the establishment indiscriminately.

104.    *Lastly*, the section cited by the Zoning Director as the reason for the City's decision to revoke Ball & Chain's CU – Section 2-211(b) of the City Code – provides that a zoning administrator "shall revoke a certificate of use" if a business commits any of a list of numbered violations.[7]  While the City does not specify, the City could only be relying on Section 2-211(b)(1) or 2-211(b)(7).  However, Ball & Chain is not the "applicant" under these sections subject to

---

[7] "b) **Revocation** of certificate of use. The zoning administrator **shall** revoke a certificate of use for any of, but not limited to, the following reasons:
1) The applicant provided a material false statement in the application or in the supplemental or additional statements of fact or studies required by the city.
2) There is a failure to comply with the terms or conditions of the certificate of use.
3) There is a violation of the provisions of this division.
4) The certificate of use holder subsequent to being issued a certificate of use, has been convicted of, or has pled guilty to, a violation of a law of Florida, or ordinance of Miami-Dade County or the city, which violation resulted from actions relating to the terms or conditions of the certificate of use.
5) The certificate of use holder is engaging or has engaged in an activity from the proposed premises that is not in compliance with a zoning ordinance or other city ordinance.
6) The business tax receipt ("BTR") for the certificate of use holder has been denied, suspended or revoked.
7) There is a violation of Chapter 10 of the City Code, including but not limited to failure to obtain a forty ( 40) year certification."

City of Miami Code of Ordinances, Section 2-211, as amended by Ordinance 13936 (emphasis added).

STEARNS WEAVER MILLER WEISSLER ALHADEFF & SITTERSON. P.A.

penalties – Ortus is.   Thus, Ball & Chain could not be penalized because it was Ortus, the City's own private provider (stepping in the shoes of the City), who submitted the application and the statements contained therein, not Ball & Chain.  In addition, even if Ortus' applications could have any bearing on this decision, the applications were only submitted in relation to Ball & Chain's CO – **not the CU**.  In fact, the CUs in this case, were issued in 2010 and 2014, prior to any involvement by Ortus.  Thus, Ortus' application could have in no way ever affected Ball & Chain's CU.  Lastly, there were no uncured violations at the time that the City revoked the CU pursuant to 2-211(b)(7). Simply put, there is no connection between the building permit and the applications for the CO and Ball & Chain's CU, or any inspections regarding fire safety done in relation to the CU.

105.    In conclusion, the above procedural deprivations and substantive falsehoods, further prove that the City's entire process was pre-textual, and part of the City's overarching plan to destroy the business and deprive Plaintiffs entirely of their property rights.  On top of the City having an unlawful goal—to shut Ball & Chain—they failed to follow their own processes in doing so.

## The City's Actions Regarding the CO and CU Also Violate
## Florida's Private Provider Statute

106.    Once the Private Provider submitted its Affidavit of Compliance/Completion, City Code prohibited the City from, months later, contesting the actions and approvals of the Private Provider, as it attempted to do by way of its suspension of the CO and revocation of the CU.

107.    By the time the City made its decision on October 22, 2020, the issued Building Permit was closed and Certificate of Completion for all work in accordance with the Permit had been provided by the Private Provider to the City. The City filed no objections to the work done within the strict time limits provided by Florida Statutes § 553.79 (12), which provides:

[n]o more than 2 business days after receipt of a request for a certificate of occupancy or certificate of completion and the applicant's presentation of a certificate of compliance and approval of all other government approvals required by law, the local building official shall issue the certificate of occupancy or certificate of completion or provide a notice to the applicant identifying the specific deficiencies, as well as the specific code chapters and sections. **If the local building official does not provide notice of the deficiencies within the prescribed 2-day period, the request for a certificate of occupancy or certificate of completion shall be deemed granted and the certificate of occupancy or certificate of completion shall be issued by the local building official on the next business day**.

(Emphasis added).

108.    Here, the City of Miami issued the CO on September 11, 2020. On October 22, 2020, *more than a month later*, and well-over the allowed 2-day period, the City suspended the CO predicated on "incomplete, misleading, and/or erroneous information as it relates to the requirements for fire safety and the Americans with Disabilities Act," and thereafter revoked the CU.

109.    Thus, the City plainly failed to comply with the deadline set forth in the Statute.

## While Plaintiffs Try To Work with the City to Re-Open Ball & Chain, the City Continues Violating Its Own Processes and Acts in Bad Faith

110.    Upon receiving the City's October 22, 2020 letters, Ball & Chain submitted two appeals to the City of Miami Planning and Zoning Board ("PZAB Appeal") and to the Board of Rules and Appeals ("BORA Appeal"), on November 5 and November 18, 2020, respectively. These appeals set forth all of the reasons why the City's decision was erroneous and contrary to all applicable regulations and laws.

111.    The PZAB Appeal focused on the revocation of the CU, as that is under the purview of the Zoning Department.  The BORA Appeal focused on the CO, specifically, the building official's determination after the audit that the scope of work triggered a Level 3 review.

112.     The City responded to the appeals by raising new alleged issues and unfounded explanations to allegedly support its decision to suspend Ball & Chain's CO and revoke the CU.

113.     First, acting outside the City's permitted scope of the "audit" of Ortus, the City analyzed the Microfilm records and found that work done at Ball & Chain post-2008 had allegedly been done without a permit.  According to the City, the as-built[8] plan, prepared by the architect of record as part of the building permit submittal in 2019, should have contained improvements that were not found in the City's Microfilm records.  The City argued Ortus should have checked the Microfilm records to ensure that all improvements at the premises were permitted and approved by the City.  The approved permit for the work permitted pursuant to this notice on March 27, 2019, concerned four very narrow issues and limited scope of work.  In any event, if the City was right in its assessment of the Microfilm records, then it needed to have cited Ball & Chain for a different kind of violation with its own opportunity to cure and be heard, instead of shutting it down.

114.     Second, using the Microfilm records, the City determined that the work area had supposedly exceeded 50% of the building area under the work for alterations, triggering a Level 3 review, and requiring additional installation of an Automatic Sprinkler System per Code Section 804.2.  Importantly, Ortus confirmed that the improvements were subject to a Level 2 review standard and therefore, the improvements complied with all applicable requests of both the City

---

[8] "As-built" essentially means "this is exactly what was here" on the date of the Microfilm records. Of importance, Ball & Chain has for years been a thriving business under current and compliant CO/CU's for nightclub and restaurant use.  Ball & Chain in fact, obtained its 40/50 year recertification in 2016, without a single issue.  That is, the City had already recently reviewed the Microfilm records in 2016 and found the structure was safe and in compliance, reissuing the certification without a single violation and raising no issues about any post-2008 improvements.

Code and the Building Code. Level 3 is not applicable in this case because the work performed does not include 50% of the building area and otherwise does not meet the requirements of a Level 3 review under the Building Code. The City allegedly calculated the work area at 60%, which is factually incorrect. In order to trigger the Level III review, the City cites to a Class II Special Permit issued in 2008 that shows a proposed "Art Gallery/Studio and Bar Lounge." The City utilized the as-built that was submitted with the Class II Special Permit (which only concerns applicable distance requirements and not construction work done or improvements) to calculate the work area to trigger a Level 3 review under the Florida Building Code. The City now relied on a Level 3 review in order to require that Plaintiffs install an Automatic Sprinkler System that is not required under a Level 2 review.

115.    The Level 3 review decision came as a shock to Ball & Chain, as the City itself, repeatedly represented—until its delayed issuance of the CO objections (and had worked with all involved parties under that understanding)—that all improvements would be conducted according to a Level 2 review, which did *not* require enhanced fire safety measures like the Automatic Sprinkler System. This heightened requirement was never brought up by the City during the scores of meetings and conversations it had with Ball & Chain and Ortus before approving the building permit, overseeing the construction, overseeing the application submitted by Ortus, multiple inspections since opening its doors by the Fire Department, including the approval by the Fire Department of the building permit, and ultimately approving the CO on September 11, 2022.

116.    While Plaintiffs waited for hearing dates on both appeals, they concurrently attempted to work with the City to fix any outstanding issues in an effort to expeditiously open their doors and mitigate their damages for the City's blatant misconduct. Yet, it was clear that the City acted in bad faith and never had any intentions of working with Plaintiffs. Plaintiffs' counsel

-46-

met on multiple occasions with the City and the architect or record, and consistently challenged the City's incorrect determination that a Level 3 review had been triggered, but the City could never provide the requested information demonstrating that a Level 3 review was appropriate. After much back and forth, Plaintiffs were forced to adhere to a Level 3 review and make the necessary changes to appease the City.

117.    On December 4, 2020, Plaintiffs' architect sent a letter to City, agreeing to submit a new set of plans for Ball & Chain that addressed the alleged deficiencies in the Ortus Audit. Thereafter, based solely on the City's promises that if Ball & Chain submitted new drawings that addressed the comments raised in the Ortus Audit, the City would: (a) approve the revised plans on an expedited basis; (b) offer open assistance on inspections; and (c) upon issuance of a building permit for the revised plans, issue a Temporary CO ("TCO"), and reinstate the CU to allow Ball & Chain to open with reasonable fire safety protocols – Plaintiffs agreed to defer both appeals.

118.    In addition, through the BORA Appeal, Ball & Chain would have only been able to obtain resolution on the limited issue of whether the scope of work triggered a Level 2 or Level 3 review, a matter that became moot once Ball & Chain unwillingly accepted to perform work pursuant to a Level 3 review solely for the sake of expediting matters. So even if Ball & Chain had succeeded with BORA, doing so would have not permitted it to reopen its doors, thus making a BORA hearing moot.

119.    Ball & Chain's only option was to work with the City and adhere to its every and ever changing demands. Yet, despite Ball & Chain's earnest efforts, the City acted in patent bad faith and continued to move the goal posts so as to continue to prevent Ball & Chain from opening its doors.

-47-

120.    Indeed, after working with the City for months, on January 27, 2021, the City Attorney's office emailed Plaintiffs' counsel, highlighting a few "issues" remaining with the "ongoing permitting process" at Ball & Chain.  Importantly, the City confirmed two key issues again: (1) Ball & Chain could have a "temporary" CU, while also using a fire watch for 1 or 2 weeks for the busy times, until the Automatic Sprinkler System was completely installed and approved; and (2) both the Zoning Department and Building Department were in agreement with this resolution.

121.    Thereafter, and in reliance on the City's promises, Ball & Chain obtained a second building permit on April 2, 2021, and awaited to receive its TCO (which would allow it to open) as the City had promised.  Yet, the City continued to play games and brought up new frivolous issues.

122.    While Plaintiffs had agreed to address the issues raised in the City's "audit" of Ortus in exchange for the City's promise to promptly consider their applications and issue a TCO (upon issuance of relevant County approvals), the City refused to honor its promises.

123.    On a call with the City on May 24, 2021, the City—for the first time—asked, as a condition for a temporary certificate, for a timeline of the relevant approvals and water main hook-up, and a timeline for building plan approvals.  Yet, the City nevertheless confirmed that it would issue a TCO upon such approvals.

124.    On June 10, 2021, Plaintiffs notified the City that their plans had been approved by the requisite authorities, provided a timeline for the balance of the building permits, and identified their track to tap into the water main by the end of July.  While the City first ignored Plaintiffs, it then, again, moved the goal posts—now conditioning the TCO on a tap-in and complete permit approval.

125.     Plaintiffs have cooperated extensively and complied in good faith with the understanding that the City's professional staff and counsel could be taken at their word. Yet, every time Plaintiffs complied with the City's requests, the City acted in manifest bad faith and changed the terms of their agreement. The City's new position—that Ball & Chain would get its TCO only after completed tap-in and completed approvals and post-approval inspection passage—was absurd and contrary to law. Plaintiffs would be due their permanent (not temporary) CO at that point. The purpose of a TCO—"temporary"—is to stand in place of and anticipating complete certification.

126.     Instead, the City raised a dozen new issues never raised before during the entire year the parties were discussing what was needed for Ball & Chain to reopen and, more importantly, had nothing to do with an imminent life/safety concern that would justify keeping the business shut down. For instance, the City conditioned the issuance of a TCO on Ball & Chain (1) providing legal paperwork regarding an egress that the City had already been inspected and approved and which remained unchanged for several decades; and (2) certifying the fire rating of an outdoor stage with prior approval by the City multiple times before to the unlawful shutdown.

127.     To make matters worse, while Ball & Chain was shut down, the City continued harassing Ball & Chain with frivolous notices of violations.

128.     For example, on June 29, 2021, Code Enforcement posted yet another violation at Plaintiffs' business—for an unlit letter in the businesses' sign.  The City Manager, himself, sent the Code Department to harass Ball & Chain and cite it for the violation. Despite that the City was aware of other businesses with prominent, store-front signs on Calle Ocho, just like Plaintiffs, that had faulty signs on the very same day that Ball & Chain was cited, Code refused to cite any of these establishments.  This occurred even though there are at least 36 other signs on Calle Ocho

-49-

that were missing one or more lights and do not illuminate properly. The addresses of these similarly situated businesses together with pictures evidencing that each business had the exact same violation as Ball & Chain—an unlit letter in the businesses' sign—on the same night Ball & Chain received this violation are attached as Addendum E. Despite having the same violation, on the same night, on the same street, none of these businesses received a notice of violation from the City, only Ball & Chain. Abiding by its plan to constantly move the goalposts, the City then maintained that Ball & Chain could not re-open until its sign violation was removed; and, when Ball & Chain repaired its sign, the City then imposed yet another sign violation on Ball & Chain in connection with its permit.

