# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF FLORIDA

### CASE NO. 21-cv-23485-ALTMAN/Reid

**THE MAD ROOM, LLC**
*d/b/a* **BALL & CHAIN,** *et al.*,

    *Plaintiffs*,

*v.*

**CITY OF MIAMI**,

    *Defendant.*

_____/

## ORDER DENYING MOTION TO DISMISS

Our Defendant, the City of Miami, has moved to dismiss the Plaintiffs' Amended Complaint on various grounds. *See* Motion to Dismiss [ECF No. 208]. For the reasons we set out below, the Motion to Dismiss is **DENIED**.

### THE FACTS[1]

In this § 1983 action, our Plaintiffs—a popular Calle Ocho bar (Ball & Chain) and restaurant (Taquerias) and their buildings' owners—allege that the City of Miami, under the direction of City Commissioner Joe Carollo, formulated and implemented a plan to shut down their businesses and run them out of town. This case and its sister case, *Fuller v. Carollo*,[2] have a long and tortured history, but the Plaintiffs' basic allegations are these:

The Plaintiffs operate Ball & Chain and Taquerias in the Calle Ocho District of Little Havana. *See* Amended Complaint [ECF No. 212] ¶ 16. Both businesses have been mainstays of the neighborhood for decades, *see id.* ¶¶ 20, 25, and—under the stewardship of Bill Fuller, Ben Bush, and

---

[1] We take the following facts from the Plaintiffs' Amended Complaint and accept them as true for purposes of this Order.

[2] *Fuller, et al. v. Carollo, et al.*, 18-cv-24190-SMITH (S.D. Fla. Oct. 11, 2018).

Zack Bush—have contributed to the revitalization of Little Havana, "helping generate economic activity and new life into the area while at the same time preserving its historical significance and cultural identity," *see id.* ¶ 17. In 2017, Fuller publicly supported Commissioner Carollo's political opponents. *Id.* ¶ 25. This simple act, the Plaintiffs argue, led the City of Miami, "for no legitimate reason and with no lawful purpose" other than "political vendetta," to use "every organ of its municipal government" to try to destroy the Plaintiffs' businesses. *Id.* ¶¶ 2, 40.

After the Plaintiffs sued Commissioner Carollo in *Fuller v. Carollo*, the retaliation (they say) only increased, and the City "began harassing [Taquerias] through constant inspections and 'walk-throughs,' that appeared as a drug bust to the larger public due to the sheer amount of officers attending each raid—usually including 10 or more officers wearing bulletproof vests and often fully armed." *Id.* ¶ 25. But that was just the beginning:

> These inspections escalated to include multiple code enforcement raids, comprised of dozens of police officers, fire department officials, code enforcement officials and inspectors with the Division of Alcohol Beverages and Tobacco, Bureau of Law Enforcement ("ABT"), who operate under the guise of checking for alcohol licenses and permits that are easily accessible to the City through its own electronic system and do not require physical visits. These raids are deliberately conducted on Friday and Saturday nights, with the sole purpose of causing substantial business disruption and monetary harm to Taquerias during peak business hours.

*Ibid.* And it wasn't just Taquerias. The Plaintiffs allege that Ball & Chain has been subject to "a myriad of meritless violations that were solely intended to harass the business, and no other business in Calle Ocho." *Id.* ¶ 23.

Three City policies are especially relevant here. *First*, the Plaintiffs contend that, on October 22, 2020, the City passed the Carollo-sponsored Ordinance No. 13941 (the "Noise Ordinance"), which "banned all outdoor music from 10 p.m. to 8 a.m. at businesses neighboring any sort of residential property." *Id.* ¶¶ 76, 136. The Plaintiffs claim that this Noise Ordinance was "directly targeted at closing Ball & Chain's outdoor entertainment at night during its prime business hours." *Id.* ¶ 136. *Second*, "on the same day, the City Commission enacted Ordinance [No.] 13936 (an amendment

2

to Section 2-211 of the City Code), . . . [which] governs the revocation of a [certificate of use, or 'CU']
for businesses . . . . [T]his amendment changed the wording of Section 2-211 from 'may' to 'shall,'
thereby taking away any discretion by the zoning director in making this decision." *Id.* ¶ 138. In other
words, § 2-211 (as amended by Ordinance No. 13936) now mandates "that the zoning administrator
revoke all certificates of use for any reason—that is, it requires revocation of every certificate of use
in issuance by the City, for no specified reason, without pre-deprivation notice or an opportunity to
cure." *Id.* ¶ 284. *Third*, on February 14, 2019, the City Commission passed Resolution No. R-19-0072,
directing the City Attorney to "research properties described at the February 14, 2019 City
Commission meeting during discussion Item 'D3.1 – Code Enforcement' regarding violations Related
to no certificate of use, certificate of use obtained under false pretenses, and/or properties with
violations that pose life-safety issues, and initiate injunctive proceedings against said properties until
the properties are brought into compliance." *Id.* ¶ 54. The "true purpose" of the Resolution, the
Plaintiffs tell us, was to "target properties, establishments, and businesses owned or affiliated with
Fuller, including the Plaintiff businesses; to place violations on those properties, establishments, and
businesses; and to thereby shutdown those business operations." *Id.* ¶ 49.

In their Amended Complaint, the Plaintiffs assert six claims: Count I (Substantive Due Process
– 42 U.S.C. § 1983); Count II (Substantive Due Process: Florida Constitution); Count III (Procedural
Due Process – 42 U.S.C. § 1983); Count IV (Procedural Due Process: Facial/As-Applied), Count V
(Equal Protection); Count VI (Unlawful Search & Seizure), and Count VII (Violation of City Charter).
*See generally* Amended Complaint. The City now asks us to dismiss "Counts I, II, V, VI (as to the
Landlord Plaintiffs), and VII with prejudice." Motion to Dismiss at 9. The City also argues that the
"Plaintiffs' requests for injunctive relief in Counts I-VII are legally unsupportable." *Id.* at 31.

THE LAW

To survive a motion to dismiss under Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). To meet this "plausibility standard," a plaintiff must "plead[ ] factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citing *Twombly*, 550 U.S. at 556). The standard "does not require 'detailed factual allegations,' but it demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Id.* (quoting *Twombly*, 550 U.S. at 555). "[T]he standard 'simply calls for enough fact to raise a reasonable expectation that discovery will reveal evidence' of the required element." *Rivell v. Private Health Care Sys., Inc.*, 520 F.3d 1308, 1309–10 (11th Cir. 2008) (quoting *Twombly*, 550 U.S. at 545). "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Iqbal*, 556 U.S. at 678. On a motion to dismiss, "the court must accept all factual allegations in a complaint as true and take them in the light most favorable to plaintiff." *Dusek v. JPMorgan Chase & Co.*, 832 F.3d 1243, 1246 (11th Cir. 2016).

ANALYSIS

I.    **Counts I & II: Substantive Due Process**

In Counts I and II of the Amended Complaint, the Plaintiffs claim that they "have state-created rights protected by the federal Constitution" (Count I) and "property rights protected by the Florida Constitution" (Count II) to the "lawful use of their properties and businesses and lawful operation of their properties and businesses." Amended Complaint ¶¶ 250, 263. In both counts, the Plaintiffs allege that "[t]he City developed and acted on an official policy to deprive Plaintiffs of their constitutionally protected property and business rights . . . . The City's policy, pattern, and practice of depriving Plaintiffs of their constitutional rights was in part substantiated by and effectuated through

legislative acts of the City, including [Ordinance Nos. 13936 and 13941], and [the] February 14, 2019 Commission Resolution." *Id.* ¶¶ 251, 255. They add that "[t]he City deprived Plaintiffs of their constitutionally protected rights for no legitimate purpose, and for reasons that were and are pretextual and therefore arbitrary and capricious and with no legitimate rational basis." *Id.* ¶ 257.