129.    In a further effort to hinder Ball & Chain's reopening, the City Attorney unilaterally instructed the City Manager and all City staff to immediately stop communicating with Plaintiffs' owners and required that all communications take place strictly through counsel. She did so notwithstanding that bedrock federal and Florida law provides that Plaintiffs may communicate directly with the City and its officials, managers, and professional staff as part of their right to petition their government. Plaintiffs' counsel gave the City permission to speak with their clients directly on these issues.

130.    The City Attorney also instructed Plaintiffs in writing to "sue and have a Court decide," if they desired to exercise their First Amendment rights to communicate with City employees.

131.    Despite the City continually bringing up new "issues," Plaintiffs did everything the City asked, though not lawfully required, to get its business back open.

132.    Ultimately, more than a year later, Ball & Chain received a temporary TCO for only its interior premises.  Ball & Chain's counsel thereafter followed up on multiple occasions to

have Zoning reinstate Ball & Chain's prior CU to allow it to open—rather than forcing it to apply for a new CU.  Yet, as part of the City's efforts to force Ball & Chain to be subjected to the new noise ordinance (detailed below, which exempts as "vested" businesses with an approval at the time of its passing), it refused and compelled Ball & Chain to apply for a new CU. To make matters worse, the City walked back its promise to allow Ball & Chain to reopen once it addressed all of the issues in the Ortus audit and has since found new "issues"—which it admits are not remotely related to any life or safety issues—to prevent Ball & Chain's reopening.

133.    All told, Plaintiffs and their design, construction, and legal professionals urgently, persistently, and desperately worked over the course of nearly a year, expending countless personnel-hours and hundreds of thousands of dollars, to attempt to reverse the City's unlawful suspicion of the CO, revocation of the CU, and closure of Ball & Chain. In the end, the City emailed Plaintiffs and instructed them to "sue" to protect their rights.

**After Colluding to Shut Down Ball & Chain, City Issues**
**New Noise Ordinance Affecting Only Ball & Chain**

134.    The City's decision to strip Ball & Chain of its CO/CU was all a pretext to allow it to enact a new ordinance and amend another (both proposed by City Commissioner Carollo) that would be applied *exclusively* to Ball & Chain, and no other business in Calle Ocho, and would give the City even more ways to continue keeping Ball & Chain's doors closed.  All part of the City's master plan.

135.    The same day it revoked the current CU and suspended the CO, on October 22, 2020, the City passed two ordinances directly targeted at closing down Ball & Chain and ensuring that its business would be severely curtailed if it ever reopened.

136.    First, the City introduced a proposal to the City Commission that banned all outdoor music from 10 p.m. to 8 a.m. at businesses neighboring any sort of residential property.  The

proposal was then enacted by the City Commission as Ordinance 13941.  The Noise Ordinance is directly targeted at closing Ball & Chain's outdoor entertainment at night during its prime business hours.

137.    Importantly, those businesses (including those in Calle Ocho) that had their CUs current at the time of the passing of the Noise Ordinance are grandfathered in and will not be affected by the Noise Ordinance.  Thus, in order to directly affect Ball & Chain with the Noise Ordinance, the City had to revoke its CU before passing it. That is, the City unlawfully revoked the current CU and suspended the CO and then passed a new noise ordinance exempting every single similar business establishment in Little Havana/Calle Ocho (and the City of Miami), but Ball & Chain.  Ball & Chain remains the only business in the City of Miami affected by the Noise Ordinance, as other businesses from Wynwood and Coconut Grove were also exempted from the rule after multiple amendments.

138.    Second, on the same day, the City Commission enacted Ordinance 13936 (an amendment to Section 2-211 of the City Code), changing just one word in the City Code, but with great consequences.  Section 2-211, the CU Revocation Ordinance, governs the revocation of a CU for businesses and previously allowed the zoning director to decide whether to revoke a certificate if a business commits one of a list of numbered violations.  Yet, this amendment changed the wording of Section 2-211 from "may" to "**shall**," thereby taking away any discretion by the zoning director in making this decision.[9]

---

[9] As discussed above, Section 2-211(b) now states: "Revocation of certificate of use. The zoning administrator **shall** revoke a certificate of use for any of, but not limited to," seven stated reasons. This is the same Section 2-211, which was improperly used by the zoning director, on **that same day** (October 22, 2020) as the only reason for the revocation of Ball & Chain's CU.  Immediately after the passing of the CU Revocation Ordinance, the zoning director sent a letter to Plaintiffs

139.     As written (pre and post amendment), while Section 2-211(c) provides Ball &
Chain with notice if the zoning administrator finds that Ball & Chain committed any of the
violations giving rise to the automatic revocation, it only does so only **after** the CU is already
revoked and the business is shut down, while the lengthy appeals process takes its course for years
thereafter.  This violates due process required by the U.S. and Florida Constitutions.

140.     Procedurally, the City also failed to follow its own processes in enacting both the
Noise Ordinance and the CU Revocation Ordinance.  For instance, the City did not allow Plaintiffs
to present a video objecting to the two new ordinances and explaining how both ordinances would
be used by the City to specifically attack Ball & Chain until after the vote had already occurred.

141.     Generally, the City also violated its own processes by failing to hear more than
eight hours of recorded public comments (much of it from Ball & Chain supporters) objecting to
the Noise Ordinance at the proposal hearing.

142.     The City argued that it failed to follow its own processes in listening to the
comments (mostly submitted by Ball & Chain supporters) pursuant to an opinion by the Florida
Attorney General because all messages followed the same "script," but the Attorney General has
denied ever giving an official legal opinion on the matter and has ignored all of Plaintiffs' request
to produce an opinion of that nature.

143.     Substantively, and procedurally, the City's two ordinances affecting only Ball &
Chain, and no other business in Calle Ocho, violate Plaintiffs' property and due process rights.

---

explaining its CUs had been "revoked pursuant to Section 2-211(b) of the Code of the City of
Miami."  Prior to amendment the City could not have relied on Section 2-211 to revoke the CU in
the manner in which they did.

**Taquerias El Mexicano Is Also Damaged by the City's**
**Constant Harassment and Unlawful Conduct**

144.    While the City persecuted and ultimately shut down Ball & Chain, the City also

harassed Plaintiffs' other main business in Calle Ocho: Taquerias El Mexicano.  The City's

harassment of Taquerias specifically started after the filing of the Related Case, whereby the City

began raiding the establishment on a daily or weekly basis to allegedly confirm whether Taquerias

had the adequate liquor licenses.  After Taquerias repeatedly showed the City that it, at all times,

operated with the appropriate license, the City then turned to repeatedly citing Taquerias for

"violations" (for work previously approved by the City) and moving the goal post on

improvements every time Taquerias fixed the most-recent violation.  The City ultimately

succeeded in also shutting down Taquerias citing to the same unconstitutional ordinance, Section

2-211, to revoke Taquerias' CU based on a mere technicality regarding an outdoor staircase, which

the City had previously approved and confirmed presents no imminent danger to the public.

145.    So far, the City has taken the following unjustifiable actions against Taquerias,

among others:[10]

     a.    On November 17, 2018, Code Enforcement entered Taquerias to check for
"documentation."  Taquerias' staff had to ask them to leave, as they did not
have a reason to be inside the store.

     b.    On December 15, 2018, the City deployed its "Dry Hour' multidisciplinary
task force operation to raid, and issue several unsupported violations
against, Taquerias. The raid took place between 11:00 p.m. on Saturday night
and 1:00 a.m. on Sunday morning and involved at least a dozen armed police,
fire inspection, code compliance, and ABT personnel. It produced no
violations noted and no action taken by ABT. But, following the raid, the City
issued a series of Code citations, claiming that Taquerias: required a separate
BTR for a "souvenir shop" allegedly separate from the restaurant; required a
warrant (zoning entitlement) for outside patio seating; was operating a

---

[10] As with Ball & Chain, Plaintiffs reserve their rights to amend the complaint and/or present evidence to the jury of
the City's ongoing harassing actions in implementing the plan detailed herein to unconstitutionally deprive Plaintiffs
of their property rights.

STEARNS WEAVER MILLER WEISSLER ALHADEFF & SITTERSON. P.A.

"lounge" (ostensibly, a type of alcohol service establishment, as opposed to a restaurant) in violation of its CU; served alcohol after closing service/consumption of food; and "was unable to provide documentation" supporting its compliance with the 51% of revenue regulation.

c.   On December 16, 2018, the City's Fire Marshal and ABT entered Taquerias asking for a "sketch." The requested information was provided and no violations were found.

d.   On December 19, 2018, a Code Enforcement Inspector posted Violation CE2018025722 for Taquerias failing to have proper documentation indicating sales of food and alcoholic beverage, which could not be the case given the City had at that point already found Taquerias in complete and full compliance of its liquor license and food sales through the City's unprecedented audit.

e.   On December 26, 2018, two other vexatious violations were posted at Taquerias, without any basis.

f.   On January 24, 2019, the Fire Marshall conducted an inspection of the patio, finding no wrongdoing.

g.   On January 25, 2019 at 8:30 a.m., just hours after, the Fire Marshall again visited Taquerias to "check the area." A Fire Department officer then posted an improper occupant load notice at Taquerias.

h.   On February 6, 2019, Code Enforcement posted another meritless violation at Taquerias for alleged: (1) failure to obtain a valid CU, (2) a tax receipt; (3) failure to obtain a warrant for a back patio; and (4) failure to obtain a BTR for a souvenir shop and CU for the upstairs lounge. Indeed, the City has conceded that all of the CU nightclub/lounge violations at Taquerias (as the City has raised this issue repeatedly over the years) never had any merit.

i.   On February 14, 2019, the Fire Marshall again arrived at Taquerias to confirm compliance with occupancy levels, even though the restaurant was nowhere near the legal limit. Later on this same day, a City Inspector issued a violation from the Fire Department for failure to have a proper CU and other issues related to the occupant load. Fire Department officials thereafter continued harassing the Taquerias employees for the information, even after Taquerias already provided the requested information.

j.   On March 10, 2019, the Fire Department again visited Taquerias, finding no wrongdoing. They came back on March 23, 2019, again finding no wrongdoing.

k.    On March 25, 2019, the City then sent an ABT Inspector for "informational purposes." Inspector Lowry stated Taquerias had no license to sell alcohol, which was incorrect and once Taquerias confirmed as much, the Inspector retracted the statement.

l.    On March 28, 2019, a City Inspector issued another meritless violation at Taquerias, for alleged "failure to provide the minimum off-street parking in SD2 zone." Indeed, the City has conceded that all of the parking violations at Taquerias (as the City raised this issue repeatedly over the years) never had any merit.

m.    On September 13, 2019, the Fire Department sent an inspector, along with a Code Enforcement inspector on an alleged noise complaint.

n.    On November 8, 2019, Code Enforcement posted another baseless violation at Taquerias.

o.    On January 13, 2020, Code Enforcement posted another baseless violation at Taquerias.

p.    On March 7, 2020, Fire Marshalls visited Taquerias, finding no wrongdoing.

146.    Each and every single one of these violations has been cleared, but not easily. Each time the City cites Taquerias unjustifiably, or for the same reasons it has already cited Taquerias in the past, Plaintiffs' counsel has to expend considerable time and legal fees in discussing the new made-up "violations" with the City, to show Taquerias' compliance with all applicable rules and regulations, to then have the City agree with Plaintiffs' counsel and ultimately agree to delete the violation. This process often takes weeks if not months, disrupts business at Taquerias, and causes damages to Plaintiffs in legal fees and other resources.

147.    The City has also failed to follow its own procedures for these violations, by only documenting them in the City's website as "noticed" but not providing Plaintiffs with an official notice of violation for some of them. Without such notice, Plaintiffs cannot be apprised of their due process rights as to each alleged violation. Moreover, the meritless violations cloud Plaintiffs' title and prevent Plaintiffs from obtaining important Zoning entitlements (as the City has

-56-

intentionally stalled Plaintiffs in a holding pattern), when the investigations should be closed or voided altogether.

148.    As a glaring example of how the City's malfeasance hurts Taquerias' business, on May 6-12, 2021, a production company wanted to hire Taquerias to be the site of a music video. Because of these unwarranted outstanding violations related to the BTR and CU, the City Attorneys' Office (in an unprecedented move) called the Event Director to have them refuse to issue a film permit to the production company, thereby causing Taquerias yet another lost business opportunity and thousands in lost profits.  Importantly, the City has no legal basis to deny a film permit due to outstanding violations, particularly given that Taquerias was already working with the City to correct them.  Of course, these unwarranted violations were subsequently voided.