"When a law does not infringe on a fundamental right, or discriminate on account of a suspect classification, but instead is a general economic regulation, we review it only for a rational basis." *Ga. Elec. Life Safety & Sys. Ass'n, Inc. v. City of Sandy Springs, Ga.*, 965 F.3d 1270, 1275 (11th Cir. 2020). This rational-basis test is "highly deferential to government action, and the regulation can only be invalidated if it is so unrelated to the achievement of any combination of legitimate purposes that we can only conclude that the legislature's actions were irrational." *Ibid.* Florida courts have held that the "due process provisions of the Florida and federal constitutions from which the rational basis tests derive use virtually identical language," such that the "two different constitutional provisions establish one, identical rational basis test." *Silvio Membreno & Fla. Ass'n of Vendors vs. the City of Hialeah*, 188 So. 3d 13, 20 (Fla. 3d DCA 2020). Because "the two tests are stated the same way"—and since courts use "the same analysis to resolve challenges brought under both federal and Florida substantive due process," *ibid.*—the City has chosen to lump Counts I and II together in its Motion to Dismiss, advancing the same arguments for both, *see* Motion to Dismiss at 11 ("[T]he rational basis analysis is identical for the evaluation of both Count I's substantive due process claim under 42 U.S.C. § 1983 and Count II's substantive due process claim under the Florida Constitution."). We'll follow suit and analyze the Plaintiffs' substantive-due-process claims together.

As to these counts, the City advances two arguments: *one*, that the Commission Resolution is not a legislative act but, rather, a "non-actionable executive act"; and *two*, that the City's Noise Ordinance "passes the rational basis test and does not support a substantive due process claim." *Id.* at 10, 14. We'll take these in turn.

As we explained at our September 20th Motion Hearing, although there's no general substantive-due-process protection for state-created property rights, *see Hillcrest Props., LLP vs. Pasco Cnty.*, 915 F.3d 1292, 1297–98 (11th Cir. 2019), "there is a legislative act exception that may apply here," Sept. 20, 2022, Hearing Tr. ("Hearing Tr.") [ECF No. 294] at 47:24–25. Specifically, "[w]here a person's state-created rights are infringed by a 'legislative act,' the substantive component of the Due Process Clause generally protects that person from arbitrary and irrational governmental action." *Kentner v. City of Sanibel*, 750 F.3d 1274, 1279–80 (11th Cir. 2014); *see also Romero v. Watson*, 2009 WL 1361714, at *6 (N.D. Fla. May 13, 2009) (Mickle, J.) ("In the Eleventh Circuit, an arbitrary or capricious legislative act may provide the basis for a substantive due process claim, which is called 'an arbitrary and capricious due process claim.'").

The Eleventh Circuit has held that there is "no dispositive test to determine which actions are executive and which are legislative, because local governing bodies often do both." *Kentner*, 750 F.3d at 1280; *see also Lewis v. Brown*, 409 F.3d 1271, 1273 (11th Cir. 2005) ("While the actions of some government officials can easily be categorized as legislative or executive, for others, like county commissioners who act in both a legislative and executive capacity, sorting out which hat they were wearing when they made a decision can be difficult."). Still, "our case law does give guidance on how to make this distinction." *Kentner*, 750 F.3d at 1280. In the words of the Eleventh Circuit, executive acts "typically arise from the ministerial or administrative activities of the executive branch and characteristically apply to a limited number of people, often to only one . . . . This includes employment terminations or individual acts of zoning enforcement . . . . Legislative acts, on the other hand, generally apply to a larger segment of—if not all of—society." *Ibid.* "Prospective" or "policy-making" decisions are generally considered "legislative or quasi-legislative," while decisions that involve the "mere administrative application of existing policies" are treated as executive. *Ibid.*

Turning to the facts of our case, the Plaintiffs allege that the "City's policy, pattern, and practice of depriving Plaintiffs of their constitutional rights was in part substantiated by and effectuated through legislative acts of the City, including the . . . February 14, 2019 Commission Resolution." Amended Complaint ¶ 255. The Plaintiffs plead the following facts in support of this claim:

> The February 14, 2019 Commission Resolution, standing alone and also as restated and interpreted by the City Attorney, constituted a legislative act setting a formal policy of the City to target Plaintiffs to the exclusion of any other business and any other resident in the City . . . .

> The Resolution set or formalized the policy of targeting—to focus already limited City resources and attention to a specific set of businesses, because of their common ownership/affiliation, and regardless of cause or evidence of any past violation or issue, to the exclusion of and differently than all other properties and businesses, rather than the City's prior policies of applying its Code and other regulations equally Citywide.

> The Resolution altered the City's policy, still in place for all other properties, establishments, and businesses in the City, of "reactive" Code enforcement (whereby the City responds to alleged Code violations or other infractions to determine non/compliance) to "proactive" Code enforcement (whereby the City actively sought out and manufactured violations)—but only for the Fuller/Plaintiff-affiliated properties, establishments, and businesses.

> The Resolution altered the City's policy, still in place for all other properties, establishments, and businesses in the City, of Code compliance (whereby the City attempts to identify issues and help property owners and business[es] achieve Code compliance) to punishment and other punitive action (whereby the City actively sought to harass, disrupt, and fine the businesses)—but only for the Plaintiff-affiliated properties, establishments, and businesses.

> The Resolution suspended normal City policies for Code violations and other infractions, which involve notices of violation, procedures for resolution of violations, and appeals to determine unsafe conditions requiring injunctive action such as closure and/or suspension or revocation of use/occupancy entitlements—but only for the Plaintiff-affiliated properties, establishments, and businesses.

*Id.* ¶¶ 63–67.

The City just disagrees with these allegations and argues that the Commission Resolution "does not create new policy or enact new regulation." Motion to Dismiss at 15. The Commission

Resolution (the City adds) is thus an executive act because "[i]t is an expression concerning matters of administration, as it directs the City Attorney to research certain properties for existing code violations and initiate injunctive proceedings as appropriate until the properties come into compliance, consistent with the process specifically laid out in the City's Charter." *Id.* at 14–15.

But the City's view that the Commission Resolution "is an executive act that cannot support a substantive due process claim" is premised on its rejection of the well-pled allegations in the Amended Complaint. Not only does the Amended Complaint allege that the Commission Resolution was a "legislative act[ ] of the City," Amended Complaint ¶ 255, but it lays out specific facts supporting the Plaintiffs' claim that the Commission Resolution was a prospective, policy-making act—*not* an act applying existing policy, *see id.* ¶¶ 64–67 (describing several ways in which the Commission Resolution "altered the City's policy"). The Plaintiffs acknowledge that "one-off municipal action directed at only one person can often be executive (i.e., denial of a zoning permit, or issuance of a parking violation)[.]" Plaintiffs' Response to the Motion to Dismiss (the "Response") [ECF No. 247] at 20. But (the Plaintiffs insist) "the intent behind the proposed measure was not merely to apply the City's Code and regulations, in continuation of already existing policy, or by mere application of existing Code or regulation, but was indeed to create a new policy to target specific businesses—those affiliated with Fuller—and not other businesses or other City residents, and not for only life-safety issues." Amended Complaint ¶ 51.

Going forward, the Plaintiffs will have to show—with evidence—that the Commission Resolution altered existing policy. And we take no position on the ultimate viability of this claim. To survive a 12(b)(6) motion to dismiss, however, "[t]he plaintiff need not prove his case." *Rhodes v. Walgreen Co., Inc.*, 2013 WL 3153737, at *1 (S.D. Ala. June 18, 2013). It's sufficient, at this stage, for the plaintiff to plead "enough facts to state a claim to relief that is *plausible* on its face." *Twombly*, 550 U.S. at 570 (emphasis added). And, despite the City's attempts to deny the factual allegations of the

complaint, we think our Plaintiffs have done that. *See, e.g.*, *Sallah ex rel. MRT LLC v. Worldwide Clearing LLC*, 860 F. Supp. 2d 1329, 1336 (S.D. Fla. 2011) (Scola, J.) (holding that the defendants' "factual denials cannot constitute a basis for a viable [m]otion to [d]ismiss" because "the [c]ourt must accept all of the plaintiff's allegations as true, construing them in the light most favorable to the plaintiff"); *Fresh Results, LLC v. ASF Holland, B.V.*, 2020 WL 95039, at *3 (S.D. Fla. Jan. 8, 2020) (Bloom, J.) ("[A]ssertions [that] constitute denials of factual allegations . . . or raise issues of fact [are] not suitable for disposition at the motion to dismiss stage."). We therefore accept as true the Plaintiffs' allegations that the Commission Resolution was a forward-looking, policy-making, and ultimately legislative act.