149.    The City's vendetta against Taquerias has also become clear in relation to Taquerias' efforts to pursue an Outdoor Dining Warrant. Taquerias engaged counsel to obtain an Outdoor Dining Warrant pursuant to Article 6.3 of Miami 21 to allow Taquerias to operate as an Alcohol Service Establishment.  The outdoor dining is an extension of its Restaurant use subject to the 4COP SFS license.  Restaurant use is exempt from the distance requirements found in Section 4 of the City Code. Nonetheless, the City has placed a hold on the Outdoor Dining Warrant, claiming that it is reviewing the separation between Taquerias and an alleged "religious facility," despite that this has absolutely no bearing on the City's review of the Outdoor Dining Warrant. Accordingly, the City placed a hold on the Outdoor Dining Warrant citing a certain "religious facility" allegedly within 300-feet at 476 SW 8th Street, called "Ministerio de Juan 3:16" ("Ministerio de Juan").

150.    However, Ministerio de Juan shares a wall with and is in the same building as local liquor store "El Gato Tuerto," located at 476 SW 8th Street. As with Taquerias, the CU for

Ministerio de Juan predates El Gato Tuerto's CU and permit to operate as a liquor store. This is also the case for thirteen (13) other 4COP licensed establishments operating within 300 ft. of a "religious facility." *See* Comparators at Addendum F. In other words, the City had no issue allowing a liquor store to operate next to Ministerio de Juan, or any of the additional 4COP licensed establishments to operate next to other "religious facilities," but revoked Taquerias' liquor reservation on the specious basis that it needs to review its "compliance with the 300' distance separation from a Religious Facility." The City's decision to treat Taquerias differently from El Gato Tuerto (a business located immediately adjacent to Ministerio de Juan) and the other thirteen (13) 4COP licensed establishments (*see* Addendum F)—all similarly situated businesses in the same immediate location as Taquerias also selling liquor to customers—has caused Taquerias damages.

151.     Outrageously, but not surprisingly, the City Manager and City Commissioner Carollo were spotted on April 2, 2021, Good Friday, personally confirming the distance between Taquerias and Ministerio de Juan with a measuring tape, notwithstanding that there is no requirement for such distance separation, and that the City Manager is not tasked with conducing such measurements (which are reserved for a professional surveyor). When confronted by Plaintiffs' counsel about this bizarre conduct (which included the City Manager's decision to wear baseball cap to conceal his identity while measuring), the City Manager admitted to taking the measurements personally and to have supposedly "inconvenienced [City Commissioner Carollo] and asked him to indulge [him] since [they] were in the neighborhood."

### Despite Taquerias & Ball & Chain Having All Proper Liquor Licenses, the City Continuously Raids Them and Unlawfully Shuts Taquerias Down

152.     As another glaring example of harassment and deprivation of property rights against Plaintiffs, as part of the City's interlocking policy directives to attack and eventually shut

Plaintiffs' businesses, the City attempted to leverage Florida's Beverage Law and alcohol-related provisions of its Code to manufacture violations, with the intention to thereby disrupt and close Ball & Chain and Taquerias. This sub-plan took three schematic forms: repeated Dry Hour raids, tasking ABT to investigate Taquerias and Ball & Chain, and an "audit" of Taquerias' alcohol-derived revenue. The City's effort to abuse the Beverage Law and target Ball & Chain's and Taquerias' licenses and entitlements is unprecedented—not a single one of the identically situated establishments in the City, with the same licensure and entitlements, were subjected to the City's targeting policy. *See* Comparators at Addendum C.

153.    The City has established and effectuated a "comprehensive multi-disciplinary task force" operation, which includes City police, fire, Code enforcement officers, building inspectors, and zoning inspectors, along with state ABT personnel, known as "Dry Hour" (also called "Bar Check" or "Quality of Life Inspections").

154.    The City's stated purpose for Dry Hour is "to ensure each establishment that serves alcohol," and more specifically "alcohol service establishments," are "in legal compliance with *all* state laws, City codes, and Miami-Dade County ordinances" (emphasis added). That is, the stated purpose, and effect, of Dry Hour, is to search for violations of the criminal law, the City Code, the Florida Building Code, the Florida Fire Prevention Code, the City's zoning ordinance, and other relevant laws and regulations.

155.    For example, City Code enforcement personnel are tasked to "review[] *any* potential Code violation during the[ Dry Hour] inspections" (emphasis added). The City's Code enforcement manual lists expected "common violations" from Dry Hour operations to include failure to have/display a BTR, operating outside the scope of a certificate of use, and noise violations.

156.    As another example, City Building Department inspectors are tasked to Dry Hour specifically to inspect raided premises for unpermitted work and other violations of the Florida Building Code. Indeed, the City recently increased its budget for and retained additional building inspectors to increase the volume of building inspections undertaken during Dry Hour operations.

157.    As another example, City Police personnel are tasked to search the raided premises for any criminal violations, such as, specifically, narcotics, prostitution, gambling, and the trafficking of minors. In other words, City Police officers tasked to Dry Hour were instructed, and then did, conduct searches of commercial and businesses properties looking specifically and primarily for criminal misconduct—the very core of a governmental search.

158.    The City selects locations for Dry Hour inspections and raids "based on ongoing issues that may be occurring as well as complaints received." The City conducts Dry Hour operations at night, when establishments are at "peak hours of operation."

159.    No City department or agency requests, or receives, any form of warrant, or justified its search by cause to a neutral judicial decision maker, prior to conducting Dry Hour inspections, or prior to conducting any search in connection with Dry Hour.

160.    Indeed, the City's Chief of Police and Police commander in charge of Dry Hour operations admit that the City believes it is entitled to conduct Dry Hour searches or any commercial premises in the City, to look for violations of the criminal law, the City Code, the Florida Building Code, the Florida Fire Prevention Code, the City's zoning ordinance, and other relevant laws and regulations, without seeking or obtaining any form of warrant—neither a standard search warrant nor an inspection warrant. Stunningly, the Police commander in charge of Dry Hour and in charge of training and deploying Dry Hour task forces does not even know how

to obtain, and has never obtained, any warrant—neither a standard search warrant nor an inspection warrant.

161.     The City's Dry Hour operation is essentially a programmatic circumvention of the Fourth Amendment's warrant requirement.

162.     The City deployed Dry Hour operations beginning in 2018 and continually since, with renewed volume beginning in mid-2021.

163.     As described in more detail herein, the City deployed Dry Hour operations against Plaintiffs' businesses.

164.     Alongside the City's own targeting efforts, the City engaged DBPR's ABT to investigate Taquerias. Between November 2018 and February 2019, City personnel tasked, and repeatedly demanded, ABT to investigate the City's accusation that Taquerias was improperly operating a "new business"—a "new lounge/nightclub that just started to operate on the second floor"—without a City CU or BTR, under its 4COP SFS license, and for operating without a valid alcohol beverage license.

165.     At the behest and on behalf of the City, ABT responded with a series of investigations and site visits of Taquerias—all of which confirmed complete compliance by Taquerias with its Florida Beverage Law license. ABT comprehensively documented its efforts in a formal investigative report issued March 8, 2019. ABT explained that it first conducted a review of Taquerias' corporate records and ABT license, which revealed no discrepancies. An ABT special agent assigned to Taquerias then conducted a thorough review of ABT license file for Taquerias, which confirmed that Taquerias' second floor was included within the reported licensed premises where Taquerias could sell alcoholic beverages. In other words, Taquerias' first and second floors (i.e., the alleged "lounge") are part of one contiguous space, and Taquerias is licensed for the sale and consumption of alcoholic beverages in the

entirety of its two-floor space. ABT nevertheless tasked three special agents to accompany the City on the December 15, 2018 Dry Hour raid. Those agents inspected Taquerias on location and confirmed that the second floor area was consistent with Taquerias' license file and sketch allowing the sale and consumption of alcoholic beverages on the second floor, as well as the first floor, of Taquerias' licensed premises. ABT made explicit that its agents found no violations. An ABT special agent conducted a further inspection of Taquerias in late January/early February 2019 to confirm compliance in connection with Taquerias' outdoor patio. ABT again confirmed no violations. An ABT investigative specialist conducted another site inspection on March 4, 2019, determining again that Taquerias met all requirements of a licensed premises.

166.    There are at least 86 establishments, as detailed in Addendum C, in the City, and including the Calle Ocho commercial district, that have zoning approval from the City to operate as, and do operate as, a restaurant (according to the criteria set out in the City's Code), with valid BTR's for same, with in-establishment dining capacities functionally identical to Taquerias, and which operate with a valid 4COP SFS license issued by DBPR/ABT. Those establishments are thus identical in all respects relevant to compliance with service of alcohol beverages. Taquerias is one of those establishments. Taquerias is the only one of those establishment as to which the City tasked and demanded that ABT investigate for compliance with any alcohol beverage related law or regulation.

167.    Despite ABT's investigation and conclusion of compliance, between March and May 2019, the City audited Taquerias' financial records and specifically its alcohol sales revenue, further attempting to manipulate the Beverage Law to shut Taquerias. However, the City ultimately concluded that Taquerias, in compliance with both the Beverage Law (as applicable) and the City Code, maintained at least 51% of its gross food and beverage revenue from the sale of food and non-alcoholic beverages.

STEARNS WEAVER MILLER WEISSLER ALHADEFF & SITTERSON, P.A.

168.     Pursuant to Chapter 4 of the City Code, a "restaurant" use is not an alcohol establishment, and must meet certain requirements, as follows:

> Restaurant means a food service establishment that meets all of the following requirements: (1) Derives at least 51 percent of its gross food and beverage revenue from the sale of food and non-alcoholic beverages during the first 60-day operating period and each 12-month operating period thereafter; (2) Licensed by the state's division of hotels and restaurants; (3) Sells or offers for sale alcoholic beverages for consumption on the premises pursuant to a valid license issued by the state permitting such activity; (4) Equipped to seat at least 20 patrons at one time; and (5) Does not sell alcoholic beverages after the hours of serving or consumption of food have elapsed.

*See* City Code Sec. 4-2.

169.     In February and March 2019, the City's Code enforcement and Legal departments determined that the City was required to conduct an audit of Taquerias to determine compliance or non-compliance with the 51% rule, and that the City could use alcohol beverage related CU non-compliance to shut Taquerias.

170.     The City—including through the City Attorney, Assistant City Manager responsible for Code compliance, Director of Code Enforcement, and Chief Financial Officer—repeatedly confirmed that an audit of Taquerias' financial records for a 12-month period was required to determine, in the first instance, compliance or non-compliance with the 51% revenue requirement.

171.     On March 12, 2019, the City's Director of Code Compliance—for the first time in the City's history—requested an audit of Taquerias "to ascertain whether 521 SW 8th Street meets the requirements of a 'restaurant' based on applicable City laws (particularly, the criterion that the restaurant derives 51 percent of gross revenues from food and non-alcoholic beverages)."

172.     On March 13, 2019, Taquerias (under duress and protest) produced audit papers—a letter from its outside certified public accountant, supported by a gross sales report, categorized

sales information, and detailed point of sales data—demonstrating that over 65% of Taquerias' sales were from food and non-alcoholic beverages.

173.    Undeterred, on May 28, 2019, the City informed Taquerias that it was "request[ing] a _formal audit_ to prove the 51-49 ratio of food to alcoholic beverages for 521 SW 8th Street." The City's CFO composed an audit review process by copying a template from Florida's DBPR—because the City had never in history ever performed an audit. The CFO stated that the audit review process was designed to determine compliance or non-compliance with the 51% revenue regulation. The City communicated that documentation and information request to Taquerias in a series of emails and conference calls between April 15 and May 3, 2019. On May 8, 2019, Taquerias (by its outside accountant) provided the City the requested audit report—auditor opinion, revenue schedule, and completed questionnaire—to supplement Taquerias' prior accountant letter and sales data.

174.    On May 9, 2019, the City (after internal confirmation up the chain of command that Taquerias had attended to all required procedures recommended by DBPR) notified Taquerias that the City had reviewed and accepted the audit report, that Taquerias had been in cull compliance with the 51% rule, and thus that Taquerias had always abided by the Beverage Law and always operated a "restaurant" in conformity with Section 4-2 of the Code, Taquerias' CU and BTR.

175.    As stated above, there are at least 86 establishments in the City, including in the core Calle Ocho commercial district, that have zoning approval from the City to operate as, and do operate as, a restaurant (according to the criteria set out in the City's Code), with valid BTR's for same, with in-establishment dining capacities functionally similar to Taquerias, and which operate with a valid 4COP SFS license issued by DBPR/ABT. _See_ Comparators at Addendum C. Those establishments are thus identical in all respects relevant to compliance with revenue from

alcohol beverages sale in relation to revenue from the sale of food and other items. Taquerias is the only one of those establishments that the City audited to determine compliance with the 51% rule. Indeed, Taquerias is the only establishment *ever*, in the City's entire history, that the City audited to determine compliance with the 51% rule.