The City's second argument—that the Noise Ordinance satisfies rational-basis review—fares no better. In their Amended Complaint, the Plaintiffs allege that Ordinance Nos. 13936 and 13941 were "directly targeted at closing down Ball & Chain and ensuring that its business would be severely curtailed if it ever reopened." Amended Complaint ¶ 135. The Plaintiffs also allege that other businesses in the vicinity of Ball & Chain were exempted from the Ordinances:

> On October 5, 2020, the City passed on first reading Ordinance No. 13936 sponsored by Commissioner Carollo to provide for the "inclusion of building code violations as a reason for revocation of certificates of use" (hereinafter the "CU Revocation Ordinance") . . . .

> On October 22, 2020, the City adopted Ordinance No. 13936 "to provide for the inclusion of building code violations as a reason for revocation of certificates of use."

> Also on October 22, 2020, unsurprisingly, the head of the Building Department, solely by way of certified letter, notified Ball & Chain that its CO was suspended as a result of the City's audit of the Private Provider which the City claims revealed that "the Certificate of Occupancy was provided based on incomplete, misleading, and/or erroneous information as it relates to the requirements for fire safety and the American[s] with Disabilities Act." . . . .

> Also on October 22, 2020, the City passed on first reading Ordinance No. 13941 (hereinafter, the "Noise Ordinance") sponsored by Commissioner Carollo to "provide for the prohibition of outdoor music between the hours of 8:00 p.m. to 8:00 a.m. the following day in areas that share a property line with any property that has a residential use."

> Putting the final nail in the coffin, on November 19, 2020, the City adopted on second reading that Ordinance No. 13941 with several amendments prohibiting outdoor music between the hours of 10:00 p.m. to 8:00 a.m., and exempting *all* business in the City of Miami *except* Ball & Chain . . . .
>
> Importantly, those businesses (including those in Calle Ocho) that had their CUs current at the time of the passing of the Noise Ordinance are grandfathered in and will not be affected by the Noise Ordinance. Thus, in order to directly affect Ball & Chain with the Noise Ordinance, the City had to revoke its CU before passing it. That is, the City unlawfully revoked the current CU and suspended the CO and then passed a new noise ordinance exempting every single similar business establishment in Little Havana/Calle Ocho (and the City of Miami), but Ball & Chain. Ball & Chain remains the only business in the City of Miami affected by the Noise Ordinance, as other businesses from Wynwood and Coconut Grove were also exempted from the rule after multiple amendments.

*Id.* ¶¶ 75–76, 137. Based on these factual allegations, the Plaintiffs claim that the Noise Ordinance "lack[s] a legitimate governmental interest" because it was "undertaken for an improper motive and by means that were pretextual, arbitrary and capricious." Response at 17 (quoting *Greenbriar, Ltd. v. City of Alabaster*, 881 F.2d 1570, 1578 (11th Cir. 1989)).

Resisting this conclusion, the City contends that, "[n]otwithstanding any conclusory allegations in the First Amended Complaint to the contrary, the Noise Ordinance does not apply only to Plaintiffs' properties. Plaintiffs ignore that the Noise Ordinance, at the very least, applies to any similarly situated businesses operating within the designated geographic [area]." Motion to Dismiss at 12–13. Since the Noise Ordinance has "general applicability," the City says, it "passes the rational basis test and does not violate . . . substantive due process provisions." *Id.* at 13–14.

We're puzzled by the City's use of the phrase "notwithstanding any conclusory allegations in the First Amended Complaint to the contrary[.]" *Id.* at 12. While it's true that, on a motion to dismiss, "legal conclusions without adequate factual support are entitled to no assumption of truth," *Dusek v. JPMorgan Chase & Co.*, 832 F.3d 1243, 1246 (11th Cir. 2016), the City seems to be asking us to reject

the facts (not just the legal conclusions) the Plaintiffs alleged in the Amended Complaint.[3] *Compare* Amended Complaint ¶ 76 ("[T]he City adopted . . . Ordinance No. 13941 with several amendments prohibiting outdoor music between the hours of 10:00 p.m. to 8:00 a.m., and exempting *all* business in the City of Miami *except* Ball & Chain."), *and id.* ¶ 137 ("Ball & Chain remains the only business in the City of Miami affected by the Noise Ordinance[.]"), *with* Motion to Dismiss at 12–13 ("[T]he Noise Ordinance does not apply only to Plaintiffs' properties . . . . [T]he Noise Ordinance only exempts properties that had grandfathered uses, that are located in certain improvement districts and higher intensity zoning districts, or that otherwise are not likely to have a deleterious effect upon neighboring residential properties . . . . Plaintiffs ignore that their businesses are directly adjacent to residential properties.").

Indeed, acknowledging this factual dispute, the City invites us to examine the language of the Noise Ordinance—which, it promises, establishes that the Noise Ordinance has "general applicability, with little exception." Motion to Dismiss at 12 n.4. The City (correctly) points out that a district court *may* "consider an extrinsic document" at the motion-to-dismiss stage "if it is (1) central to the plaintiff's claim, and (2) its authenticity is not challenged." *SFM Holdings, Ltd. V. Banc of Am. Sec., LLC,* 600 F.3d 1334, 1337 (11th Cir. 2010). But we've considered the language of the Noise Ordinance, and it doesn't settle the factual dispute at the heart of Counts I and II. The City suggests that the Noise Ordinance creates "only very limited exceptions" for "properties that had grandfathered uses, that are located in certain improvement districts and higher intensity zoning districts, or that otherwise are not likely to have a deleterious effect upon neighboring residential properties[.]" Motion to Dismiss at 13. The

---

[3] In *Iqbal*, the Supreme Court held that a complaint will not "suffice if it tenders naked assertions devoid of further factual enhancement." 556 U.S. at 678 (cleaned up). As we've shown, the Amended Complaint isn't devoid of factual enhancement. On the contrary, it includes quite a bit of factual matter—which, if taken as true, suggests that the City's legislative policies deprived the Plaintiffs of their constitutionally protected property and business rights. That's enough for now.

Plaintiffs, by contrast, argue that those exemptions apply to "every similarly situated establishment other than Ball & Chain." Response at 16. In other words, the parties aren't so much disputing the language of the Noise Ordinance as they are the scope of its exemptions. And that's precisely the kind of factual dispute we cannot resolve on a motion to dismiss.

The City disagrees with the Plaintiffs' facts—that much is clear. But whether well-pleaded facts are true or false isn't for us to decide at this stage of the proceedings. *See, e.g.*, *Thayer v. NCL (Bahamas) Ltd.*, 2020 WL 7632099, at *9 (S.D. Fla. Dec. 4, 2020) (Torres, Mag. J.), *report and recommendation adopted*, 2020 WL 7625224 (S.D. Fla. Dec. 22, 2020) (Williams, J.) ("[W]e decline to resolve a factual dispute on a motion to dismiss because it should be reserved for summary judgment or trial."); *United States ex rel. Harris v. Lockheed Martin Corp.*, 905 F. Supp. 2d 1343, 1346 (N.D. Ga. 2012) (refusing, at the motion-to-dismiss stage, to "delve into the parties' battle over factual disputes that go far beyond the scope of the [complaint]"). The City's Motion to Dismiss Counts I and II is, therefore, **DENIED**.

## II.    Count V: Equal Protection "Class of One"

In Count V, the Plaintiffs allege that "the City intentionally treated Plaintiffs differently from others identically situated" and that "the City's regulatory conduct in respect of and treatment of Plaintiffs' property and businesses is different from, and intentionally discriminatory in comparison to, all other restaurant property and business owners and operators within the Calle Ocho area of the City of Miami, who are prima facie identical to Plaintiffs in all relevant respects." Amended Complaint ¶ 290. According to the Plaintiffs, "[t]here is no rational basis for such difference in Plaintiffs' treatment by the City. All bases provided by the City for its different treatment of Plaintiffs' [sic] are pretextual and thus inherently arbitrary and capricious." *Id.* ¶ 291.