176.    Despite ABT's independent investigation and confirmation of Taquerias' compliance with the Beverage Law and its alcohol license, and despite the City's own investigation and audit and determination of Taquerias' compliance with the alcohol volume sales element of its licensure, the City Code, its CU and its BTR, the City undertook a series of warrantless Dry Hour raids of Taquerias that culminated in Taquerias' unlawful closure and the arrest of Taquerias' general manager.

177.    Taquerias has been raided on multiple dates, including demanding that the restaurant provide documentation for a nightclub on the second floor ("Los Altos"), even though Los Altos is properly licensed and purely operating as part of the Taquerias' restaurant and was documented as such.

178.    On April 3, 2021, multiple Police officers and Code enforcement personnel were dispatched to Taquerias. Police refused to speak with Taquerias ownership, telling management that they were sent on site "from above." This took place one day after Taquerias staff identified Commissioner Carollo, the City Manager, and other City personnel, lurking outside Taquerias with measuring devices. The City took no enforcement action.

179.    On May 1, 2021, pursuant to a Dry Hour operation, the City, including the Police Department, Code Enforcement, ABT, and Building Inspectors, entered Taquerias without a warrant and gave a written warning for a supposed liquor law violation.  When the Police Department and accompanying "task force" attempted to enter the building, Fuller reiterated that

Code Enforcement was not allowed to enter the venue without a warrant.  The Police Department disregarded this request, instead stating: "that's not going to happen," and proceeded to let Code Enforcement and others in.

180.    This raid occurred just days after the City swore in its new Chief of Police, whose first and highest priority on the job was to conduct an unlawful stakeout at Taquerias, along with the City Manager and other City departments.  Pursuant to its "Operation Dry Hour," the Police Department is required to prepare an accurate police report. Post raid, Plaintiffs wrote to the Chief of Police alerting him that his police report did not match the ABT report, erroneously stating that Los Altos was given a "written warning, liquor law violations" by ABT.  This was simply false. ABT's report had correctly found no violations by Taquerias, yet still, the Chief of Police refused to correct the falsified police records to comport with the ABT report, despite Plaintiffs' several requests to do so.

181.    The police officers turned on all of the lights on the second floor, Los Altos, and shut off the music, disrupting the night for all at the establishment.  Taquerias' staff continued explaining the situation to the officers, and affirming that the CU posted by the downstairs entrance covers the entire space, but the police officers ignored these explanations and instead threatened to issue arrests.

182.    Plaintiffs' counsel quickly explained to the City that its threats were unwarranted. Taquerias is a restaurant (including Los Altos), not a night club, and its CU provides for "Restaurant" use, for which liquor may be sold as long as the ratio of food to liquor is 51% (food) to 49% (liquor).  Whenever liquor is sold, its kitchen is open, in accordance with City of Miami Code Section 4-2.  Taquerias (including Los Altos) has a 4COP SFS License that permits the sale of alcohol at the premises, which includes both floors under license number BEV2300954.  The

fact that the license covers both floors can be easily verified by reviewing the sketch on file with ABT.  This license is current and valid through March 31, 2022.  The CU for Los Altos is a Restaurant Use.

183.    The plans reviewed for the CU at Taquerias included the entire premises consisting of both floors of the establishment.  Further, it does not distinguish between areas in the restaurant, per Chapter 4 of the City Code.

184.    This was also confirmed by the issued notice from ABT, which stated, "no violations observed" during the raid, citing as the reason for its determination that "Taqueria[s] has and continues to comply with all laws, rules, and regulations for the operation of a Restaurant with a 4COP liquor license."

185.    Since ABT found the business in compliance with its liquor license[11], the City instead cited the business for failure to display a BTR.

186.    Just five days later, on May 5, 2021, the City again raided Taquerias knowing that Taquerias, a Mexican restaurant, and its patrons, were celebrating Cinco de Mayo.  In fact, Taquerias was one of the only two Mexican restaurants in the entire City that were raided on Cinco de Mayo, and both were Fuller-affiliates.  Code Enforcement and the Police Department showed up to Taquerias again, alleging Taquerias did not have a valid BTR.  The general manager showed them the current receipt for the BTR, but the police officers and code inspectors remained at

---

[11] The City's actions forced Taquerias to abandon its 4COP Quota license in favor of a 4COP SFS license, which requires more stringent compliance with levels of square footage, seating, and percentage of food sales.  Plaintiffs' decision to abandon its 4COP quota license was the result of the City's constant harassment and knowing that the City would not grant Taquerias the required "Exception" to allow Taquerias to achieve dual use as both a Restaurant and a Bar (while it pursues its Bar liquor license).  Thus, in an effort to appease the City, Taquerias abandoned a liquor license it was lawfully entitled to have.

Taquerias for approximately 30 minutes.  Taquerias was only missing an official BTR permit because the City refused to mail it to Taquerias.  Plaintiffs were unable to get it in-person as the offices were closed due to the COVID-19 pandemic.

187.    Ultimately, the City acknowledged that the entire BTR issue was the City's fault. However, the City still refused to remove the violation from its system and refused to send a print-only version of the BTR permit for Taquerias to display.  Taquerias was again cited for only displaying the receipt, even though this was clearly due to the City's own incompetence and malfeasance.  It took Plaintiffs' attorneys many hours with the City's and BTR's employees to release the BTR permit, which ultimately only happened the **day after** the court ruled against Commissioner Carollo's Motion to Dismiss in the Related Case.  This was not a coincidence.

188.    Nevertheless, the raids continued.  On June 19, 2021, at 1:00 a.m., the Police Department, Fire Department and Code Enforcement raided Taquerias without stating a reason for doing so.  Taquerias' general manager explained they could not come in without a warrant, or at least without providing a reason, per Florida Statute Section 933.29, but the City ignored him.  All three divisions paraded through Taquerias in an extremely disruptive fashion.  The officers ultimately left, finding no wrongdoing.

189.    On Friday August 20, 2021, shortly before midnight, the Miami Police Department and Code Enforcement undertook an illegal warrantless search and (a) arrested the General Manager and (b) ordered all patrons to leave the premises, shutting down the restaurant for no legitimate reason.

190.    Their reasoning—that the upstairs area, Los Altos, was operating as a "nightclub"—is the same pretextual reason the City stated for all of the previous illegal raids.

191.    As in the past, the City failed to conduct any kind of inspection to properly determine whether Taquerias was operating as a nightclub, *i.e.*, that its primary use was not the sale of food.  As in the past, the City failed to conduct any kind of inspection to properly determine whether Taquerias was selling food at the same time as it was selling alcoholic beverages. Indeed, in order to do so, the City would have had to inspect the kitchen to ensure that it was open, and inspect Taqueria's liquor license—neither of which they did. Had they done so, the City would have confirmed, yet again, that Taquerias was operating legally and under its current BTR. And of course, the City did not and could not determine from a site raid whether Taquerias was in compliance with the 51% rule—not only because the City had already confirmed that, but also because the City had itself concluded (as is obvious) that a site visit cannot inspect 12-month trailing financial and sales records to ascertain the percentage of sales by volume.

192.    Instead, the Police Department simply classified Taquerias as a "nightclub" because patrons were dancing and standing up—neither of which are relevant factors under the Code or the Beverage Law.

193.    As evidence of the City's vexatious and intimidation harassing tactics, City police issued an arrest affidavit and fingerprinted Taquerias' manager David Caplan was in front of his staff and customers.  Mr. Caplan tried to reason with the police and attempted to deliver the explanatory letter that Plaintiffs' counsel had prepared in anticipation of this very issue, given the countless times these unlawful raids have occurred. Yet, the Police Department refused to read the letter and proceeded with the arrest.  That the City engaged in malicious prosecution and unlawful harassment was further corroborated by the State Attorney's Office's decision to dismiss all charges against Mr. Caplan a month later—but only after Plaintiffs were forced to hire counsel for their employee to present a detailed request for dismissal outlining the unlawfulness of the City's

actions and then had to spend a year working to have the arrest officially expunged from Mr. Caplan's record.

194.    After the unlawful raid, Plaintiffs' counsel immediately emailed the City Attorney's office to request that the City take immediate action to correct their error and permit the business to reopen.

195.    After much petitioning, the City Attorney's office finally confirmed "there is no reason preventing [Taquerias' Los Altos] from opening and operating as a restaurant at this time." Yet, the City Attorney's office refused to explain why the City engaged in such brazenly unlawful conduct and then completely abandoned their prior position.

196.    The City Attorney's office has yet to confirm that the City will abide by its own laws and stop these unlawful and harassing warrantless searches, particularly on this patently frivolous basis given that Taquerias has repeatedly provided the City with proof of its proper BTR, CU, and liquor license.

197.    In connection with each of the above-described episodes, Taquerias demanded that the City properly substantiate and obtain a warrant prior to conducting administrative or enforcement inspections and searches. Taquerias prepared its staff appropriately to deny the City warrantless access, and provided City personnel verbal and written communications denying consent and directing the City to seek judicial approval to access its property. While Taquerias has proactively worked with City fire professionals, invited multiple inspections, and quickly resolved identified issues, and consented to City Building Department access to inspect for unsafe structure and unpermitted work—allowing the City access to its property at specified times and for specified purposes in a good faith attempt to blunt City attacks—it never provided consent for any of the Dry Hour raids. The City never sought, and never obtained, either: (i) consent from Taquerias (or

any Plaintiff), (ii) a search warrant, nor (iii) an inspection warrant, to enter the Taquerias property in connection with any alcohol-beverage related law, code, or regulation.

198.     Moreover, the City admits freely that despite that there exists other restaurants in the City of Miami, and including Calle Ocho, which are similarly situated to Taquerias with the same liquor license (*see* Comparators at Addendum C), none have been subject to the same amount of inspections, raids or degree of scrutiny for alleged liquor law violations as Taquerias.

### Again Using its Unconstitutional Ordinance, the City Succeeds In Shutting Down Taquerias

199.     Having failed in its efforts to permanently shut down Taquerias based on a liquor law issue, the City used the same strategy against Taquerias that it used to shut down Ball & Chain.

200.     In or about 2019, Taquerias was noticed for work without a permit.  Again, to avoid any hiccups, Taquerias immediately hired architects, obtained a building permit, and worked diligently to finalize a new building permit.  Yet, every time the City went to the premises to inspect the scope of work—and during each of Taquerias' weekly scheduled calls with the City, its discipline chiefs and inspectors, and its Building Directors—the City consistently found new supposed "issues" every time Taquerias finished addressing the prior one.   The City's acts were done maliciously and with ill intent, to continue expanding the scope of work and causing Taquerias' ownership to spend more than $100,000 at the City's behest and considerable amount of time, and frustration.

201.     In its final effort to shut down the business, on September 15, 2021 (the eve of Yom Kippur, the holiest Jewish Holiday, which Plaintiffs' principals and employees observe) three Building Department inspectors barged into Taquerias, unannounced, to conduct an inspection directed by "the City Administration" of a demolition permit that had been closed for four years. When the owners requested that the inspectors return later because they were observing the

holiday, the City refused and said they did not have "an option to refuse entry to building inspectors" but could not cite any law or authority supporting its position. Because the City failed to give any prior notice, Taquerias was not able to have its general contractor onsite to ensure compliance with inspection requirements. The inspections and subsequent violation are all the more harassing given that Taquerias had been working with the City for the past year (including participating in weekly calls with the Building Department) to address any pending issues. Yet, the City never once raised this "demolition permit" issue and, instead, showed up unannounced in a blatant attempt to disrupt the businesses' patrons and harass the owners.

202.    When confronted about this conduct, the City Attorneys' Office prohibited Taquerias' owners from exercising their constitutionally protected rights to speak directly with City staff and employees to remedy these issues and refused to respond to any of Taquerias' counsel's half-dozen requests to speak.

203.    Six days later, on September 21, 2021, and without any prior notice, the City revoked Taquerias' CU pursuant to Sections 2-211(b) (5) and (7) of the Code and deployed City police to ensure the business was shut down.

204.    Notwithstanding that the City has maintained that it is illegal for a business to operate without a CU; and the City has revoked the CUs for various businesses with life/safety issues, *i.e.*, unsafe structures under 2-211(b)(7); the City is aware that they nevertheless continue to operate; but, the City refuses to deploy police to shut them down. *See, e.g.*, *supra*, ¶ 97(a)-(c). In the past five years, the City has revoked CUs for more than 300 businesses. Of all the CU revocations in the City, the Zoning Department director confirmed the City has never revoked a CU without prior notice and a hearing except for Plaintiffs, notwithstanding that there exist businesses identical to Plaintiffs with alleged "life safety" and "fire safety" issues. *See*

-72-

Comparators at Addendum G.  Additionally, the City had never before revoked a CU prior to its revocation of Ball & Chain's in 2020. Moreover, the City further affirmed that all of the other CUs it has revoked, aside from Ball & Chain's and Taquerias,' were pursuant to findings made at unsafe structure panel hearings.

205.   The City deployed the same unconstitutional ordinance to shut Taquerias as it had to shut Ball & Chain.

206.   The City's sole basis for shutting Taquerias down was that the outdoor, second staircase for the property was within 10 feet of the neighboring lot line, thereby allegedly violating Florida Building Code § 1027.5 "Location."