To state a viable claim under an equal-protection "class of one" theory, the plaintiff must allege that the defendant "intentionally treated it differently from others who were similarly situated,

and . . . if so, . . . that there was no rational basis for the disparate treatment." *Griffin Indus., Inc. v. Irvin*, 496 F.3d 1189, 1202 (11th Cir. 2007). In doing so, the plaintiff need only identity *one* similarly situated comparator. *See Eisenberg v. City of Miami Beach*, 1 F. Supp. 3d 1327, 1342 (S.D. Fla. 2014) (Altonaga, J.) ("[F]or [p]laintiffs to state a class of one claim, they need to allege *at least one* similarly situated comparator." (emphasis added)). But "the 'similarly situated' requirement must be rigorously applied . . . . [P]laintiffs are not permitted simply to rely on broad generalities in identifying a comparator." *Ibid.* (cleaned up); *see also Williams v. Mercado*, 2018 WL 467232, at *3 (M.D. Fla. Jan. 18, 2018) (Howard, J.) ("[T]he Eleventh Circuit has determined that, with respect to the similarly situated requirement, 'class of one plaintiffs may [at the motion-to-dismiss stage] fairly be required to show that their professed comparison is sufficiently apt.'" (quoting *Griffin Indus.*, 496 F.3d at 1205)).

At our September 20th Motion Hearing, we dismissed the Plaintiffs' class-of-one claim without prejudice and with leave to amend, *see* Hearing Tr. at 88:7–8, because the Plaintiffs had "failed to identify a similarly situated comparator," *id.* at 89:25–90:1–3. Quoting *Eisenberg*, we explained that "[c]lass of one equal protection claims generally require plaintiffs to identify comparators in the pleading in order to show intentional, discriminatory treatment different from others similarly situated." *Id.* at 90:21–24. And, we continued, "[c]ourts in our circuit have consistently dismissed 'class of one' claims like this one where, as here, the complaint identifies no similarly situated comparator— or where it fails to give enough detail in trying to allege that the comparator is similarly situated." *Id.* at 93:7–11 (citing *GJR Invs. vs. Cnty. of Escambia, Fla.*, 132 F.3d 1359, 1367–68 (11th Cir. 1998), *overruled in part on other grounds by Randall v. Scott*, 610 F.3d 701, 709 (11th Cir. 2010)). We therefore concluded that the Plaintiffs had "failed to plead a viable 'class of one' claim" because (in their initial Complaint) they didn't "identify for us any comparators by name or address, and they don't give us any details about the circumstances of the alleged unequal treatment." *Id.* at 91:19, 92:7–9.

The Plaintiffs have now fixed that deficiency. Throughout the Amended Complaint (and in multiple addenda), the Plaintiffs now identify "six comparative contexts" and multiple "similarly-situated comparators within each context." Response at 21. For example, the Plaintiffs allege that their restaurant, Taquerias, was the only business with purported "life safety issues" to be shut down by the City's zoning administrator, while other businesses with purported "life safety" and "fire safety" issues were allowed to continue operating. In their words:

> Taquerias was . . . shut down . . . in September 2021 under a claim by Zoning of a "life safety issue" in connection with the location of an outdoor staircase which had been in place during every inspection, including [the Fire Department's] inspection on February 14, 2019, after which it confirmed there were no life safety issues or concerns . . . .

> [T]hree businesses in Little Havana—one block away from Ball & Chain and on the same Calle Ocho as Taquerias—[ ] had their CUs revoked on December 20, 2021 for "life safety issues," i.e., unsafe structures under 2-211(b)(7). But, they continue to operate in violation of the law and without action by the City to shut them down, despite the City having knowledge of them, doing so:

> a. Sabor Borinqueno, 1644 SW 8 Street—restaurant cited for life/safety issues, including electrical work without a permit;
> b. Oriental Chinese Restaurant D/B/A Sala'o Cuban Restaurant, 1642 SW 8 Street—restaurant cited and adjudicated for electrical work without a permit and also had life safety concerns. Instead of closing the business down, Sala'o was given 90 days to comply after the Board found them guilty; and
> c. Latin Art Core, Inc., 1646/1648 SW 8 Street—cited for life/safety issues, including electrical work without a permit . . . .

> [T]hese 3 businesses, two of whom are restaurants like Ball & Chain, and all of which are on the same street, remain open without a CU, and Ball & Chain remains closed by the City under the exact same circumstances.

Amended Complaint ¶¶ 62, 97.

The Plaintiffs also claim that the City prevented Taquerias from obtaining an Outdoor Dining Warrant because of the restaurant's proximity to a religious establishment, even though the City allowed similarly situated businesses—also within three-hundred feet of a religious facility—to continue selling alcohol:

The City's vendetta against Taquerias has also become clear in relation to Taquerias' efforts to pursue an Outdoor Dining Warrant. Taquerias engaged counsel to obtain an Outdoor Dining Warrant pursuant to Article 6.3 of Miami 21 to allow Taquerias to operate as an Alcohol Service Establishment. The outdoor dining is an extension of its Restaurant use subject to the 4COP SFS license. Restaurant use is exempt from the distance requirements found in Section 4 of the City Code. Nonetheless, the City has placed a hold on the Outdoor Dining Warrant, claiming that it is reviewing the separation between Taquerias and an alleged "religious facility," despite that this has absolutely no bearing on the City's review of the Outdoor Dining Warrant. Accordingly, the City placed a hold on the Outdoor Dining Warrant citing a certain "religious facility" allegedly within 300-feet at 476 SW 8th Street, called "Ministerio de Juan 3:16" ("Ministerio de Juan").

However, Ministerio de Juan shares a wall with and is in the same building as local liquor store "El Gato Tuerto," located at 476 SW 8th Street. As with Taquerias, the CU for Ministerio de Juan predates El Gato Tuerto's CU and permit to operate as a liquor store. This is also the case for thirteen (13) other 4COP licensed establishments operating within 300 ft. of a "religious facility." *See* Comparators at Addendum F.[4] In other words, the City had no issue allowing a liquor store to operate next to Ministerio de Juan, or any of the additional 4COP licensed establishments to operate next to other "religious facilities," but revoked Taquerias' liquor reservation on the specious basis that it needs to review its "compliance with the 300' distance separation from a Religious Facility." The City's decision to treat Taquerias differently from El Gato Tuerto (a business located immediately adjacent to Ministerio de Juan) and the other thirteen (13) 4COP licensed establishments (*see* Addendum F)—all similarly situated businesses in the same immediate location as Taquerias also selling liquor to customers—has caused Taquerias damages.

*Id.* ¶¶ 149–50.

Finally, the Plaintiffs allege that Ball & Chain was treated differently than similarly situated businesses with respect to the "alcohol warrant process":

Ball & Chain was required to go through a time-consuming and costly alcohol warrant process. The City forced Ball & Chain to jump through hoops to obtain a warrant not only to delay Ball & Chain's permits, but also because a separate warrant process would require that Ball & Chain meet more stringent requirements related to noise complaints, which . . . has been a key part of the City's plan to shut down Plaintiffs. All the while, Ball & Chain's competitors have been given concession after concession from the City. Cubaocho is located at 1465 SW 8 St; is engaged in the same business use as Ball & Chain; also has a 4COP license like Ball & Chain's (though it looks to be inactive, which raises the question as to how the City is allowing CubaOcho to continue serving alcohol); has the same alcohol warrant as Ball & Chain; and also has

---

[4] *See* Addendum F to the Amended Complaint [ECF No. 212-6] at 2 (identifying thirteen comparators within three-hundred feet of a religious establishment).

> an outdoor patio serving food and alcohol. Cubaocho is thus identical to Ball & Chain
> in all respects relevant to compliance with the service of alcoholic beverages yet was
> treated differently.