207.   However, the staircase at issue was part of a 2019 building permit (BD19-05503-001) on which Taquerias had been working with the City for years to ensure it met all applicable Codes, when the City abruptly shut  down Taquerias.  Indeed, Taquerias spent the last two years and many tens of thousands of dollars making changes to the staircase at the behest of the City, including replacing the concrete landing at the bottom of the stairs and closing the risers.  During the entire period in which Taquerias was working with the City, the City never once raised the issue of the location of the stairs.  Moreover, at no point did the City ever mention that Taquerias could or would be shut down for this technical violation.

208.   Taquerias never received a Notice of Violation regarding its outside staircase. Instead, on July 21, 2021, *after* Taquerias had finished spending considerable time and money improving the stairs in accordance with the City's comments, a Building Department inspector noted in his comments to a field check that the staircase was less than 10 feet from the adjacent lot line.

209.    As a result, Taquerias immediately began working on bringing the staircase into compliance and hired a general contractor for the work.  Taquerias provided conceptual plans to the Chief of the Building Department who approved them, and prepared architectural and structural plans to conduct the necessary work.

210.    During these two months while Taquerias worked to demolish and move the staircase (the same staircase it had just finished repairing on account of the City's demands), the City permitted Taquerias to remain open.  Indeed, there exists a secondary means of egress to address any imminent life or safety issues until the permanent solution was completed.

211.    In addition, since July 21, 2021, there were not any visits or inspections by the Fire Department or the Building Department related to the outside stairs.  At no moment did the Fire Department or the Building Department made any determination that the outside staircase presented an imminent danger to life and safety of the public. On the contrary, on February 16, 2021, the Fire Department conducted a final fire inspection (by Fire Inspector Daniel Caballero) finding Taquerias in full compliance on all fire issues, and raising no concerns about the outside staircase as an imminent danger to life or safety.  At no moment did the City require Taquerias to permit the outside stairs; in fact, Taquerias included the outside stairs in its "2nd Floor Legalization Plans" that the City approved and on which issued it permits.

212.    Taquerias' attorneys immediately contacted the City on September 22, 2021, challenging the revocation of the CU and the City's failure to provide Taquerias the requisite notice and opportunity to cure.  Taquerias' counsel explained in painstaking detail how the staircase issue poses no imminent risk to life or safety that would permit the closure of the business.  Yet, even after multiple requests, the City has failed to explain how the staircase, which provides a secondary form of egress and is nowhere close to an adjacent building, poses an imminent danger to life and

STEARNS WEAVER MILLER WEISSLER ALHADEFF & SITTERSON. P.A.

property requiring the shutting down of a business per any City ordinance, rule, or code.  Nor could it, as one does not exist.

213.    In response to Taquerias' counsel's requests that the City explain why it was shut down, the City Attorney brazenly admitted the City's unlawful retaliation, stating "If your clients would have … treated City staff with respect, they would not be in the precarious situations they find themselves in today."

214.    At most, the City should have simply issued a code violation for which Taquerias would have been allowed notice and an opportunity to cure, rather than imposing the draconian measures it did.[12]   To be clear, for all of the businesses in Addendum G and unlike with Plaintiffs, the City first cited the business with the alleged violation(s); the businesses were then given the opportunity to work with the City to correct the violation or participate in a hearing before an unsafe structures panel; and then only after the relevant process, procedures or hearings had taken place, did the City issue a CU revocation.

215.    During the relevant timeframe, no other business in Calle Ocho, other than Ball & Chain and Taquerias, has been shut down in this manner.  *See* comparators at Addendum G, listing other businesses with alleged "life safety issues" but that were not shut down or deprived of a pre-revocation quasi-judicial process.

---

[12] Section 162.06 of the Florida Statutes allows a "code inspector to initiate enforcement proceedings of the various codes" by first "notify[ing] the violator and give [ ] a reasonable time to correct the violation" within a specified time.  Fla. Stat. § 162.06(2).  "Should the violation continue beyond the time specified for correction, the code inspector shall notify an enforcement board and request a hearing."  *Id.*  Notice of the scheduled hearing must be provided.  *Id.*

### New Miami Chief of Police Confirms
### The City's Policy against Plaintiffs

216.     On April 5, 2021, the City swore in a new Chief of Police because "there was a need to reform the MPD and to change the culture of the agency."  In his September 24, 2021 memorandum to the City Manager and the City of Miami Mayor, the new Chief details the conduct alleged against the City and its corrupt employees by Plaintiffs here.

217.     In particular, the Chief explains for months, three City Commissioners, including those who have personally targeted Plaintiffs, have "interfere[d] with the MPD's affairs including the IAD investigation, hamper[ed the Chief's] given mission to reform the MPD, and retaliate[d] for refusing to succumb to their collective efforts to influence the outcome of the ongoing IAD investigation and operations."  He goes on to explain that in his career of "over 35 years" he "has never personally experienced such interference in a confidential law enforcement investigation."

218.     The Chief further confirmed that Commissioner Carollo requested the Chief to "allow him to use the MPD as his personal enforcer against anyone he perceives as offensive," which included also influencing "City Code Enforcement deployment decisions."

219.     He specified:

> In fact, Carollo and Diaz de la Portilla provided the MPD with a target list of establishments, which they claim are engaged in criminal activity and have pointed the finger at establishments in each other's districts, causing the MPD to investigate business establishments based on nothing more than the whims of Commissioners Carollo and Diaz de la Portilla.
>
> The MPD SIS/Vice Division has wasted untold hours investigating business establishments because of the improper political influence of, and intimidation by, these two commissioners. Unfortunately, Commissioner Reyes frequently joins Carollo and Diaz de la Portilla in their pattern of official misconduct.  After five months of observing these two commissioners, and the negative impact they are having on MPD and our business community, coupled with their unlawful obstruction of the IAD investigation involving Camacho, I feel compelled to memorialize and report their unlawful and retaliatory conduct.

STEARNS WEAVER MILLER WEISSLER ALHADEFF & SITTERSON, P.A.

220.     These statements were no surprise as a former City of Miami Chief of Police made similar accusations in 2019 in an email to the then City Manager concerning the City Attorney's request "that Miami police personnel, and other departments, conduct new site inspections at the direction of a city commissioner." This request "was aimed at one particular business owner in the city" (i.e., Bill Fuller). The email confirms the City Attorney created the list referenced at above, in which "the addresses forwarded in her email target[ed] the particular business owner [Bill Fuller] which gives the impression that the city is selectively targeting his businesses for new investigations." The Chief described the City's acts as "an unsanctioned and unlawful exercise of powers beyond the limits of [the commissioner's] legislative power as a city commissioner to intentionally cause harm to a business owner" and a "violation of the code ethics ordinance."

221.     Police Chief Colina and his successor Chief Acevedo, both of whom openly criticized the City for its targeting of Plaintiffs, are both no longer in power or employed by the City. The message from the City is clear: either target Plaintiffs' business and fall in line, or risk retaliation.

### The City Continues Unlawfully Harassing Plaintiffs
### After the Filing of This Lawsuit

222.     Plaintiffs filed their original complaint in this lawsuit on September 30, 2021. Undeterred, the City has not only continued, but actually ramped up its unlawful conduct against Plaintiffs thereafter, as well as tried to whitewash their targeting of Plaintiffs by pretending to ramp up enforcement against other businesses to avoid the appearance of impropriety or targeting.

223.     Specifically, the City continued engaging in a series of unprecedented continuous raids (sometimes daily) in a show of force by a variety of disciplines intended solely to intimidate and harass Ball & Chain. For example:

STEARNS WEAVER MILLER WEISSLER ALHADEFF & SITTERSON, P.A.

a.      On or about October 20, 2021, Commissioner Joe Carollo was spotted loitering near the back of Ball & Chain looking for violations, as he has done repeatedly in the past.  After his visit, numerous City inspectors then proceeded to inspect the business.

b.      On or about November 5, 2021, Building Inspector Elmer Rodriguez entered Plaintiffs' closed property without warrant or permission.  Plaintiff employee, Darius Green, requested Mr. Rodriguez not enter again the private property without consent.  When Plaintiffs questioned who sent him, he refused to provide additional details aside from just stating his "supervisor." Plaintiffs provided Mr. Rodriguez a copy of a warrant letter indicating that Plaintiffs do not give permission for Mr. Rodriguez, or any other City official, to be on the property.

c.      On or about November 8, 2021, around 8:00 pm, three (3) marked police cars parked in front of the Ball & Chain property and proceeded to conduct surveillance on the business.  Once Plaintiffs' employees began filming the police cars, all three immediately left the property.

d.      On or about November 20, 2021, around 1:00 am, six (6) City employees descended upon Ball & Chain.

e.      On or about November 21, 2021, an Inspector from the Fire Department arrived at Ball & Chain to take a decibel reading with a measuring wheel instrument.   He was then joined by five (5) members of the Police Department, including Commander Chin-Quee, who also joined on the decibel reading with a measuring wheel instrument. Commander Chin-Quee accosted Plaintiffs' employees and called them disrespectful and argumentative simply for respectfully asking questions regarding the nature of the City's visit, and defending the business, as it was clear no noise violation should issue. Nevertheless, the Police issued a noise violation arguing the music was "audible" beyond one-hundred (100) feet.  Plaintiffs' employees tested the levels themselves and confirmed no music was audible beyond one-hundred (100) feet so that the violation should not be issued.  Nevertheless, the City subsequently posted a noise violation at Ball & Chain.

f.      On or about December 2, 2021, the Police Department again visited Ball & Chain to allegedly address noise complaints, and to take a decibel reading.  When asked where the complaints were coming from, the Police Department could not (or would not) provide details or names.

g.      On or about December 3, 2021, around 10:30 pm, two individuals from the Fire Department visited Ball & Chain to conduct an "occupancy check." The leader from the Fire Department had a Notice of Violation form in hand, ready to be distributed to the Plaintiffs, which was never issued

because Ball & Chain confirmed strict compliance with their occupancy limits.

h.   On or about December 8, 2021, around 11:00 pm, two (2) police cars again parked in front of Ball & Chain to conduct surveillance. Once Plaintiffs' employees began filming the police cars, both cars immediately left the property.

i.   On or about December 9, 2021, the Fire Department again visited Ball & Chain to inspect. Plaintiffs' Manager explained he was not consenting to the Fire Department entering or searching the premises. No violation was issued on this occasion.

j.   On or about December 16, 2021, eight (8) members of the Police Department, including Sergeant Rodriguez, Officer Hernandez, Officer Anuum, Officer Hernandez, and Officer Lyttle visited Ball & Chain for the purpose of addressing a "complaint" for which they "received a call," and to conduct a "business inspection." Ball & Chain's employees demanded the City not enter without a warrant, to no avail. The Police Department proceeded with the inspection.

k.   On or about December 17, 2021, Commander Conrad Chin-Quee, Fire Inspector Cagnin, and another individual from the Fire Department visited Ball & Chain to conduct an "occupancy check." While Plaintiffs' Manager's demanded that the City not enter without a warrant, Commander Chin-Quee refused the demand and stated there is no need for a warrant for a visit of this nature. Fire Inspector Cagnin asked if the occupancy had been "properly posted." Upon confirmation from the Manager that the occupancy had been properly posted, the City left the premises.

l.   On or about December 18, 2021, two (2) individuals from the Fire Department, including Lt. Yanez, visited Ball & Chain to conduct another "occupancy check." This was the third consecutive night where such an inspection took place at Ball & Chain. A Fire Department employee recorded something on his "Occupant Load Violation Log" and subsequently left.

m.   On or about February 11, 2022, two (2) individuals from the Fire Department arrived at Ball & Chain to check the occupancy "clickers." Ball & Chain's employees again provided proof that they were in strict compliance of occupancy limits. The Fire Department could not issue a violation.

n.   On or about April 6, 2022, Commissioner Carrollo was again spotted investigating near Ball & Chain around 3:00 pm. Staff from Ball & Chain reported that he was talking to residents living in the building right behind Ball & Chain, which the City had just purchased. Not coincidentally, only

-79-

an hour and a half after Carollo's visit, at 4:30 pm, Taylor Reid from the Building Department arrived to inspect the property (affiliated with Plaintiffs) immediately adjacent to Ball & Chain but found no wrongdoing.

### The City Continues Its Harassment By Keeping
### One of Ball & Chain's Largest Sources of Revenue, and Taquerias, Closed

224.    When the City shut down Ball & Chain on October 22, 2020, both the exterior and the interior of Ball & Chain became inoperable.  As explained above, Plaintiffs worked tirelessly with the City for about a year and were eventually allowed to only reopen the interior of Ball & Chain on or about November 1, 2021, with a temporary CO and CU ("TCO" and "TCU").  While the City initially issued the TCO on September 1, 2021, the City delayed for two months until November 1, 2021 to conduct the necessary inspections to finalize the building permit.  Ball & Chain's interior continues operating under that TCO and TCU, but the City has yet to issue the final CO and CU allowing Ball & Chain to operate both the interior and exterior as it did before the unlawful shutdown.