*Id.* ¶ 75 n.3.

Remember, for a plaintiff to state a class-of-one claim, he must allege that he was intentionally treated differently than "at least one" similarly situated comparator—and that there was no rational basis for the difference in treatment. *See Eisenberg*, 1 F. Supp. 3d at 1342. As we've shown, the Plaintiffs have identified multiple alleged comparators. Beyond identifying these comparators by name and address, the Plaintiffs have also explained how at least some of these comparators were similarly situated to the Plaintiffs' businesses. *See, e.g.*, Amended Complaint ¶ 75 n.3 ("Cubaocho is located at 1465 SW 8 St [next-door to Ball & Chain]; is engaged in the same business use as Ball & Chain; also has a 4COP license like Ball & Chain's[;] has the same alcohol warrant as Ball & Chain; and also has an outdoor patio serving food and alcohol. Cubaocho is thus identical to Ball & Chain in all respects relevant to compliance with the service of alcoholic beverages yet was treated differently."); *see also id.* ¶ 150 (describing how, like Taquerias, El Gato Tuerto is located within 300 feet of the religious establishment "Ministerio de Juan," also has a 4COP license, also received a CU after Ministerio de Juan received a CU, and "also sell[s] liquor to customers"). The Plaintiffs also allege that the City's disparate treatment of the two businesses had no rational basis:

> [W]hile the City refused to extend Ball & Chain's liquor license to its outdoor space
> via an administrative decision, it previously approved Ball & Chain's competitor and
> next-door neighbor Cubaocho's request to extend its alcohol warrant through the
> exact same minor modification process that Ball & Chain requested, but was unfairly
> denied by the City. Instead, Ball & Chain was required to go through a time-consuming
> and costly alcohol warrant process. The City forced Ball & Chain to jump through
> hoops to obtain a warrant not only to delay Ball & Chain's permits, but also because a
> separate warrant process would require that Ball & Chain meet more stringent
> requirements related to noise complaints, which . . . has been a key part of the City's
> plan to shut down Plaintiffs.

*See id.* ¶ 75 n.3; *see also id.* ¶¶ 149–50 (alleging that the City's treatment of Taquerias, in contrast to its treatment of "other 4COP licensed establishments operating within 300 ft. of a religious facility," was

justified "on [a] specious basis," was driven by political "vendetta," and had "absolutely no bearing on the City's review of the Outdoor Dining Warrant").[5]

Federal courts have consistently found similar allegations sufficient to state a claim for relief under a "class of one" theory. *See, e.g.*, *Vill. of Willowbrook v. Olech*, 528 U.S. 562, 563–65 (2000) (per curiam) (affirming circuit court's holding that the plaintiff "sufficiently alleged" a "class of one" claim where the plaintiff's "complaint can fairly be construed as alleging that the Village intentionally demanded a 33-foot easement as a condition of connecting her property to the municipal water supply where the Village required only a 15-foot easement from other similarly situated property owners" and "that the Village's demand was 'irrational and wholly arbitrary'"); *Geinosky v. City of Chicago*, 675 F.3d 743, 748 (7th Cir. 2012) ("Geinosky's general allegation that defendants 'intentionally treated plaintiff differently than others similarly situated' is sufficient here, where the alleged facts so clearly suggest harassment by public officials that has no conceivable legitimate purpose. To require more would elevate form over substance. Geinosky's complaint states a class-of-one claim in light of the pattern of unjustified harassment he has alleged.").

We therefore **DENY** the City's Motion to Dismiss Count V.

### III.      Count VI: Unreasonable Search and Seizure

In Count VI of the Amended Complaint, the Plaintiffs allege that "the City's searches and seizures of Taquerias' and Ball & Chain's establishments were unreasonable, pretextual, . . . and have been so random and unpredictable to eliminate reasonable procedures and expectations, thereby violating Taquerias' and Ball & Chain's constitutionally protected rights to be secure in their persons

---

[5] *See also id.* ¶ 46 ("City officials and personnel admit that the only reason for the City to target Plaintiffs' properties and establishments was because of their related ownership; that that reason was pretextual and arbitrary, related only to political vendetta and animus; and that there was no independent rational basis (such as cause to believe that the businesses had any violations at all, or violations in excess of or different than other like properties and establishments) for the City to target these properties and establishments.").

and property." Amended Complaint ¶ 304. In its Motion to Dismiss, the City says that the "Plaintiffs fail to plead a reasonable expectation of privacy *by the landlords* for their Fourth Amendment Claim at Count VI . . . . While the Court previously deemed this claim a 'close call' as to Ball & Chain and Taquerias, it expressly allowed the City to renew its Motion to Dismiss as to Little Havana Arts Building, LLC and La Gran Fiesta, LLC ('Landlord Plaintiffs'). And, *as to them*, Plaintiffs have failed to state a plausible claim for relief." Motion to Dismiss at 25 (emphasis added).

But the Plaintiffs haven't asserted a Fourth Amendment claim on behalf of the so-called "Landlord Plaintiffs" (Little Havana Arts Building, LLC, and La Gran Fiesta, LLC) in their Amended Complaint. On the contrary, their "Fourth Amendment Claim is only brought on behalf of Plaintiffs Taquerias and Ball & Chain." Response at 28; *see also* Amended Complaint ¶¶ 299, 304:

> [A]s described herein, the City violated Taquerias' and Ball & Chain's rights to be secure in their persons and property by trespassing on and/or searching Taquerias' and Ball & Chain's establishments absent a warrant, per se, because the City's searches as part of its Dry Hour operations did not have as their primary (or even indirect) purpose the enforcement of Florida's Beverage Law or any regulatory regime in respect of a pervasively regulated industry . . . .

> Further . . . the City's searches and seizures of Taquerias' and Ball & Chain's establishments were unreasonable, pretextual, not designed to support and unnecessary for the furtherance of the relevant administrate [sic] scheme or purpose[.]

The City appears to have misunderstood the Plaintiffs' claim in Count VI. The Motion to Dismiss Count VI of the Amended Complaint is, therefore, **DENIED**.[6]

---

[6] Since the City has only "renew[ed] its Motion to Dismiss as to Little Havana Arts Building, LLC and La Gran Fiesta, LLC," Motion to Dismiss at 25—and because it has only argued that "Count VI should be dismissed with prejudice as to them," *id.* at 27—the City has forfeited (at least for now) any other arguments it might have advanced as to Count VI, *see Hamilton v. Southland Christian Sch., Inc.*, 680 F.3d 1316, 1319 (11th Cir. 2012) ("[T]he failure to make arguments and cite authorities in support of an issue waives it."); *In re Egidi*, 571 F.3d 1156, 1163 (11th Cir. 2009) ("Arguments not properly presented . . . are deemed waived.").

IV.      **Count VII: Violation of the City Charter**

In Count VII, the Plaintiffs allege that the City violated the City of Miami Charter (the "City Charter"). The Plaintiffs "plead this claim largely in the alternative to their substantive due process claims." Amended Complaint ¶ 307. As we've discussed, the Plaintiffs argue in Counts I and II that "the February 2019 communications and directives by the City Attorney . . . to . . . specifically target and ultimately shut exclusively Plaintiffs' businesses" were a "reification of the City Commission's policy adopted by formal legislative act in and by the Commission Resolution R-19-0072." *Ibid.* "In the alternative," the Plaintiffs contend, "if actions by the City Attorney and Commissioner Carollo were taken outside formal policy set by the City through the Commission and/or outside the direction of the City Manager, then . . . those actions violated the City Charter, which the City intended and knowingly allowed, such that the City violated the City Charter's requirement that the City abide by its own Charter." *Ibid.*

According to the Plaintiffs, "[t]he Charter, at Section 15, provides that '[t]he city manager shall be responsible for the administration of all units of the city government under the city manager's jurisdiction, and for carrying out policies adopted by the city commission.' No other officer or employee of the City may direct administration of the City, carry out City policy, or control any unit of the City government." *Id.* ¶ 311. "Commissioner Carollo," they add, "directed, requested and took part in the removal of persons employed by the City Manager and interfered with the City Manager's ability to exercise his own judgment in the appointment of employees in the administrative service. Commissioner Carollo directly, and th[r]ough the City Attorney, gave orders and directed staff to undertake unlawful inspections, investigate, issue citations and, ultimately shutdown Plaintiffs' businesses. Indeed, Commissioner Carollo repeatedly ordered Code Enforcement, Police, Building, and Fire Department directors, officers and employees to undertake drive-alongs and walk-alongs with him so that he could point out 'problems' with Plaintiffs' businesses that he demanded be cited

and ordered them to proactively find problems with Plaintiffs' businesses in an effort to shut them down." *Id.* ¶¶ 312–13. As to the City Attorney, the Plaintiffs argue that she exceeded the scope of her authority under the Charter when she "ordered City Staff to undertake unlawful inspections, investigate, issue citations and, ultimately shutdown [sic] Plaintiffs' businesses." *Id.* ¶ 314; *see also id.* ¶¶ 55–56 (alleging that the City Attorney directed "every department in the City" to target "Fuller-affiliated properties" via "new site inspections" and "various violations and citations").