225.    As to Ball & Chain's exterior, the City has refused to allow it to reopen its outdoor/patio area, even under a TCO or TCU.  This is because, at the eleventh hour  on or about September 2021, and after working with the City for months to reopen Ball & Chain's entire establishment, the Zoning Department further delayed the issuance of required permits and raised yet another issue for the first time: the necessity of a Covenant in Lieu of Unity of Title (the "Covenant") in order for the City to release its comments to Ball & Chain's building permit plans and allow it to reopen the exterior.

226.    Ball & Chain had no other option but to engage with the City to attempt to resolve the issue, notwithstanding the City's constant moving of the goal post.  The Covenant submitted by Ball & Chain in response to the Zoning Department's request is a 7-page City form titled "Declaration of Restrictive Covenants," available through the City website as a sample form.  The

form is filed using the City's ProjectDox system, and leaves no room for negotiation of provisions where, as here, Ball & Chain adopted all of the relevant provisions from the City.

227.    In order to deliberately delay the processing of the Covenant, on November 21, 2021, the Fire Department visited Ball & Chain and attempted to enter the premises without a warrant.  The Fire Department issued no citations or violations to Ball & Chain.  Two hours after the Fire Department visit, the Police Department arrived at Ball & Chain, accompanied by Code Enforcement.  The Police Department officers stated they heard "beats" from a vacant park located less than 100 feet from Ball & Chain and issued a noise citation to Ball & Chain (the "Noise Citation").  Ball & Chain offered to provide the City an hourly noise log with corresponding measurements conducted by Ball & Chain showing compliance with the noise ordinances.  The City refused to accept Ball & Chain's proof of compliance with required noise levels, and issued the noise citation.

228.    Knowing that it had done nothing wrong, and that it was in strict compliance with the noise levels on November 21, 2022, Ball & Chain appealed the Noise Citation ("Noise Appeal").  At the hearing on the Noise Appeal, Ball & Chain provided the City evidence that it did not have an "audible" noise within 100 ft. from the premises, and should not have been issued the Noise Citation.  However, because the hearing officer refused to consider key evidence in  Ball & Chain's defense, the appeal was summarily denied.

229.    It then became clear why the City manufactured the Noise Citation from November 21, 2022: in order to further delay processing the Covenant, and further delay reopening Ball & Chain's patio/outdoor area.

230.    Knowing this fact, and in an effort to not further delay reopening Ball & Chain's patio/outdoor area, on December 3, 2021, Ball & Chain requested that the City's Code Compliance

Director allow the Covenant to be processed pending resolution of the Noise Appeal. While the City's Code Compliance Director first consented on December 3, 2021 to the processing of the Covenant while the Noise Appeal was pending, the City Attorney's Office reversed course on December 6, 2021 and refused the processing of the covenant until resolution of the Noise Appeal.

231.    The Noise Citation, therefore, delayed issuance of the Covenant and thus prevented the opening of Ball & Chain's patio and issuance of a CO and CU for Ball & Chain's exterior.

232.    On November 21, 2021, on the same night that code issued the Noise Citation, and in an effort by the City to hide the targeting of Ball & Chain, the City also cited Guantanamera Café and Lounge (located at 1465 SW 8th St.) ("Guantanamera") for the same noise violation. Guantanamera is a similarly-situated restaurant in Calle-Ocho and next-door to Ball & Chain, also serving Cuban food, liquors, cigar and coffee, and playing live music daily. Ultimately, and upon information and belief, the noise violation issued to Guantanamera on November 21, 2021, was promptly cleared, and Guantanamera did not have to pay a fine or appeal its violation.

233.    As further proof of unequal treatment when it comes to Ball & Chain, approvals of similar covenants by the City for similarly-situated businesses, on average, take less than two months, but the approval of the Covenant here took over nine months.

234.    Additionally, the City Attorney herself is not usually concerned with review and approval of Covenants. But in keeping with the City's plan, in this instance, the City Attorney intervened in the issuance of this Covenant, and called separate high level administrative meetings before approving Ball & Chain's Covenant, further delaying its issuance. This, notwithstanding that the Covenant, in the City form, had already been reviewed and approved by all applicable department directors, including the Zoning Director, who requested the Covenant in the first place,

STEARNS WEAVER MILLER WEISSLER ALHADEFF & SITTERSON, P.A.

and the City Attorneyassigned to review and approve the Covenant.  If the City conducted this type of process for every project in the City, no development would move forward, and the City's planning and permitting process would come to a complete standstill.

235.    The delay in approving the Covenant also delayed the required inspections, close-out of the permit, and issuance of a CO and CU that includes Ball & Chain's exterior.

236.    The Covenant was finally recorded on June 23, 2022, but the Zoning Department again delayed in removing the comment in its internal system (iBuild) until August 6, 2022, more than five weeks after recordation and for no reason other than to continue delaying reopening.

237.    But the City did not stop there.  Once the Covenant issue was resolved by Zoning, Ball & Chain called in the remaining inspections from the Fire Department.  This inspection was the only task remaining for Ball & Chain to be able to obtain its permanent CO and CU and reopen the entirety of the establishment.  But, the Fire Inspector refused to inspect maintaining the life safety plans that had been submitted with the Building Permit Plans (long before this inspection around 2019) were different than those submitted for the Occupant Load Certificate.  This discrepancy, the Fire Department argued, prevented it from moving forward with any inspections at Ball & Chain, and prevented Ball & Chain from closing out its permits.

238.    Unsurprisingly, this apparent discrepancy was the City's own fault.  For many decades, the City allowed dual occupancies as expressly permitted by the Florida Building Code, Section 1004.3.  In compliance with this Section, and during the inspections that ultimately allowed Ball & Chain's interior to reopen on November 1, 2021, Ball & Chain submitted an application for the Occupant Load Certificate.  The City issued an Occupant Load Certificate with dual occupancy for the interior—allowing 123 occupants during the day, while using non-fixed

tables and chairs for lunch patrons, and 170 occupants in the evening, when the tables and chairs are removed.  Ball & Chain used this "dual" occupant load for its interior at the time of reopening.

239.    On or about February 2022, the City again reversed course, and now for the first time, told Ball & Chain that it would no longer allow dual occupancies, and would now limit the interior occupancy at Ball & Chain to 123 occupants at all times regardless of whether it could remove the non-fixed tables and chairs. This constitutes ¼ or a mere 27% of the occupancy the City had previously allowed at Ball & Chain – totaling 450 occupants both indoors and outdoors prior to the shutdown in 2020.

240.    Ball & Chain's counsel reached out immediately to the Fire Department to request an increase of occupancy (as 123 occupants would be unsustainable for the business) and agreed to remove tables and chairs to be allowed 200 occupants instead.  The Fire Department agreed to make this change only if Ball & Chain submitted a new life safety plan for the Occupant Load Certificate.  Plaintiffs' counsel questioned the necessity of this amendment to the Life Safety Plan, as the City had previously already approved more than 170 occupants, but the City insisted and Plaintiffs were left with no choice but to acquiesce to the City's unreasonable and unnecessary demands.

241.    However, this request was a deliberate City tactic undertaken to further delay Ball & Chain from obtaining its entitlements.  The Fire Department knew that the discrepancy between the amended life safety plan for the Occupant Load Certificate, and the life safety plan for the building permit, would ensure that Ball & Chain's CO and CU process remain stalled, barring any inspections.

242.    This is exactly what happened.  When it came time to conduct the last inspection necessary for Ball & Chain to reopen its doors around August 2022, the Fire Department refused,

and is now requesting Ball & Chain submit new life safety plans in connection with an entire new building permit plan to reconcile the discrepancy, which would trigger review (again) by all disciplines already previously approved, and will further delay reopening by at least three months. Knowing back in September 2021 that Ball & Chain would be required to amend the building permit plans entirely, the Fire Department sat on this information for almost a year, and only brought it up to Ball & Chain around August 2022 when Ball & Chain called the final inspection.

243.   As of the filing of this Amended Complaint, Ball & Chain still does not have a final CO and CU for its interior and exterior spaces, and continues working through new eleventh hour hurdles and unprecedented all department plan re-reviews that the City manufactures, for instance to recalculate the occupancy loads, and to finalize a sustainable occupancy load for a business that was already required to install unnecessary Fire Alarms and a Fire Sprinkler System at the City's behest.   As of October 4, 2022, the City continues moving the goalpost during meetings on this issue.   The closing of Ball & Chain's patio for the last two years, an area constituting more than 50% of revenues for the business, is just another example of the City's policy violating Plaintiffs' rights and causing Plaintiff to incur significant damages.

244.   Despite that warrants are routinely extended for an additional year by the Planning Department, Ball & Chain suspects the City will continue to delay this process until at least January 2023, when Ball & Chain's Outdoor Warrant is scheduled to expire.   That way, even if the City allows Ball & Chain to reopen its outdoor patio at some point after January 2023, Ball & Chain would not be able to sell food or beverage (including alcohol) outdoors, which would dramatically limit its revenue.

245.   Moreover, the City, at the direction of Commissioner Carollo, has continued its plan to run Plaintiffs out of the City by purchasing the property directly abutting Ball & Chain's

patio. Knowing a Fuller-affiliated business was already under contract for the purchase of this property, the City offered an inflated price for the property and was successful in purchasing the property despite Fuller's contract to purchase. Unlike the City, the Fuller-affiliated business needed entitlements for the land from the City in order to complete the purchase.  The City then moved hastily to demolish the property and is actively developing it.

246.    Despite that there exist businesses just like Plaintiffs, including those detailed herein and, in particular, CubaOcho Museum & Performing Arts Center and Guantanamera Café and Lounge (both located at 1465 SW 8th St.), Sala'o Cuban Restaurant & Bar (1642 SW 8th St.), Sabor Borinqueno (1644 SW 8th St), and Latin Art Core Inc. (1646 SW 8th St), that have sought to legalize alleged unpermitted work, the City has not subjected these non Plaintiff-affiliated businesses to the same level of intense scrutiny with the highest-ranking City officials (including the City Manager), number of inspections, constant moving of the goalposts, falsely-issued citations, and unwarranted delays and lengthy shut downs.  Moreover, none of these businesses have had permits issued on any work required under the relevant unsafe structure orders, or otherwise, and they still remain open.

### Damages

247.    Plaintiffs have incurred millions in damages and significant out of pocket expenditures, along with substantial lost time, stress and aggravation, on account of the City's unlawful, malicious, vexatious, continuing, and harassing practices and policies.

### CAUSES OF ACTION

### COUNT I
### (SUBSTANTIVE DUE PROCESS – 42 U.S.C. § 1983)

248.    Plaintiffs incorporate each of the above factual allegations as if fully restated here.

249.    The Fourteenth Amendment to the United States Constitution prohibits the City from "depriv[ing] any person of life, liberty, or property, without due process of law." The Fifth Amendment to the United States Constitution as applied by the Fourteenth Amendment to the United States Constitution prohibits the City from "depriv[ing a person] of life, liberty, or property, without due process of law."

250.    Plaintiffs have state-created  rights protected by the federal Constitution to lawful use of their properties and businesses and lawful operation of their properties and businesses.

251.    The City developed and acted on an official policy to deprive Plaintiffs of their constitutionally protected property and business rights, as described herein.

252.    In addition and in the alternative, the City's pattern and practice of similar and interlocking malicious conduct to deprive, and resulting in depriving, Plaintiffs of their constitutionally protected property and business rights, described herein, constitutes a policy and custom of the City to do so.

253.    In addition and in the alternative, the City was deliberately indifferent to and therefore adopted the actions of its officials, agents and employees in depriving Plaintiffs of their constitutionally protected property and business rights, as described herein.

254.    There is a direct and causal link between the City's policies and customs against Plaintiffs and their constitutional rights being violated.  The plan against Plaintiffs is a persistent and widespread unconstitutional practice, and the City has full knowledge of such customs, having been approved and supported by the City and its resources. In addition and in the alternative, both through the City's unofficial custom and practice shown through repeated acts of the individual final policy makers for the City, and through a showing of the municipality's deliberate indifference to the constitutional rights of an individual, and the City's repeated failure to make

any meaningful investigation into multiple complaints of constitutional violations by Plaintiffs and its counsel for years.

255.    The City's policy, pattern, and practice of depriving Plaintiffs of their constitutional rights was in part substantiated by and effectuated through legislative acts of the City, including the Ordinances, and February 14, 2019 Commission Resolution, stated *supra*.

256.    The City thereby deprived Plaintiffs of their constitutionally protected rights.

257.    The City deprived Plaintiffs of their constitutionally protected rights for no legitimate purpose, and for reasons that were and are pretextual and therefore arbitrary and capricious and with no legitimate rational basis.

258.    Such deprivation was the result of an abuse of governmental power in excess of ordinary tortious conduct.

259.    The City acted herein under color of state law.

WHEREFORE, Plaintiffs demand judgment in their favor and against the City:

    a.    awarding damages in an amount including but not limited to the actual damages, consequential damages, remunerative damages, lost profits, associated with the deprivation of Plaintiffs' constitutional rights, as well as all pre- and post-judgment interest and attorneys' fees and costs as provided by 42 U.S.C. § 1983 and 42 U.S.C. § 1988(b);

    b.    entering a preliminary and permanent injunction compelling the City to issue all entitlements to permit Plaintiffs to enjoy their constitutionally protected rights;

    c.    entering a preliminary and permanent injunction preventing the City from taking any action including in its governmental capacity to prevent Plaintiffs from enjoying their constitutionally protected rights; and

    d.    granting any other such relief as the Court deems just and proper.