Before we move onto the City's new arguments for dismissal, we must address the fact that, at our September 20th Motion Hearing, we dismissed this claim *without prejudice* on the ground that, "under Florida law, the exclusive remedy for a violation of the Miami City Charter is suit for equitable relief in state court. The City Charter," we said, "does grant City residents standing to 'bring legal actions to enforce the City Charter, but such actions shall be filed in Miami-Dade County Circuit Court pursuant to its general equity jurisdiction.' . . . . [T]he City Code, therefore, doesn't give the Plaintiffs a remedy anywhere else." Hearing Tr. at 106:10–18 (quoting Section (C) of the City Charter, Citizens' Bill of Rights).

The Plaintiffs now insist that we got this part of our first order wrong because "the City Charter cannot vest mandatory, exclusive jurisdiction to adjudicate a claim for equitable relief in state court . . . . Only Congress, not a state legislature, can constitutionally divest a federal court of its subject matter jurisdiction." Response at 29 (quoting *Webb v. Tom Brown, Inc.*, 807 F.2d 783, 784 (9th Cir. 1987)). And that seems right. We cannot read the City Charter's exclusivity provision as divesting us of our congressionally-bestowed subject-matter jurisdiction.[7] As a threshold matter, we've already

---

[7] As the Supreme Court has explained:

> [D]istrict courts of the United States . . . are courts of limited jurisdiction. They possess only that power authorized by Constitution and statute . . . . Although the district courts may not exercise jurisdiction absent a statutory basis, it is well established—in certain classes of cases—that, once a court has original jurisdiction over some claims

determined that we have "supplemental jurisdiction over this claim," Hearing Tr. at 106:9, and the

City doesn't contest this finding in its renewed Motion to Dismiss, *see* Motion to Dismiss at 28–31

(arguing that Count VII should be dismissed because (1) "this court has already rejected Plaintiffs'

claim," (2) "Plaintiffs are artificial entities, not 'residents of the City,'" (3) "Plaintiffs cannot recover

damages for alleged code violations," and (4) "the City Attorney answers directly to the

Commission[.]").[8]

And, because we have supplemental jurisdiction over this claim, we cannot interpret the City

Charter in a way that would prohibit us from exercising that jurisdiction. As the Sixth Circuit reasoned

in a similar case:

> Davet next argues that the district court lacked jurisdiction to consider the city's
> counterclaim. In doing so, however, he does not dispute that the district court properly
> obtained [supplemental jurisdiction over the counterclaims] . . . . Davet argues that the
> district court nonetheless lacked power to review the city's counterclaims. As he sees
> it, Ohio law grants "exclusive jurisdiction over civil actions to enforce Cleveland
> building and housing codes" to the "Housing Division of the Cleveland Municipal
> Court," and a federal district court assuredly does not satisfy this requirement . . . .
>
> [W]e think that Davet misreads Ohio law.
> . . . .
>
> But even if that were not the case, we would still construe the law not to bar federal
> jurisdiction in this instance. If accepted, Davet's construction of § 1901.181(A)—

---

in the action, it may exercise supplemental jurisdiction over additional claims that are
part of the same case or controversy. The leading modern case for this principle is
[*Mine Workers v. Gibbs*, 383 U.S. 715 (1966)]. In *Gibbs*, the plaintiff alleged the
defendant's conduct violated both federal and state law. The District Court, *Gibbs* held,
had original jurisdiction over the action based on the federal claims. *Gibbs* confirmed
that the District Court had the additional power (though not the obligation) to exercise
supplemental jurisdiction over related state claims that arose from the same Article III
case or controversy.

*Exxon Mobil Corp. v. Allapattah Servs., Inc.*, 545 U.S. 546, 552–53 (2005) (cleaned up).

[8] Nor could the City have contested our supplemental jurisdiction over the claim, given the shared
"nucleus of operative fact," *Gibbs*, 383 U.S. at 725, between Count VII and the Plaintiffs' constitutional
claims, *compare* Amended Complaint ¶¶ 248–305 (laying out the allegedly unlawful actions taken by
City Commissioners, the City Attorney's Office, and other City officials in the context of Counts I–
VI), *with id.* ¶¶ 306–320 (describing those same actions in the context of Count VII).

under which only the Housing Division of the Cleveland Municipal Court possessed jurisdiction to hear the city's state-law counterclaim—would present a square conflict between the requirements of § 1901.181(A) and 28 U.S.C. § 1367(a), which gives district courts "supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy." That conflict is traditionally resolved in favor of the federal legislation under the Supremacy Clause. U.S. Const. art. VI, cl. 2; *see Marshall v. Marshall*, [547 U.S. 293] (2006) (holding that despite purporting to grant exclusive jurisdiction to specialized state probate courts over certain matters, state legislation may not divest a federal court of jurisdiction over a probate-related dispute); . . . . *Markham v. City of Newport News*, 292 F.2d 711, 713 (4th Cir. 1961) ("In determining its own jurisdiction, a District Court of the United States must look to the sources of its power and not to acts of states which have no power to enlarge or to contract the federal jurisdiction."); 17 Charles Alan Wright, Arthur R. Miller & Edward H. Cooper, Federal Practice and Procedure, § 4211 (2d ed. 2005) ("A state cannot defeat federal jurisdiction of a matter judicial in nature by confining jurisdiction to a specialized state court . . .").

*Davet v. City of Cleveland*, 456 F.3d 549, 553–54 (6th Cir. 2006). And the Sixth Circuit isn't alone. As the

Eighth Circuit has explained:

> The district court held that it had no jurisdiction to decide the pendent state law claim because the Teacher Fair Dismissal Act provides that "[t]he exclusive remedy for any person aggrieved by the decision of the school board shall be appealed [an appeal] therefrom to the circuit court of the county in which the school district is located . . ." Ark. Stat. Ann. § 80–1264.9(b) . . . .

> The right to assert jurisdiction over state claims through the doctrine of pendent jurisdiction is a law of the United States, and, as such, under the supremacy clause of the Constitution, Article VI, this law has precedence over any contrary state law. Once a district court has determined that under the laws of the United States it may assert pendent jurisdiction, any contrary state law which would deny that jurisdiction is ineffective. *Wojciechowski v. Harriman*, 607 F. Supp. 631, 634–35 (D.N.M. 1985) (pendent jurisdiction is derived from the Constitution; therefore the supremacy clause prohibits a state from restricting a federal court's pendent jurisdiction); *Gruss v. Curtis Publishing Co.*, 361 F. Supp. 58, 59 (S.D.N.Y. 1973) (district court denied motion to dismiss pendent claim which argued that the federal court had no jurisdiction over the claim because state statute which created the right designated that exclusive jurisdiction was in the state court), *later judgment on the merits was reversed in* 534 F.2d 1396 (2d Cir.) . . . .

> To allow a state legislature to limit the pendent jurisdiction of the federal courts would in many cases defeat the purpose of pendent jurisdiction; expediency, efficiency, and fairness to the parties[.]