## COUNT II
## (SUBSTANTIVE DUE PROCESS, FLORIDA CONSTITUTION)

260.    Plaintiffs incorporate each of the above factual allegations as if fully restated here.

261.     Section Nine of the Florida Constitution prohibits the City from "depriv[ing any person] of life, liberty or property without due process of law."

262.     Plaintiffs have  rights protected by the Florida Constitution in their private property.

263.     Plaintiffs have property rights protected by the Florida Constitution to lawful use of their properties and businesses lawful operation of their properties and businesses.

264.     The City developed and acted on an official policy to deprive Plaintiffs of their constitutionally protected property and business rights, as described herein.

265.     In addition and in the alternative, the City's pattern and practice of similar and interlocking malicious conduct to deprive and resulting in depriving Plaintiffs of their constitutionally protected property and business rights, described herein, constitutes a policy and custom of the City to do so.

266.     In addition and in the alternative, the City was deliberately indifferent to and therefore adopted the actions of its officials, agents and employees in depriving Plaintiffs of their constitutionally protected property and business rights, as described herein.

267.     The City's policy, pattern, and practice of depriving Plaintiffs of their constitutional rights was in part substantiated by and effectuated through legislative acts of the City, including Ordinance 13941 and February 14, 2019 Commission Resolution stated *supra*.

268.     The City thereby deprived Plaintiffs of their constitutionally protected rights.

269.     The City deprived Plaintiffs of their constitutionally protected rights for an improper motive and by arbitrary and capricious means.

WHEREFORE, Plaintiffs demand judgment in their favor and against the City:

   a.     entering a preliminary and permanent injunction compelling the City to issue all entitlements to permit Plaintiffs to enjoy their constitutionally protected rights;

b.      entering a preliminary and permanent injunction preventing the City from taking any action including in its governmental capacity to prevent Plaintiffs from enjoying their constitutionally protected rights; and

c.      granting any other such relief as the Court deems just and proper.

## COUNT III
## (PROCEDURAL DUE PROCESS – 42 U.S.C. § 1983)

270.    Plaintiffs incorporate each of the above factual allegations as if fully restated here.

271.    The Fourteenth Amendment to the United States Constitution prohibits the City from "depriv[ing] any person of life, liberty, or property, without due process of law." The Fifth Amendment to the United States Constitution as applied by the Fourteenth Amendment to the United States Constitution prohibits the City from "depriv[ing a person] of life, liberty, or property, without due process of law."

272.    Plaintiffs have a liberty and property interest in their private property and business operations.

273.    As described herein, the City deprived Plaintiffs of their liberty and property interests, including by: suspending the CO, revoking the CU, closing Plaintiffs' business operations, and forcing Plaintiffs to obtain a new "approval" which the City contends affects Plaintiffs' vesting of rights.

274.    As described herein, the City undertook those deprivations of those protected interests without affording Plaintiffs notice and an opportunity to be heard, both prior to and after the deprivations of those protected interests.

275.    The City did so by, among other things, failing to follow the procedures set forth in City Code § 2-814, et seq. to allow the businesses to cure any alleged violations and to request a hearing before a special master prior to stripping it of its entitlements, including its CU and CO.

276.    The City further did so by, among other things, failing to provide a constitutionally adequate process to remedy the deprivations, including because the BORA and PZAB appeals do not address the deprivations at stake here.

277.    The City thereby deprived Plaintiffs of their constitutionally protected rights.

278.    Such deprivation was the result of an abuse of governmental power in excess of ordinary tortious conduct.

279.    The City acted herein under color of state law.

WHEREFORE, Plaintiffs demand judgment in their favor and against the City:

    a.    awarding damages in an amount including but not limited to the actual damages, consequential damages, remunerative damages, lost profits, associated with the deprivation of Plaintiffs' constitutional rights, as well as all pre- and post-judgment interest and attorneys' fees and costs as provided by 42 U.S.C. § 1983 and 42 U.S.C. § 1988(b);

    b.    entering a preliminary and permanent injunction compelling the City to issue all entitlements to permit Plaintiffs to enjoy their constitutionally protected rights;

    c.    entering a preliminary and permanent injunction preventing the City from taking any action including in its governmental capacity to prevent Plaintiffs from enjoying their constitutionally protected rights; and

    d.    granting any other such relief as the Court deems just and proper.

**COUNT IV**
**(PROCEDURAL DUE PROCESS, FACIAL, QUASI-FACIAL, AS APPLIED**
**CHALLENGES TO ORDINANCE/CODE – 42 U.S.C. § 1983)**

280.    Plaintiffs incorporate each of the above factual allegations as if fully restated here.

281.    The Fourteenth Amendment to the United States Constitution prohibits the City from "depriv[ing] any person of life, liberty, or property, without due process of law." The Fifth Amendment to the United States Constitution as applied by the Fourteenth Amendment to the United States Constitution prohibits the City from "depriv[ing a person] of life, liberty, or property, without due process of law."

-91-

282.     Plaintiffs have a liberty and property interest in their private property and business operations. Plaintiffs are entitled to notice and an opportunity to be heard, both prior to and after any deprivations of those protected interests.

283.     Ordinance 13936's alteration of Section 2-211 of the City Code from "may" to "shall," eliminating any discretion by the zoning director in revoking the CU for businesses based on the violations enumerated in the Code, which violations do not involve immediate life safety or like emergent conditions, facially and inherently, and as applied to Plaintiffs and to like circumstances, does not afford adequate notice and an opportunity to be heard prior to such revocation and deprivation.

284.     Section 2-211 as amended by Ordinance 13936 mandates ("shall") that the zoning administrator revoke *all* certificates of use for *any* reason—that is, it requires revocation of every certificate of use in issuance by the City, for no specified reason, without pre-deprivation notice or an opportunity to cure. That provision is therefore facially unconstitutional. Further, Section 2-211 as amended by Ordinance 13936 mandates ("shall") that the zoning administrator revoke *all* certificates of use for any circumstance within the ambit of the seven enumerated "reasons," which include innumerable circumstances not implicating emergent life-safety hazards, all without pre-deprivation notice or an opportunity to cure. That provision is therefore facially or quasi-facially unconstitutional. Finally, the City applied Section 2-211 (pre and post amendment by Ordinance 13936) to revoke Plaintiffs' certificates of use in circumstances that do not implicate emergent life-safety hazards, without pre-deprivation notice or an opportunity to cure. The provision is therefore unconstitutional as applied to Plaintiffs.

STEARNS WEAVER MILLER WEISSLER ALHADEFF & SITTERSON, P.A.

285.     Plaintiffs were injured and are likely in the future to be injured by the City's adoption and enforcement of the Ordinance, including in the revocation of their CU and closure of their businesses as described herein.

286.     The City acted herein under color of state law.

WHEREFORE, Plaintiffs demand judgment in their favor and against the City:

     a.     declaring unconstitutional Section 2-211 of the City Code as currently in force, as amended by Ordinance 13936;

     b.     invalidating and reverting any action or consequence harming Plaintiffs due to enactment and/or enforcement of Section 2-211 of the City Code as currently in force, as amended by Ordinance 13936;

     c.     issuing preliminary and permanent injunctive relief to that effect;

     d.     awarding damages in an amount including but not limited to the actual damages, consequential damages, remunerative damages, lost profits, associated with the deprivation of Plaintiffs' constitutional rights, as well as all pre- and post-judgment interest and attorneys' fees and costs as provided by 42 U.S.C. § 1983 and 42 U.S.C. § 1988(b); and

     e.     granting any other such relief as the Court deems just and proper.

## COUNT V
## (EQUAL PROTECTION, CLASS OF ONE – 42 U.S.C. § 1983)

287.     Plaintiffs incorporate each of the above factual allegations as if fully restated here.

288.     The Fourteenth Amendment to the United States Constitution prohibits the City from "deny[ing] to any person within its jurisdiction the equal protection of the laws."

289.     Plaintiffs have constitutionally protected rights to equal protection of and under the laws.

290.     As described herein, including as specifically alleged at paragraphs 57, 73, 74, 75, 89, 91, 95, 97, 98, 99, 128, 150, 152, 166, 175, 198, 204, 215, 233, & 246; *see also* Addenda A thru G, the City intentionally treated Plaintiffs differently from others identically situated. Thus, the City's regulatory conduct in respect of and treatment of Plaintiffs' property and businesses is

STEARNS WEAVER MILLER WEISSLER ALHADEFF & SITTERSON, P.A.

different from, and intentionally discriminatory in comparison to, all other restaurant property and business owners and operators within the Calle Ocho area of the City of Miami, who are prima facie identical to Plaintiffs in all relevant respects.

291.    There is no rational basis for such difference in Plaintiffs' treatment by the City. All bases provided by the City for its different treatment of Plaintiffs' are pretextual and thus inherently arbitrary and capricious.

292.    In addition and in the alternative, as described herein, the City's animus against Plaintiffs is readily obvious in the City's regulatory conduct in respect of and treatment of Plaintiffs' property and businesses.

293.    The City acted herein under color of state law.

WHEREFORE, Plaintiffs demand judgment in their favor and against the City:

    a.    awarding damages in an amount including but not limited to the actual damages, consequential damages, remunerative damages, lost profits, associated with the violation of Plaintiffs' constitutional rights, as well as all pre- and post-judgment interest and attorneys' fees and costs as provided by 42 U.S.C. § 1983 and 42 U.S.C. § 1988(b);

    b.    entering a preliminary and permanent injunction compelling the City to issue all entitlements to permit Plaintiffs to enjoy their constitutionally protected rights;

    c.    entering a preliminary and permanent injunction preventing the City from taking any action including in its governmental capacity to prevent Plaintiffs from enjoying their constitutionally protected rights;

    d.    granting any other such relief as the Court deems just and proper.

### COUNT VI
### (UNLAWFUL SEARCH & SEIZURE – 42 U.S.C. § 1983)

294.    Plaintiffs incorporate each of the above factual allegations as if fully restated here.

295.    The Fourteenth Amendment to the United States Constitution prohibits the City from "depriv[ing] any person of life, liberty, or property, without due process of law." The Fourth

Amendment to the United States Constitution as applied by the Fourteenth Amendment to the United States Constitution prohibits the City from "violat[ing]" Plaintiffs' "right . . . to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures," and prohibits the City from undertaking any search or seizure (a) without a warrant supported by probable cause and specifying the legitimate nature and purpose of the seizure, or (b) if conducting an administrative inspection of commercial premises subject of a statutory regulatory scheme, without a substantial interest in regulating the particular business, the inspection being necessary to further the regulatory scheme, and the statute's inspection program, in view of the certainty and regularity of its application, providing a constitutionally adequate substitute for a warrant.

296.    Plaintiffs further and additionally have a fundamental privacy right in their commercial properties protected by the Fourth Amendment and the Fourteenth Amendments substantive due process provisions prohibiting the City from "depriv[ing] any person of life, liberty, or property, without due process of law."

297.    The City did not obtain a warrant for any search or seizure of Plaintiffs' properties described herein.

298.    As described herein, the City's Dry Hour operations in purpose, design, and practice, neither attempted nor in fact did seek to enforce Florida's Beverage Law. By contrast, the City's Dry Hour operations were intended and did seek to investigate and enforce *inter alia* the criminal law, the City's municipal Code, the Florida Building Code, the Florida Fire Prevention Code, and the City's zoning regulations.

299.    Accordingly, as described herein, the City violated Taquerias' and Ball & Chain's rights to be secure in their persons and property by trespassing on and/or searching Taquerias' and Ball & Chain's establishments absent a warrant, per se, because the City's searches as part of its

STEARNS WEAVER MILLER WEISSLER ALHADEFF & SITTERSON. P.A.

Dry Hour operations did not have as their primary (or even indirect) purpose the enforcement of Florida's Beverage Law or any regulatory regime in respect of a pervasively regulated industry.

300.    Further, Taquerias is a restaurant, not an alcohol service establishment—both in fact and as defined by the City Code. Despite that Taquerias has a valid state-issued liquor license, it is as a matter of law not a business within a closely regulated industry as relevant to the Fourth Amendment's protection against warrantless and/or unreasonable searches and seizures.

301.    Accordingly, as described herein, the City violated Taquerias' rights to be secure in its persons and property by trespassing on and/or searching Taquerias' establishment absent a warrant, per se, because the narrow exception to the Fourth Amendment's warrant requirement for administrative searches of businesses in closely regulated industries does not apply to Taquerias.

302.    Further, as described herein, when the City undertook its searches/raids of Taquerias, it was not attempting to, and did not, enforce Florida's Beverage Law or any regulatory regime of a pervasively regulated industry. The City had established, by ABT's repeated investigations and the City's own audit, that Taquerias was in full compliance with all relevant alcohol beverage related laws and licensure. And, when the City conducted its searches/raids of Taquerias, it did not inspect of investigate for information relevant to enforcement of the Florida's Beverage Law or any regulatory regime of a pervasively regulated industry.