*Thompkins v. Stuttgart Sch. Dist. # 22*, 787 F.2d 439, 441–42 (8th Cir. 1986).

Because we cannot construe the City Charter as precluding us from exercising our supplemental jurisdiction over Count VII, we'll address the City's three other arguments for dismissal.

*First*, the City contends that the "Plaintiffs lack standing as limited liability companies to invoke the Citizens' Bill of Rights in the City Charter. Section (C) confers standing only on 'Residents of the City,' allowing them to bring legal actions in Miami-Dade County Circuit Court to enforce the City Charter and Citizens' Bill of Rights. City of Miami Charter, Citizens' Bill of Rights (C). Nowhere does the Citizens' Bill of Rights refer to corporate entities, however, instead using the terms 'persons,' 'citizens', 'residents' and 'individuals' interchangeably." Motion to Dismiss at 28. Unfortunately for the City, Florida courts—including the Florida Supreme Court—have already rejected this very same argument. *See* Corrected Order on Mot. to Dismiss, *Cuesta v. City of Miami*, Case No. 2020-006298-CA-01 (Fla. 11th Jud. Cir. 2020) (Hanzman, J.), ECF No. 53 at 16 ("In November 2016 the voters approved a provision to be added to the City Charter which provides: '**Residents** of the City shall have standing to bring legal actions to enforce the City Charter, the Citizens' Bill of Rights, and the Miami-Dade County Citizens' Bill of Rights as applied to the City.' . . . . [I]n the absence of any contrary appellate precedent, the Court finds that 'Residents' include both natural persons and legally organized juridical entities whose principal place of business is within the City limits."); *In re Advisory Op. to Governor*, 243 So. 2d 573, 579 (Fla. 1971) (holding that the terms "residents" and "citizens," when used by the Florida Legislature, "have been held more often than not to apply to corporations as well as to natural persons"); *In Fla. Wildlife Fed'n v. State Dep't of Env't Regul.*, 390 So. 2d 64, 68 (Fla. 1980) ("[M]ost courts which have considered the question have concluded that corporations are citizens for the purpose of pursuing rights granted to citizens"). Given Florida courts' clear holding that the term "Residents" in the City Charter includes corporate entities whose principal place of business is within a city's limits, *see Cuesta*, ECF No. 53 at 16, we reject the City's argument that "Count VII should be

dismissed because Plaintiffs lack standing as limited liability companies to invoke the Citizens' Bill of Rights in the City Charter," Motion to Dismiss at 28.

*Second*, the City argues that the "Plaintiffs cannot recover damages for alleged Code violations"—as opposed to violations of the City Charter. *See id.* at 30. "While Plaintiffs no longer allege violations of the City Code in the Amended Complaint," the City adds, "their *ad damnum* clause still asks this Court to enjoin the City from 'violating the Code and Charter.'" *Ibid.* The Plaintiffs respond that "the City is obviously required to abide by its own Code, [so] the Court can as necessary enjoin it to do so as relief in this case." Response at 32. "But," they continue, "to avoid confusion on what amounts to an irrelevant distinction, Plaintiffs can withdraw the phrase 'the Code' to its wherefore clause seeking injunctive relief against the City 'for violating the Code and Charter' . . . to be consistent with the terms used in Section C of the Citizens' Bill of Rights." *Ibid.* Since the parties seem to agree on this issue, we **STRIKE** the phrase "the Code" from paragraph 320 of the Amended Complaint.

*Third*, the City insists that "Count VII fails on its merits as to the City Attorney." Motion to Dismiss at 31. In response to the Plaintiffs' claim that no officer of the City other than the City Manager "may direct administration of the City, carry out City policy, or control any unit of the City government," Amended Complaint ¶ 311, the City argues that "nothing in Section 15 regarding the powers of the City Manager addresses or not the authority of the City Attorney . . . . [B]y design, the City Attorney is empowered to communicate with all city officials directly, without having to go through the City Manager . . . . Therefore, to the extent Count VII is predicated on actions of the City Attorney, it fails to state a claim and should be dismissed," Motion to Dismiss at 31.

Section 15 of the City Charter thus doesn't *specifically* address the authority of the City Attorney. *See* Section 15 of the City Charter ("The city manager shall be responsible for the administration of all units of the city government under the city manager's jurisdiction, and for carrying out policies

adopted by the city commission."). In the Plaintiffs' view, however, Section 15 makes the City Manager "*alone responsible* for the administration of all units of the City government under his jurisdiction" and makes clear that "[n]o one else, *including the City Attorney*, can direct City administrative staff." Response at 32 (emphasis added). As we've said, the Plaintiffs allege that the "City Attorney independently, and at the behest of Commissioner Carollo ordered City Staff to undertake unlawful inspections, investigate, issue citations and, ultimately shutdown Plaintiffs' businesses," in violation of the City Charter. Amended Complaint ¶ 314. Having reviewed Section 15 of the City Charter, we cannot agree that the Plaintiffs' reading is, at this pleading stage of the case, implausible. So, we'll **DENY** the Motion to Dismiss Count VII. But we'll invite the City to re-raise this argument—that the Plaintiffs have misinterpreted Section 15 of the City Charter—at summary judgment.

## V.        Injunctive Relief

Finally, the City argues that the "Plaintiffs' requests for injunctive relief in Counts I–VII are legally unsupportable" because the "Plaintiffs' requests for prospective injunctive relief are remote, speculative, and unsupported by plausible allegations"—and because the "Plaintiffs cannot obtain injunctive relief for past acts[.]" Motion to Dismiss at 31–32, 34. The City also maintains that the "Plaintiffs' requested mandatory injunction is an inappropriate remedy[.]" *Id.* at 33. We disagree.

As a threshold matter, we reject the Plaintiffs' view that the City has waived its challenges to the Plaintiffs' demands for injunctive relief. *See* Response at 33 n.10 (noting that "the City failed to raise these arguments in its first motion to dismiss, despite Plaintiffs identically requesting all forms of injunctive relief in its [sic] original complaint"). In support of this argument, the Plaintiffs cite Rule 12(g)(2) of the Federal Rules of Civil Procedure, which "limits the defenses that can be raised for the first time in a second or successive motion to dismiss under Rule 12." *Brooks v. Powell*, 706 F. App'x 965, 968 (11th Cir. 2017); *see also* FED. R. CIV. P. 12(g)(2) ("Except as provided in Rule 12(h)(2) or (3), a party that makes a motion under this rule must not make another motion under this rule raising a

defense or objection that was available to the party but omitted from its earlier motion."). "In other words, unless one of the specified exceptions applies, a party cannot raise a defense in a second Rule 12 motion that it failed to raise in its first Rule 12 motion." *Brooks*, 706 F. App'x at 968.

But Rule 12(h)(3) "exempts from waiver or forfeiture motions to dismiss for lack of subject-matter jurisdiction." *Id.* at 969 (citing FED. R. CIV. P. 12(h)(3)). And, since the City's "new" challenges to the Plaintiffs' requests for injunctive relief are jurisdictional—*i.e.*, they attack the Plaintiffs' *standing* to assert prospective claims, *see* Motion to Dismiss at 26—Rule 12(h)(3) is clear that the City hasn't waived these arguments, *cf. Gause v. Med. Bus. Consultants, Inc.*, 424 F. Supp. 3d 1175, 1189 (M.D. Fla. 2019) (Kovachevich, J.) ("Where any element [of Article III standing] is missing, the plaintiff lacks standing to sue, and the district court, as a result, lacks subject matter jurisdiction over the plaintiff's claims.").