303.    Accordingly, as described herein, the City violated Taquerias' rights to be secure in its persons and property by trespassing on and/or searching Taquerias' establishment not in conformance with the purposes and procedures of the relevant statutory scheme.

304.    Further, as described herein, the City's searches and seizures of Taquerias' and Ball & Chain's establishments were unreasonable, pretextual, not designed to support and unnecessary for the furtherance of the relevant administrate scheme or purpose, and have been so random and

unpredictable to eliminate reasonable procedures and expectations, thereby violating Taquerias'

and Ball & Chain's constitutionally protected rights to be secure in their persons and property.

305.    The City acted herein under color of state law.

WHEREFORE, Taquerias and Ball & Chain demand judgment in their favor and against

the City:

    a.    awarding damages in an amount including but not limited to the actual damages, consequential damages, remunerative damages, lost profits, associated with the violation of Taquerias' and Ball & Chain's constitutional rights, as well as all pre- and post-judgment interest and attorneys' fees and costs as provided by 42 U.S.C. § 1983 and 42 U.S.C. § 1988(b);

    b.    entering a preliminary and permanent injunction enjoining the City from undertaking unreasonable searches and seizures of Taquerias' and Ball & Chain's property and establishments;

    c.    entering a preliminary and permanent injunction requiring that the City obtain a warrant supported by probable cause, directed to particular property, and supporting the purpose of the statutory scheme, and otherwise requiring the City's compliance with the statutory scheme for inspection; and

    d.    granting any other such relief as the Court deems just and proper.

## COUNT VII
## (VIOLATION OF CITY CHARTER)

306.    Plaintiffs incorporate each of the above factual allegations as if fully restated here.

307.    Plaintiffs plead this claim largely in the alternative to their substantive due process

claims. The City has repeatedly affirmed that the February 2019 communications and directives

by the City Attorney, with direction to all City departments and disciplines to, *inter alia,*

specifically target and ultimately shut exclusively Plaintiffs' businesses—which directives were

followed and continue to be carried out by all relevant City departments and disciplines—was a

formal restatement and reification of the City Commission's policy adopted by formal legislative

act in and by the Commission Resolution R-19-0072. That legislative act, and the City's carrying

out of its policy that followed from that act, depriving Plaintiffs of their state-crated rights, for no legitimate reason and for arbitrary, capricious, and pretextual reasons, substantiates in relevant part Plaintiffs' substantive due process claims. In the alternative, if actions by the City Attorney and Commissioner Carollo were taken outside formal policy set by the City through the Commission and/or outside the direction of the City Manager, then (as detailed below) those actions violated the City Charter, which the City intended and knowingly allowed, such that the City violated the City Charter's requirement that the City abide by its own Charter.

308.   The City is organized under, and governed and bound by, the City of Miami Charter ("Charter").

309.   The Charter's Bill of Rights, at Section 52(A)(1) of the Charter, provides that the "City shall abide by all of [the Charter's] express provisions."

310.   The Charter, at Section 4(d) provides that no city commissioner "shall direct, *request, take part in* or dictate the appointment or removal of any person in office or employment by the city manager or subordinates or in any manner interfere with the city manager or prevent the city manager from exercising his/her own judgment in the appointment of officers and employees in the administrative service."  This section also provides that all city commissioners "shall deal with the administrative service *solely* through the city manager" and no city commissioner "shall give orders to any of the subordinates of the city manager [or] city attorney . . either publicly or privately. Any such dictation, prevention, orders or other interference or violation of this section on the part of . . . a member of the city commission [] shall be deemed to be violation of the Charter, and upon conviction before a court of competent jurisdiction any individual so convicted shall be subject to a fine not exceeding five hundred dollars ($500.00) or

imprisonment for a term of not exceeding sixty days or both, and in the discretion of the court shall forfeit his or her office."

311.    The Charter, at Section 15, provides that "[t]he city manager shall be responsible for the administration of all units of the city government under the city manager's jurisdiction, and for carrying out policies adopted by the city commission." No other officer or employee of the City may direct administration of the City, carry out City policy, or control any unit of the City government.

312.    As detailed above, Commissioner Carollo directed, requested and took part in the removal of persons employed by the City Manager and interfered with the City Manager's ability to exercise his own judgment in the appointment of employees in the administrative service.

313.    Commissioner Carollo directly, and though the City Attorney, gave orders and directed staff to undertake unlawful inspections, investigate, issue citations and, ultimately shutdown Plaintiffs' businesses. Indeed, Commissioner Carollo repeatedly ordered Code Enforcement, Police, Building, and Fire Department directors, officers and employees to undertake drive-alongs and walk-alongs with him so that he could point out "problems" with Plaintiffs' businesses that he demanded be cited and ordered them to proactively find problems with Plaintiffs' businesses in an effort to shut them down.

314.    The City Attorney independently, and at the behest of Commissioner Carollo ordered City Staff to undertake unlawful inspections, investigate, issue citations and, ultimately shutdown Plaintiffs' businesses. In fact, numerous City staff, including the City Manager, Deputy City Manager and Assistant City Manager, were deeply concerned with the City Attorneys' directives against Plaintiffs, indicating that the City "ought to be enforcing the Code citywide and

not just targets [i.e., Plaintiffs' businesses]," as "the City Charter has provision on the lines of communicating directions to staff."

315.    The Chief of Police Colina likewise warned that the City Attorney's directives to target Plaintiffs is an "unsanctioned and unlawful exercise of powers…to intentionally cause harm to [Plaintiffs]" such that it interferes with the "operations and procedures of various departments" thereby constituting a "violat[ion] of our charter."   The subsequent Chief of Police, Acevedo, voiced the same concern stating that Commissioner Carollo's direction and interference with the police department to undertake unlawful raids of Plaintiffs' businesses'' was violation of "authority under the City charter."

316.    The Charter's Bill of Rights, at Section 52(C) of the Charter, provides that "[r]esidents of the City shall have standing to bring legal actions to enforce the City Charter, the Citizens' Bill of Rights, and the Miami-Dade County Citizens' Bill of Rights as applied to the City."

317.    Plaintiffs are residents of the City and thus have standing to sue for violations of the Charter and Bill of Rights. Plaintiffs have also suffered direct, specific, and concrete harm and injury by the City's violation of its Charter identified herein, including in disruption of, lost profits to, and closure of, their businesses.

318.    The Charter's Bill of Rights, at Section 52(C) of the Charter, further provides for relief and venue in respect of such claim, that "[s]uch actions shall be filed in Miami-Dade County Circuit Court pursuant to its general equity jurisdiction."

319.    However, as this Court has ruled in this case, consistent with close to two centuries of binding United States Supreme Court precedent, no state law, including the Charter, may prescribe or limit the jurisdiction of a federal court, including this Court; rather, only the United

STEARNS WEAVER MILLER WEISSLER ALHADEFF & SITTERSON. P.A.

States Congress has the exclusive and sole power to confer or withdraw this Court's subject matter jurisdiction. As the United States Supreme Court explained 150 years ago:

> [W]here a general right is . . . conferred [by state statute], it can be enforced in any Federal court within the State having jurisdiction of the parties[, and] [i]t cannot be withdrawn from the cognizance of such Federal court by any provision of State legislation that it shall only be enforced in a State court.

*Chicago & N.W.R. Co. v. Whitton*, 80 U.S. 270, 271 (1871) (state statute requiring certain action be brought in state court could not limit federal court supplemental subject matter jurisdiction). Therefore, while states can create causes of action and proscribe related relief, they cannot grant or vest exclusive jurisdiction to adjudicate that claim in their own courts. *See Marshall v. Marshall*, 547 U.S. 293, 313 (2006) (despite purporting to grant to specialized state courts exclusive jurisdiction over certain matters, state legislation may not divest a federal court of supplemental subject matter jurisdiction over those matters). Rather, this Court may exercise supplemental jurisdiction to the full extent provided by 28 U.S.C. § 1367.

320.    Accordingly, while the Charter can create a cause of action and standing to sue for violation of the Charter (as it has), and provide for a specific form of, such as equitable, relief as the relief in respect of such claim (as the Charter can be read to so delimit), the Charter cannot grant or vest exclusive jurisdiction in a state court over such claim, nor divest this Court of jurisdiction over such claim (as it purports to do). The Court has already ruled that none of the 28 U.S.C. § 1367(c) factors are present here. Thus, this Court has, and must exercise, supplemental subject matter jurisdiction over this claim.

WHEREFORE, Plaintiffs demand judgment in their favor and against the City:

    a.    entering a preliminary and permanent injunction compelling the City to issue all entitlements to permit Plaintiffs as required by the Code and Charter;

STEARNS WEAVER MILLER WEISSLER ALHADEFF & SITTERSON, P.A.

b.     entering a preliminary and permanent injunction preventing the City from taking any action including in its governmental capacity adverse to Plaintiffs and violating the Code and Charter;

c.     entering a preliminary and permanent injunction to ensure that the City abides by its Charter and preventing the City from allowing the City Commissioners, City Attorney, and City Manager, to further violate the City Charter, to Plaintiffs' detriment;

d.     awarding costs as affixed by the Court; and

e.     granting any other such relief as the Court deems just and proper.

## DEMAND FOR JURY TRIAL

321.    Plaintiffs demand a trial by jury on all claims so triable.

STEARNS WEAVER MILLER WEISSLER ALHADEFF & SITTERSON, P.A.

Dated: October 11, 2022

Respectfully submitted,

**STEARNS WEAVER MILLER WEISSLER
ALHADEFF & SITTERSON, P.A.**
Museum Tower, Suite 2200
150 West Flagler Street
Miami, Florida 33130
Telephone: 305-789-3200
By: */s/  Maria A. Fehretdinov*
   MARIA A. FEHRETDINOV
   Florida Bar No. 52084
   mfehretdinov@stearnsweaver.com
   JASON S. KOSLOWE
   Florida Bar No. 122758
   jkoslowe@stearnsweaver.com
   MATTHEW C. DATES
   Florida Bar No. 90904
   mdates@stearnsweaver.com
   CHELSEA E. KOFF
   Florida Bar No. 100557
   ckoff@stearnsweaver.com
   CORAL DEL MAR LOPEZ
   Florida Bar No. 1022387
   clopez@stearnsweaver.com
   RYAN T. THORNTON
   Florida Bar No. 99195
   rthorton@stearnsweaver.com

*Attorneys for Plaintiffs*

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that on October 11, 2022, I electronically served a copy of the

foregoing to the service list below.

| | |
|---|---|
| VICTORIA MÉNDEZ, City Attorney<br>CHRISTOPHER ALLAN GREEN, Assistant City Attorney<br>ERIC J. EVES, Assistant City Attorney<br>BRANDON L. FERNANDEZ, Assistant City Attorney<br>JOHN A. GRECO, Deputy City Attorney<br>KERRI L. MCNULTY, Office of City Attorney<br>BRYAN E. CAPDEVILA, Assistant City Attorney<br>KEVIN R. JONES, Division Chief for Labor & Employment<br>vmendez@miamigov.com<br>CAGreen@miamigov.com<br>kjones@miamigov.com<br>eeves@miamigov.com<br>bfernandez@miamigov.com<br>tmickens@miamigov.com<br>jagreco@miamigov.com<br>klmcnulty@miamigov.com<br>csantos@miamigov.com<br>bcapdevila@miamigov.com<br>mgriffin@miamigov.com<br>Attorneys for Defendant<br>444 S.W. 2nd Avenue, Suite 945<br>Miami, FL 33130-1910 | RAQUEL A. RODRIGUEZ, ESQ.<br>A. SHEILA ORESTSKY, ESQ.<br>MIRANDA LUNDEEN SOTO, ESQ.<br>DANIEL R. LAZARO, ESQ.<br>KELLY H. KOLB, ESQ.<br>JENNIFER OLMEDO-RODRIGUEZ, ESQ.<br>JESSE STOLOW, ESQ.<br>BUCHANAN INGERSOLL & ROONEY PC<br>One Biscayne Tower<br>2 South Biscayne Blvd., Suite 1500<br>Miami, FL 33131-1822<br>raquel.rodriguez@bipc.com<br>sheila.oretsky@bipc.com<br>miranda.soto@bipc.com<br>dan.lazaro@bipc.com<br>jennifer.olmedo-rodriguez@bipc.com<br>jesse.stolow@bipc.com<br><br>GRETCHEN JANKOWSKI, ESQ.<br>MACKENZIE A. BAIRD, ESQ.<br>BUCHANAN INGERSOLL & ROONEY PC<br>Union Trust Building<br>501 Grant Street, Suite 200<br>Pittsburgh, PA 15219-4413<br>gretchen.jankowski@bipc.com<br>mackenzie.baird@bipc.com<br><br>*Admitted Pro Hac* |

*/s/ Maria A. Fehretdinov*
MARIA A. FEHRETDINOV

STEARNS WEAVER MILLER WEISSLER ALHADEFF & SITTERSON, P.A.