Still, we reject the City's claim that the "Amended Complaint does not plausibly allege . . . that Plaintiffs are likely to suffer the same alleged constitutional violations they say have previously taken place." Motion to Dismiss at 32; *see also id.* at 34 ("[A] plaintiff seeking declaratory or injunctive relief must allege and ultimately prove a real and immediate—as opposed to a merely hypothetical or conjectural—threat of future injury . . . . Yet Plaintiffs fail to do so here, primarily complaining about 'February 2019 communications and directives.'" (cleaned up)). In the second paragraph of their Amended Complaint, after all, the Plaintiffs allege that the City is *currently* engaged in a "relentless effort against Plaintiffs designed to run them and their businesses out of town." Amended Complaint ¶ 2. And the Plaintiffs repeatedly make similar allegations of ongoing harm throughout their Amended Complaint. *See, e.g., id.* ¶ 23 ("The City *continues* to harass Ball & Chain, by, among other things, moving the goalposts with eleventh hour requests and re-reviews by all department disciplines, to ensure that one of Ball & Chain's greatest sources of revenue, its patio, *remains* closed." (emphases added)); *id.* ¶ 75 ("The City *continues* to implement its plan and policy against Plaintiffs, and, accordingly, Plaintiffs

reserve their right to amend their complaint and/or present the continued and unrelenting harassment by the City against Plaintiffs to the jury[.]" (emphasis added)); *id.* ¶ 77 ("Since the City unjustifiably shut down Ball & Chain, it has been working diligently to reopen the premises but the City *continues* to make unreasonable and new demands and requests preventing the business from opening." (emphasis added)). These allegations belie the City's contention that the Plaintiffs haven't "show[n] some likelihood that, but for the Court's intervention, [they] will be subjected to the same unlawful—and injurious—course of conduct in the future." Motion to Dismiss at 32.

The Amended Complaint also includes an entire section "document[ing] the City's unending targeting and harassment *since the filing* of the original complaint in September 2021." Response at 34 (emphasis added); *see also* Amended Complaint ¶¶ 222–23:

> Plaintiffs filed their original complaint in this lawsuit on September 30, 2021. Undeterred, the City has not only continued, but actually ramped up its unlawful conduct against Plaintiffs thereafter, as well as tried to whitewash their targeting of Plaintiffs by pretending to ramp up enforcement against other businesses to avoid the appearance of impropriety or targeting.

> Specifically, the City continued engaging in a series of unprecedented continuous raids (sometimes daily) in a show of force by a variety of disciplines intended solely to intimidate and harass Ball & Chain. For example: . . . .

> On or about November 5, 2021, Building Inspector Elmer Rodriguez entered Plaintiffs' closed property without warrant or permission. Plaintiff employee, Darius Green, requested Mr. Rodriguez not enter again the private property without consent. When Plaintiffs questioned who sent him, he refused to provide additional details aside from just stating his "supervisor." Plaintiffs provided Mr. Rodriguez a copy of a warrant letter indicating that Plaintiffs do not give permission for Mr. Rodriguez, or any other City official, to be on the property.

> On or about November 8, 2021, around 8:00 pm, three (3) marked police cars parked in front of the Ball & Chain property and proceeded to conduct surveillance on the business. Once Plaintiffs' employees began filming the police cars, all three immediately left the property . . . .

> On or about November 21, 2021, an Inspector from the Fire Department arrived at Ball & Chain to take a decibel reading with a measuring wheel instrument. He was then joined by five (5) members of the Police Department, including Commander Chin-Quee, who also joined on the decibel reading with a measuring wheel instrument.

Commander Chin-Quee accosted Plaintiffs' employees and called them disrespectful and argumentative simply for respectfully asking questions regarding the nature of the City's visit, and defending the business, as it was clear no noise violation should issue. Nevertheless, the Police issued a noise violation arguing the music was "audible" beyond one-hundred (100) feet. Plaintiffs' employees tested the levels themselves and confirmed no music was audible beyond one-hundred (100) feet so that the violation should not be issued. Nevertheless, the City subsequently posted a noise violation at Ball & Chain . . . .

On or about December 18, 2021, two (2) individuals from the Fire Department, including Lt. Yanez, visited Ball & Chain to conduct another "occupancy check." This was the third consecutive night where such an inspection took place at Ball & Chain. A Fire Department employee recorded something on his "Occupant Load Violation Log" and subsequently left.

To state the obvious, the Plaintiffs have—repeatedly and in great detail—alleged that the City *continues* to subject them to ongoing harm and a "real and immediate . . . rather than speculative threat of future injury." *A&M Gerber Chiropractic LLC v. GEICO Gen. Ins. Co.*, 925 F.3d 1205, 1210 (11th Cir. 2019). The Plaintiffs have thus done more than enough to establish their standing to assert their claims for prohibitory injunctive relief.

Finally, we reject the City's contention that the Plaintiffs have "failed to plausibly allege a claim for mandatory injunctive relief." Motion to Dismiss at 33. "Where the [injunctive] relief requested is mandatory, i.e., not just enjoining a party from acting but rather requiring some affirmative action, then the movant faces a particularly heavy burden of persuasion." *Winmark Corp. v. Brenoby Sports, Inc.*, 32 F. Supp. 3d 1206, 1218 (S.D. Fla. 2014) (Scola, J.). In Counts I–III, V, and VII, the Plaintiffs ask us to enter "a preliminary and permanent injunction compelling the City to issue all entitlements to permit Plaintiffs to enjoy their constitutionally protected rights[.]" Amended Complaint ¶¶ 259, 269, 279, 293, 320. The City tells us that a mandatory or affirmative injunction should only be issued "where a clear legal right has been violated, irreparable harm has been threatened, and there is a lack of an adequate remedy at law." Motion to Dismiss at 34 (quoting *Fernandez v. Bal Harbour Vill.*, 49 F. Supp. 3d 1144, 1151 (S.D. Fla. 2014) (Lenard, J.)) The City argues that, "for Count[s] I, III, V," the "Plaintiffs

do not sufficiently allege that there [is] no adequate remedy at law . . . . And, for the remaining counts, Plaintiffs make no effort to show that they have suffered an irreparable harm." *Ibid.* Again, we disagree.

Although a party seeking an affirmative permanent injunction must meet a high burden, the Plaintiffs have done enough here. Throughout their Amended Complaint, the Plaintiffs have plausibly alleged that the City repeatedly and flagrantly violated (and continues to violate) their constitutional rights. *See, e.g.*, Amended Complaint ¶ 299 ("[T]he City violated Taquerias' and Ball & Chain's [Fourth Amendment] rights to be secure in their persons and property by trespassing on and/or searching Taquerias' and Ball & Chain's establishments absent a warrant[.]"); *id.* ¶ 304 (alleging that, even if the searches did not require a warrant, "the City's searches and seizures of Taquerias' and Ball & Chain's establishments were unreasonable, pretextual, . . . and unnecessary for the furtherance of the relevant administrat[ive] scheme or purpose, and have been so random and unpredictable to eliminate reasonable procedures and expectations, thereby violating Taquerias' and Ball & Chain's constitutionally protected rights to be secure in their persons and property"); *id.* ¶¶ 273–74 ("[T]he City deprived Plaintiffs of their liberty and property interests, including by: suspending the CO, revoking the CU, closing Plaintiffs' business operations, and forcing Plaintiffs to obtain a new 'approval' which the City contends affects Plaintiffs' vesting of rights . . . . [T]he City undertook those deprivations of those protected interests without affording Plaintiffs notice and an opportunity to be heard, both prior to and after the deprivations of those protected interests."). They've also plausibly claimed that the City's actions have presented an existential threat to their businesses—some of which *still* aren't open to the public. *See id.* ¶ 23 ("[O]ne of Ball & Chain's greatest sources of revenue, its

patio, remains closed."); Response at 35 ("Through this all, Taquerias remains closed by the City.").

That's sufficient, at this stage of the case, to state a viable claim for mandatory injunctive relief.[9]

CONCLUSION

After careful review, therefore, we hereby **ORDER and ADJUDGE** that the Defendant's Motion to Dismiss [ECF No. 208] is **DENIED**.

**DONE AND ORDERED** in the Southern District of Florida on December 12, 2023.

**ROY K. ALTMAN**
**UNITED STATES DISTRICT JUDGE**

cc:    counsel of record

---

[9] Because the Plaintiffs never filed a motion for a preliminary injunction (which presumably would've applied and analyzed the familiar four-factor preliminary-injunction test)—and since this case has been pending for over two years—we disregard the Plaintiffs' request for a *preliminary* injunction.